IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

———————

PEOPLE FOR THE ETHICAL TREATMENT OF PROPERTY OWNERS,
*Plaintiff-Appellee,*

v.

UNITED STATES FISH AND WILDLIFE SERVICE, et al.,
*Federal Defendants-Appellants,*

and

FRIENDS OF ANIMALS,
*Intervenors-Defendants-Appellants.*

———————

On Appeal from the United States District Court for the District of Utah
Case No. 2:13-cv-00278-DB | Judge Dee Benson

———————

# OPENING BRIEF FOR THE U.S. FISH AND WILDLIFE SERVICE ET AL.

———————

ORAL ARGUMENT REQUESTED

———————

JOHN C. CRUDEN
*Assistant Attorney General*

DAVID C. SHILTON
MARY HOLLINGSWORTH
ANNA T. KATSELAS
*Attorneys*
U.S. Department of Justice
Environment & Natural Resources Division
P.O. Box 7415
Washington, D.C. 20044
Phone: (202) 514-2772
Fax: (202) 353-1873
Email: anna.katselas@usdoj.gov

# TABLE OF CONTENTS

**Page**

STATEMENT OF RELATED CASES……………………………………………….ix

GLOSSARY……………………………………………………………………....x

INTRODUCTION ………………………………………………………………....1

STATEMENT OF JURISDICTION …………………………………………….....1

STATEMENT OF THE ISSUE ……………………………………………….....2

STATEMENT OF THE CASE ……………………………………………………3

    I.      Introduction …………………………………………………………..3

    II.     Factual Background ………………………………………………...4

         A.     Statutory and Regulatory Background ………………………..4

         B.     The Utah Prairie Dog …………………………………..6

         C.     Conservation of the Utah Prairie Dog Pursuant to the ESA …..12

         D.     PETPO's Activities Restricted by the Section 4(d) Rule ………18

         E.     Procedural History ……………………………………………20

SUMMARY OF ARGUMENT ……………………………………………....22

ARGUMENT ……………………………………………………………………..25

    The Section 4(d) Rule Is a Valid Exercise of Congress's Power Under the
    Commerce Clause and the Necessary and Proper Clause …………………....25

    The Rule Regulates Activities that are Part of an Economic Class of Activities
    that Have a Substantial Effect on Interstate Commerce …………………….25

A.  *The ESA in general and the Section 4(d) Rule in particular are directed at commercial or economic activity* ……………………………...31

B.  *The ESA substantially affects interstate commerce, and Congress had a rational basis for including takes of intrastate species on nonfederal land in the scheme* ……………………………………...39

    1.  *The ESA protects current and future commercial or economic activity* …………………………………………..42

    2.  *The ESA restricts commercial or economic activity* ……………46

    3.  *Congress had a rational basis for including the take of intrastate endangered and threatened species in the comprehensive scheme* …………………………………....48

C.  *The ESA does not intrude on an area of traditional state authority* ……………………………………………………..50

CONCLUSION …………………………………………………………...53

STATEMENT REGARDING ORAL ARGUMENT ……………………………...I

CERTIFICATE OF COMPLIANCE ……………………………………...II

FORM CERTIFICATIONS …………...........................................................III

STATUTORY AND REGULATORY ADDENDUM………………………………

DISTRICT COURT FINDINGS AND CONCLUSIONS ………………………….

CERTIFICATE OF SERVICE ………………………………………….........

# TABLE OF AUTHORITIES

**U.S. Constitutional Provisions**

Art. I, § 8, Cl. 3 ……………..…………………………………………………… . 2, 25

Art. I, § 8, Cl. 18 ……………………………………………………………….. 2, 25

**Federal Cases**

*Ala.-Tombigbee Rivers Coal. v. Kempthorne*, 477 F.3d 1250 (11th Cir. 2007)

    ………………………………………….27, 32, 41, 42, 43, 45, 46, 48, 49, 50, 52

*Babbitt v. Sweet Home Chapter, Cmtys. for Great Ore.*, 515 U.S. 687 (1995) …………… 27

*Bennett v. Spear*, 520 U.S. 154 (1997) …………………………………………. 27

*Camps Newfound/Owatonna, Inc. v. Town of Harrison*, 520 U.S. 564 (1997) ……….. 36, 37

*Ctr. for Biological Diversity v. Norton*, 262 F.3d 1077 (10th Cir. 2001) ………………... 28

*Forest Guardians v. U.S. Fish & Wildlife Serv.*, 611 F.3d 692 (10th Cir. 2010) ………... 28

*GDF Realty Invs., Ltd. v. Norton,* 326 F.3d 622 (5th Cir. 2003)

    ………………….....…………………………………….. 27, 33, 34, 41, 46, 49, 52

*Gibbs v. Babbitt*, 214 F.3d 483 (4th Cir. 2000)

    ……...…………………….... 27, 33, 34, 36, 37, 41, 43, 44, 46, 48, 49, 50, 51, 52

*Gonzales v. Raich*, 545 U.S. 1 (2005) ………….. 21, 23, 26, 27, 29, 30, 31, 39, 40, 41, 48

*Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241 (1964) …………………….. 31

*Hodel v. Indiana*, 452 U.S. 314 (1981) …………………………………………… 42

*Hodel v. Va. Surface Mining & Reclamation Ass'n*, 452 U.S. 264 (1981) ………. 42, 46, 47

*Hughes v. Oklahoma*, 441 U.S. 322 (1979) …………………………………………... 37

*Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172 (1999) ………………... 51

*Missouri v. Holland*, 252 U.S. 416 (1920) ………………………………………… 51

*N.M. Cattle Growers Ass'n v. U.S. Fish & Wildlife Serv.*, 248 F.3d 1277 (10th Cir. 2001)

………………...………………………………………………………… .28

*NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1 (1937) …………………………… 26

*Nat'l Ass'n of Home Builders v. Babbitt*, 130 F.3d 1041 (D.C. Cir. 1997)

………………...………………………………….... 28, 32, 41, 42, 43, 44, 45, 46, 52

*Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644 (2007) ……………... 27

*Preseault v. ICC*, 494 U.S. 1 (1990) …………………………………………… 46

*Rancho Viejo, L.L.C. v. Norton*, 323 F.3d 1062 (D.C. Cir. 2003)

…………………………………………………………... 28, 30, 33, 41, 46, 47, 52

*San Luis & Delta-Mendota Water Auth. v. Salazar*, 638 F.3d 1163 (9th Cir. 2011)

………………………………………………....……27, 32, 40, 41, 42, 46, 52

*Tennessee Valley Auth. v. Hill*, 437 U.S. 153 (1978) …………………..…... 4, 27, 35, 43, 45

*United States v. Brune*, 767 F.3d 1009 (10th Cir. 2014) ……………………………... 50

*United States v. Grassie*, 237 F.3d 1199 (10th Cir. 2001) …………………………… 36, 37

*United States v. Hickman*, 179 F.3d 230 (5th Cir. 1999) *(en banc)* …………………........34

*United States v. Jeronimo-Bautista*, 425 F.3d 1266 (10th Cir. 2005) ………3, 30, 31, 39, 41

*United States v. Lopez*, 514 U.S. 549 (1995) …………………………….........20, 24, 26, 27

iv

*United States v. Morrison*, 529 U.S. 598 (2000) …………………………... 20, 24, 26, 35

*United States v. Patton*, 451 F.3d 615 (10th Cir. 2006) …………....... 3, 29, 30, 33, 35, 39

*Wyoming v. U.S. DOI*, 442 F.3d 1262 (10th Cir. 2006) ……………………………... 28

*Wyoming v. U.S. DOI*, 360 F. Supp. 2d 1214 (D. Wyo. 2005) ……………………… 28

**Federal Statutes**

Administrative Procedure Act

5 U.S.C. § 702 (2012) …………………………………………………………. 1

Controlled Substances Act

21 U.S.C. § 801 (2012) ……………………………………………………… 29

Endangered Species Act

16 U.S.C. § 1531 (2012) …………………………………………………………. 1

16 U.S.C. § 1531(a)(1) (2012) ……………………………………………... 5, 47

16 U.S.C. § 1531(a)(2), (a)(3) (2012) …………………………………………... 5

16 U.S.C. § 1531(b) (2012) …………………………………………………... 4, 25

16 U.S.C. § 1532(15) (2012) …………………………………………………... 5

16 U.S.C. § 1532(19) (2012) …………………………………………………1, 6

16 U.S.C. § 1533(d) (2012) ……………………………………………...3, 5, 6, 17, 37

16 U.S.C. § 1533(a), (f) (2012) ………………………………………………….. 17

16 U.S.C. § 1533(a)(1)(A)-(E) (2012) ………………………………………… 5

16 U.S.C. § 1538 (2012) ……………………………………………………5, 6, 37

16 U.S.C. § 1539 (2012) …………………………………………….... 6, 13, 16, 17

16 U.S.C. § 1539(j) (2012) ………………………………………………… 37


Other

28 U.S.C. § 1291 (2012) ……………………………………………………… 2

28 U.S.C. § 1331 (2012) ……………...………...……………………….... 1

28 U.S.C. § 1346(a)(2) (2012) …………………...……………………... 1

28 U.S.C. § 2201 (2012)...……………...……...…………………….... 1

28 U.S.C. § 2202 (2012) …....………………...……………………….... 1

**Federal Administrative Rules**

38 Fed. Reg. 14,678 (June 4, 1973) …………………………………….. 12

39 Fed. Reg. 1171 (Jan. 4, 1974) ……………………………………... 12

*Final Rule to Reclassify the Utah Prairie Dog as Threatened, With Special Rule To Allow*

  *Regulated Taking*, 49 Fed. Reg. 22,330-31 (May 29, 1984) ....………......…. 8, 9, 13, 14

*Final Rule to Amend Special Rule Allowing Regulated Taking of the Utah Prairie Dog*, 56 Fed.

  Reg. 27,438, 27, 439 (June 14, 1991) …………………………………….. 10, 14

*Final Rule Revising the Special Rule for the Utah Prairie Dog*, 77 Fed. Reg. 46,158 (Aug. 2, 2012)……………………………………………..................2, 3, 6, 7, 8, 9, 10, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 29, 30, 31, 33, 36, 39 39, 40, 48, 50

50 C.F.R. § 17.31 (2013) …………………………………………………..2, 6, 13

50 C.F.R. § 17.40(g) (2013) …………………………………………….. 14

50 C.F.R. § 17.40(g)(2) (2013) ……………………………………… 3, 15, 36

50 C.F.R. § 17.40(g)(3)(iii) (2013) …………………………………… 15

50 C.F.R. § 17.40(g)(3)(iv) (2013) …………………………………… 15

50 C.F.R. § 17.40(g)(4) (2013) …………………………………………….3

50 C.F.R. § 17.40(g)(4)(i) (2013) …………………………………… 16

50 C.F.R. § 17.40(g)(4)(ii)(A) (2013) …………………………….......... 16

50 C.F.R. § 17.40(g)(5) (2013) …………………………………….. 3, 16

## State Statutes

Utah Administrative Code R657-19-6 .................................................................... 2

## Federal Legislative History:

H.R. Rep. No. 93-412, at 4 (1973)……………………………………….5, 43, 44, 45, 47

S. Rep. No. 91-526, at 3, reprinted in 1969 U.S.C.C.A.N. at 1415 ……………...44, 45

S. Rep. No, 93-307, at 1, reprinted in 1973 U.S.C.C.A.N. at 2990 …………………45

**Other**

Blake Hudson, Commerce in the Commons: *A Unified Theory of Natural Capital*

    *Regulation Under the Commerce Clause*, 35 Harv. Envtl. L. Rev. 375, 426 (2011)…….35

http://wildlife.utah.gov/wildlife-news/1611-utah-prairie-dog-plan-approved.html .....2

http://www.nps.gov/brca/naturescience/mammals.htm ...............................................11

http://www.nps.gov/brca/planyourvisit/updogday.htm ...............................................11

http://www.capitolreef.org/wildlife.htm ...........................................................................11

http://scenicsouthernutah.com/dixie-national-forest .....................................................12

http://www.census.gov/prod/www/fishing.htm ............................................................12

http://ecos.fws.gov/tess_public/pub/adHocSpeciesForm.jsp ......................................25

# STATEMENT OF RELATED CASES

This appeal has been consolidated with Friends of Animals' appeal from the same district-court judgment, 10th Cir. No. 04-1451.  Aside from these consolidated appeals, the undersigned counsel is not aware of any related cases within the meaning of Rule 28.2(c)(1).

# GLOSSARY

| | |
|---|---|
| ESA | Endangered Species Act |
| FWS | U.S. Fish and Wildlife Service |
| PETPO | People for the Ethical Treatment of Property Owners |
| Section 4(d) Rule or Rule | *Final Rule Revising the Special Rule for the Utah Prairie Dog*, 77 Fed. Reg. 46,158 (Aug. 2, 2012) |

# INTRODUCTION

People for the Ethical Treatment of Property Owners, or PETPO, brought this lawsuit to challenge the constitutionality of a rule issued to conserve the Utah prairie dog, a species listed as threatened under the Endangered Species Act of 1973 (ESA or the Act), 16 U.S.C. § 1531 *et seq.* Subject to exceptions intended to reduce conflicts between property-development interests and the conservation of the species, the rule prohibits the species' "take," which means to "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19); *Final Rule Revising the Special Rule for the Utah Prairie Dog*, 77 Fed. Reg. 46,158 (Aug. 2, 2012) (the Section 4(d) Rule or the Rule). PETPO complains that some of its members' inability to freely take Utah prairie dogs on nonfederal land interferes with their use or enjoyment of such land in various respects. It contends that Utah prairie dogs, which occur only in Utah, have no commercial value, and that Congress cannot constitutionally limit their take on nonfederal land. The district court ruled in favor of PETPO. These consolidated appeals followed.

# STATEMENT OF JURISDICTION

PETPO alleged jurisdiction in the district court pursuant to 28 U.S.C. §§ 1331, 1346(a)(2), 2201, and 2202, and 5 U.S.C. § 702. Aplt. App. at 15.[1] Because two other

---

[1] "Aplt. App." refers to the Appellants' Joint Appendix, and the references are to the page numbers of that document.

laws that PETPO does not challenge imposed greater restrictions on Utah prairie dog take than the Section 4(d) Rule imposes, namely 50 C.F.R. § 17.31 (the blanket Section 4(d) Rule) and Utah Administrative Code R657-19-6, Defendants-Appellants the U.S. Fish and Wildlife Service *et al.* (FWS or the Service) and Defendant-Intervenor-Appellant Friends of Animals argued that PETPO failed to establish that a favorable decision would redress its injuries and thus the district court lacked jurisdiction.[2] The district court held that PETPO had standing and entered final judgment resolving all claims on November 6, 2014. Aplt. App. at 198-200, 209. FWS filed a timely notice of appeal on December 30, 2014. Aplt. App. at 213. This Court has jurisdiction over FWS's appeal pursuant to 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUE

The sole issue on appeal is whether the Commerce Clause, Art. I, § 8, Cl. 3, and the Necessary and Proper Clause, Art. I, § 8, Cl. 18, authorize Congress to protect the Utah prairie dog from take on nonfederal land pursuant to the Endangered Species Act. The district court ruled on this issue in its November 5, 2014 memorandum

---

[2] After the district court issued its decision, Utah revised its Utah prairie dog management plan to "remove restrictions from private property through a timely and structured process while assisting in the conservation of populations on designated federal and protected non-federal lands." *See* http://wildlife.utah.gov/wildlife-news/1611-utah-prairie-dog-plan-approved.html (explaining the action and linking to the new plan). Once the state's new plan is implemented (the effective date is not stated), state law will be less protective than the Section 4(d) Rule.

decision and order on the parties' cross-motions for summary judgment.  Aplt. App.

193-208; Docket No. 68.  This Court reviews constitutional claims *de novo*.  *United*

*States v. Patton*, 451 F.3d 615, 620 (10th Cir. 2006), *cert. denied*, 127 S.Ct. 1247 (2007);

*United States v. Jeronimo-Bautista*, 425 F.3d 1266, 1268-69 (10th Cir. 2005), *cert. denied*, 547

U.S. 1069 (2006).


## STATEMENT OF THE CASE

## I.  Introduction

In 2012, FWS revised a rule pursuant to ESA Section 4(d) to prescribe the

measures it deemed "necessary and advisable to provide for the conservation of [the

Utah prairie dog]."  16 U.S.C. § 1533(d); *Final Rule Revising the Special Rule for the Utah*

*Prairie Dog*, 77 Fed. Reg. 46,158 (Aug. 2, 2012).  The Section 4(d) Rule prohibits the

species' take except as authorized in limited circumstances where conflicts between

Utah prairie dogs and landowners have arisen.  Specifically, the Rule authorizes direct

and intentional take, subject to certain restrictions and up to a total annual limit of

10% of the species' total range-wide population, on agricultural lands and properties

within a half mile of conservation lands.  50 C.F.R. § 17.40(g)(2) and (3).  Where

certain conditions are met, the Rule further authorizes take in areas where prairie dogs

create serious human-safety hazards or disturb the sanctity of significant human

cultural or human burial sites.  *Id.* § 17.40(g)(4).  Finally, the Rule authorizes take that

is incidental to standard and otherwise lawful agricultural practices.  *Id.* § 17.40(g)(5).

PETPO is a membership organization that purports to represent "private property owners and [others] subject to overly burdensome regulations." Aplt. App. at 16. Ten PETPO members complain of harm from the 4(d) Rule, including: (1) Cedar City Corporation, which owns and operates recreational areas and a cemetery, and owns the Cedar City Regional Airport; (2) a widow and son whose husband and father, respectively, is buried in the Cedar City cemetery; (3) two farmers; and (4) five current or prospective property developers. Aplt. App. at 22-30. PETPO contends the Utah prairie dog is a purely intrastate species with no commercial value, and that "[FWS] has no authority to require PETPO's members to obtain a permit, or satisfy any other conditions, before taking the prairie dog on non-federal land." Aplt. App. at 32-33. On cross-motions for summary judgment, the district court ruled in favor of PETPO. Aplt. App. at 193-208.

## II. Factual Background

### A. Statutory and Regulatory Background

After more limited federal endangered-species laws proved inadequate, Congress enacted the ESA in 1973 "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved" and "to provide a program for the conservation of such endangered species and threatened species." 16 U.S.C. § 1531(b); *see Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 174-78 (1978) (*TVA*) (recounting history). Congress's seminal finding in the ESA is that various species of fish, wildlife, and plants in the United States "have been rendered

extinct as a consequence of economic growth and development untempered by adequate concern and conservation." 16 U.S.C. § 1531(a)(1). Congress further found that "other species . . . have been so depleted in numbers that they are in danger of or threatened with extinction," and that "these species of fish, wildlife, and plants are of esthetic, ecological, educational, historical, recreational, and scientific value to the Nation and its people." *Id.* § 1531(a)(2), (a)(3).

In *TVA*, the Supreme Court recognized that "Congress intended endangered species to be afforded the highest of priorities," and "the plain intent of Congress in enacting this statute was to halt and reverse the trend toward species extinction, whatever the cost." *Id.* at 174, 184. The legislative history reflects that Congress regarded "pollution, destruction of habitat and the pressures of trade" as the three most significant threats to species' existence. H.R. Rep. No. 93-412, at 4 (1973), *reprinted in* Senate Committee on Environment and Public Works, 97th Cong., 2d Sess., *A Legislative History of the Endangered Species Act of 1973, As Amended* 41 (1982).

To achieve the ESA's purposes, Section 4 directs the Secretary[3] to determine which species are endangered or threatened pursuant to five listing factors. 16 U.S.C. § 1533(a)(1)(A)-(E). Subject to certain exceptions, Section 9 prohibits the "take" of endangered species, a term of art which means "harass, harm, pursue, hunt, shoot,

---

[3] Congress conferred responsibility for implementing the ESA on the Secretaries of the Interior and Commerce. 16 U.S.C. § 1532(15). The Secretary of the Interior has entrusted her responsibilities to FWS, and the Secretary of Commerce to the National Marine Fisheries Service.

wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." *Id.*
§§ 1532(19), 1538.

For species listed as threatened, Section 4(d) directs the Secretary to "issue such regulations as he deems necessary and advisable" to conserve the species; such regulations "may prohibit" any act that is prohibited with respect to endangered species under Section 9. *Id.* § 1533(d). FWS has elected to extend all of Section 9's prohibitions to threatened species via a "blanket" Section 4(d) rule (the Blanket Section 4(d) Rule) which operates unless the Service issues a species-specific Section 4(d) rule. 50 C.F.R. § 17.31. Section 10 of the Act grants the Secretary additional discretion to authorize take in specified circumstances, including where it is incidental to the carrying out of an otherwise lawful activity, and the applicant has submitted a conservation plan meeting certain requirements. 16 U.S.C. § 1539(1)(B), (2). Those requirements include showings that the applicant will, to the maximum extent practicable, minimize and mitigate the impacts of the authorized take, and that the take will not appreciably reduce the likelihood of the survival and recovery of the species in the wild. *Id.* § 1539(a)(2)(B).

### B. The Utah Prairie Dog

The Utah prairie dog (*Cynomys parvidens*) is the smallest of five prairie dog species, all of which are native to North America and none of which overlaps in geographic range. Aplt. App. at 50; 77 Fed. Reg. at 46,160. Found only in southwestern and central Utah, it is the westernmost member of the genus *Cynomys*

and has the most restricted range of the four species in the United States. Aplt. App. at 47; 77 Fed. Reg. at 46,161. Historically, the Utah prairie dog's range extended much farther north. Aplt. App. at 51-53; 77 Fed. Reg. at 46,161.

Approximately 70% of the Utah prairie dog population occurs on private land. Aplt. App. at 68. The species occupies semi-arid shrub-steppe and grassland habitats and, within these, opts for swale-type formations where moist herbaceous vegetation is available. Aplt. App. at 65; 77 Fed. Reg. at 46,161. Utah prairie dogs are burrowing animals that prefer areas with deep, productive soils, the same areas preferred by agricultural producers. Aplt. App. at 68; 77 Fed. Reg. at 46,161. Agricultural crops can benefit prairie dogs by providing highly nutritious forage, which is reflected by today's high prairie dog densities on agricultural compared to non-agricultural sites. Aplt. App. at 68. As of 2012, Utah prairie dog densities were approximately twice as high at sites associated with agriculture compared to non-agricultural sites. 77 Fed. Reg. at 46,161. While it is believed that valley bottoms always supported more prairie dogs than the surrounding drier areas, today's agricultural practices probably unnaturally augmented the species' distribution and abundance in agricultural areas. *Id.*

Prairie dogs in agricultural fields have also been subject to negative impacts including unregulated lethal control efforts to protect crops, habitat fragmentation from fences and roads, and urban predators. Aplt. App. at 68. The private ownership

of agricultural lands also means that those lands not in production are at risk of being converted to urban uses. Aplt. App. at 68.

Utah prairie dogs live in social groups called clans, which consist of an adult male, several adult females, and their offspring. Aplt. App. at 63; 77 Fed. Reg. at 46,160. One or several clans may comprise a colony, a group of prairie dogs with associated mounds, burrows, and food resources within calling distance. 77 Fed. Reg. at 46,160-61. Colonies are genetically similar and vulnerable to local catastrophes such as epizootic-disease outbreaks, which can kill large numbers of animals within a few days. 77 Fed. Reg. at 46,161.

Utah prairie dog populations began to decline in the 1920s when control programs to eradicate them were launched. 77 Fed. Reg. at 46,161. All prairie dog species have been targets of such programs, which involve shooting, poisoning, drowning, and habitat destruction. Aplt. App. at 128. While the precise magnitude of the Utah prairie dog's decline is unknown, by the early 1970s the species had been eliminated from major portions of its historical range and had declined to approximately 3,300 individuals distributed among 37 colonies.[4] Aplt. App. at 51. In addition to poisoning and habitat alteration induced by agricultural and grazing activities, sylvatic plague and drought were factors in the Utah prairie dog's decline.

---

[4] The species' historical abundance has been estimated to be approximately 95,000 animals, but that figure is not based on actual surveys and may not be reliable. Aplt. App. at 51; *Final Rule To Reclassify the Utah Prairie Dog as Threatened, With Special Rule To Allow Regulated Taking* 49 Fed. Reg. 22,330-31 (May 29, 1984).

77 Fed. Reg. at 46,160. The species' population hit a low spring count of 1,866 adult animals in 1976.[5] Aplt. App. at 59.

The intensive campaigns to eradicate prairie dogs were driven primarily by ranchers who believed the animals competed with livestock for forage. Aplt. App. at 128; *Final Rule To Reclassify the Utah Prairie Dog as Threatened, With Special Rule To Allow Regulated Taking* 49 Fed. Reg. 22,330-31 (May 29, 1984). Many agricultural producers believed that Utah prairie dogs affected their operations through loss of forage, equipment damage from driving across burrows, and livestock injury caused when livestock stepped into burrows. Aplt. App. at 69. Although some of these impacts may have been site-specific or uncommon, the perceived impacts may have resulted in negative human perceptions of prairie dogs. Aplt. App. at 69.

Utah prairie dogs remain underground for four to six months each year, and mate following this period. Aplt. App. at 62. In April or May, litters of one to seven pups are born, and mothers nurse the young in the burrows. Aplt. App. at 62. The pups emerge by mid-June, when they are no longer dependent on their mothers and primarily forage on their own. Aplt. App. at 62. Population counts are highest in the summer months when both juveniles and adults are above ground; however, juvenile

---

[5] Spring counts of Utah prairie dogs typically underestimate the actual number of adult animals because only 40% to 60% of prairie dogs are above ground at any one time. Therefore, the Utah Division of Wildlife Resources implements a 50% average rate for count accuracy across the range of the Utah prairie dog. Thus, spring adult counts are multiplied by two to estimate the adult population. Aplt. App. at 54.

prairie dogs suffer high mortality rates in the fall and winter. Aplt. App. at 62; *Final Rule to Amend Special Rule Allowing Regulated Taking of the Utah Prairie Dog*, 56 Fed. Reg. 27,438, 27, 439 (June 14, 1991). Accordingly, the best available information concerning Utah prairie dog population trends is obtained from "spring counts," survey and mapping efforts conducted in April or May after the adults have emerged from the burrows but before the juveniles have done so. Aplt. App. at 54; 77 Fed. Reg. at 46,161. These counts are factored into a formula used to calculate annual population estimates.[6] Aplt. App. at 54.

Prairie dogs are "keystone" species of the western grassland ecosystem, meaning they have a disproportionately large effect relative to their abundance. Aplt. App. at 65, 128. Their foraging decreases the height and changes the species composition of vegetation, and increases landscape heterogeneity. Aplt. App. at 65, 128. Their excavations increase the mixing of topsoil and subsoil and increase the uptake of nitrogen by plants. Aplt. App. at 65, 128. Prairie dog colonies increase the biological diversity and species richness of the grassland ecosystem. Aplt. App. at 128. Animals including burrowing owls, rabbits, ground squirrels, weasels, and badgers rely on the habitat conditions created by Utah prairie dog colonies and frequently use their burrows for shelter. Aplt. App. at 65, 128. Utah prairie dogs are

---

[6] The formula FWS uses is as follows: Population Estimate = [(2 x Spring Adult Count) x 0.67 (proportion of adult females) x 4 (average number of breeding young per female) + (2 x Spring Adult Count). Aplt. App. at 54.

subject to natural predation by a number of species, including coyotes, badgers, long-tailed weasels, various raptors, and snakes, although predators probably do not exert a controlling influence on numbers of prairie dogs in established colonies. Aplt. App. at 63.

In addition to their biological value, Utah prairie dogs are studied by scientific researchers and are of interest to wildlife viewers and photographers. *See* Aplt. App. at 101-134. The species has also been featured in educational programs. Aplt. App. at 99-100 (discussing programs put on by Southern Utah University and three Cedar City elementary schools). A number of Utah parks also feature the Utah prairie dog in efforts to attract visitors. Of the 59 mammals present at Bryce Canyon National Park, only four are featured on the park's website; and one of those four is the Utah prairie dog.[7] Bryce Canyon National Park also hosts an annual Utah Prairie Dog Day to provide visitors with opportunities to "view prairie dogs in their natural habitat."[8] The Capitol Reef National Park specifically mentions the Utah prairie dog in its description of wildlife-viewing activities in southern Utah.[9] Cedar City's Tourism Bureau, which provides information on the area's recreational activities, informs visitors that the Utah prairie dog, among other interesting species, may be viewed at

---

[7] *See* http://www.nps.gov/brca/naturescience/mammals.htm (last visited Apr. 6, 2015). The websites provided in this section were provided to the district court. *See* Aplt. App. at 167-71.

[8] http://www.nps.gov/brca/planyourvisit/updogday.htm (last visited Apr. 6, 2015); *see also* Utah Prairie Dog Day – 2012, (last visited Apr. 6, 2015).

[9] *See* http://www.capitolreef.org/wildlife.html (last visited Apr. 6, 2015).

Dixie National Forest.[10]  More broadly, in an annual Utah Survey of Fishing, Hunting,

and Wildlife-Associated Recreation, approximately 178,000 nonresidents reported

observing, photographing, or feeding wildlife in Utah; 112,000 of these nonresidents

reported these activities for small land mammals, specifically including prairie dogs.[11]

### C.  Conservation of the Utah Prairie Dog Pursuant to the ESA

The Utah prairie dog was listed as endangered in 1973 under the Endangered

Species Conservation Act of 1969, one of the ESA's more-limited predecessor

statutes.  Aplt. App. 47; *Amendments to Lists of Endangered Fish and Wildlife*, 38 Fed. Reg.

14,678 (June 4, 1973).  On January 4, 1974, it was placed on the ESA's endangered-

species list.  Aplt. App. 47; 39 Fed. Reg. 1,171 (Jan. 4, 1974).  At the time of listing,

the Utah prairie dog was threatened with extinction due to habitat destruction and

modification, over-exploitation, disease, and predation.  Aplt. App. at 47.  Urban

expansion across the species' range, which resulted in permanent habitat loss as well

as habitat fragmentation, was one factor that contributed to the species' endangered

status.  Aplt. App. at 66.  Also and as noted previously, conflicts between Utah prairie

---

[10] *See* http://scenicsouthernutah.com/dixie-national-forest (last visited Apr. 6, 2015).

[11] U.S. Department of Interior, et al., 2011 National Survey of Fishing, Hunting, and
Wildlife-Associated Recreation: Utah 11, 34, available at
http://www.census.gov/prod/www/fishing.html (last visited Apr. 6, 2015).

dogs and farmers and ranchers have historically spurred wide-scale efforts to eradicate the species. Aplt. App. at 67-69.

By May 1984, Utah prairie dog populations had expanded in portions of their range, and FWS reclassified the species to threatened status with a Section 4(d) Rule which allowed limited, regulated take.[12] Aplt. App. at 47; *Final Rule to Reclassify the Utah Prairie Dog as Threatened, with Special Rule to Allow Regulated Taking*, 49 Fed. Reg. 22,330 (May 29, 1984). Under that Section 4(d) rule, up to 5,000 Utah prairie dogs could be legally taken annually between June 1 and December 31, pursuant to a permit system developed by the Utah Division of Wildlife Resources (UDWR). 49 Fed. Reg. at 22,330. The rule was geographically limited to delineated portions of Cedar and Parowan Valleys in Iron County, Utah, where 98% of prairie dogs occurred on private land where alfalfa was the major crop. *Id.* FWS concluded that the high population of prairie dogs was straining the carrying capacity of available habitat for the species in this area. Such high population densities increase the risk of sylvatic-plague outbreak. Overpopulation of prairie dogs in those valleys also resulted in significant crop losses and, in turn, a serious conflict between Utah prairie dogs and human agricultural interests. *Id.* At that time, FWS was concerned that ranchers might resort to illegal take methods, which could severely damage remaining Utah

---

[12] Absent this special Section 4(d) rule, the blanket 4(d) rule would have applied by default, under which no take would be legal without a Section 10 permit issued by FWS. *See* 50 C.F.R. § 17.31.

prairie dog populations. *Id.* Accordingly, the Service concluded that authorizing some take was the best approach to relieve the prairie dog population pressures on habitat conditions and human land uses.

In 1991, FWS amended the 1984 Section 4(d) rule to increase the annual limit on legal take to 6,000 animals, and to broaden the permissible take area to the Utah prairie dog's entire range. Aplt. App. at 47; *Final Rule to Amend Special Rule Allowing Regulated Taking of the Utah Prairie Dog*, 56 Fed. Reg. 27,438 (June 14, 1991). FWS explained in the 1991 rule that the control program successfully addressed the overpopulation problem in Cedar and Parowan Valleys, allowing more stable growth of colonies on private land and possibly reducing the chance of disease outbreaks. 56 Fed. Reg. at 27,440. The Service further noted that the program improved cooperation between farmers and conservation agencies, reducing the incentive for illegal take. *Id.* The 1991 rule also reflects UDWR's view that ranchers would not continue to tolerate substantial crop losses caused by prairie dogs. 56 Fed. Reg. at 27,439. FWS increased the annual limit and geographic range of the program because Utah prairie dogs had expanded into previously uninhabited areas, creating similar overpopulation problems and causing landowners outside Cedar and Parowan Valleys to request take permits. *Id.*

Most recently, FWS amended the Section 4(d) Rule in 2012, issuing the version that PETPO challenges here. *Final Rule Revising the Special Rule for the Utah Prairie Dog*, 77 Fed. Reg. 46,158 (Aug. 2, 2012), *codified at* 50 C.F.R. § 17.40(g). This Rule

authorizes take in four circumstances, two of which require a permit and count toward a prescribed annual take limit, and two of which require only written FWS authorization and do not count toward an annual take limit.

In the former category (take that requires a permit or counts toward a prescribed annual take limit), the Rule authorizes take between June 15 and December 31 throughout the Utah prairie dog's range on agricultural lands and properties within one-half mile of conservation lands. 50 C.F.R. § 17.40(g)(2), (3). The allowable limit of such take is 10% of the species' annual range-wide population, no more than 7% of which may occur on agricultural lands. *Id.* § 17.40(g)(3)(iii). This limit is higher than the amount of actual take that occurred under the previous Section 4(d) rules. 77 Fed. Reg. at 46,175. The allowable methods of take include translocation efforts by trained and permitted individuals under, lethal trapping and shooting. 50 C.F.R. § 17.40(g)(3)(iv). Actions intended to drown or poison Utah prairie dogs, and the use of gas cartridges, anti-coagulants, and explosive devices are prohibited. *Id.*

In the latter category (take that does not require a permit or count toward a prescribed annual take limit), the rule authorizes take that is incidental to otherwise-legal standard agricultural practices, and also authorizes take on lands where prairie dogs create serious human safety hazards or disturb the sanctity of significant human or cultural burial sites. *Id.* § 17.40(g)(2), (4), and (5).

Where prairie dogs create serious human safety hazards or disturb the sanctity of significant human cultural or human burial sites, non-lethal take, such as filling

prairie dog burrows, is authorized subject to FWS's written approval. *Id.*

§ 17.40(g)(4)(i). Direct or intentional lethal take is authorized, subject to written FWS approval, after all practicable measures to reduce the conflict, which include the construction and maintenance of a prairie-dog proof fence and translocation of remaining prairie dogs, have been implemented. *Id.* § 17.40(g)(4)(ii)(A). Where this condition is met, there are no restrictions on the amount, timing, or methods of lethal take. *Id.* § 17.40(g)(4)(ii)(A).

The agricultural-activities provision authorizes take that is incidental to activities including plowing (to a specified maximum depth), discing, harrowing, irrigating crops, mowing, harvesting, and bailing, as long as the activities are not intended to eradicate Utah prairie dogs. *Id.* § 17.40(g)(5). Such take is authorized year-round and does not require written authorization.

In addition to the Section 4(d) Rule, FWS has also authorized limited take of Utah prairie dogs in particular circumstances pursuant to ESA Section 10. For instance, FWS has issued incidental-take permits to Iron and Garfield Counties, to address conflicts between property-development interests there and the conservation of the species; over 70% of the Utah prairie dog population occurs in Iron County. Aplt. App. at 66. Iron County also has the highest human population of the species' three recovery units and that population is rapidly expanding; its projected average annual growth rate is 2.7% through 2060. Aplt. App. at 66. Before FWS issued the current Section 4(d) Rule, it had also authorized incidental take at the Cedar City

Regional Airport pursuant to ESA Section 7 and at the Cedar City golf course pursuant to ESA Section 10. Aplt. App. at 136-37. The Section 4(d) Rule's authorization of take where Utah prairie dogs create human safety hazards addresses the airport and golf-course circumstances more broadly. *See* 77 Fed. Reg. at 46,168.

FWS's decision to prohibit Utah prairie dog take except as authorized in the Section 4(d) Rule and in operative incidental-take permits reflects the Service's judgment that the prohibition is "necessary and advisable to provide for the conservation of [the] species." 16 U.S.C. § 1533(d). While Utah prairie dog populations have been stable to increasing since annual population counts began in 1976, the species' recovery will not be complete until it no longer meets the definition of a threatened species; this assessment will be informed in part by the criteria set forth in its Recovery Plan in addition to an analysis of the five listing factors.[13] *See* 16 U.S.C. § 1533(a), (f); Aplt. App. at 41, 54; *see also* 77 Fed. Reg. at 46,167. The Utah prairie dog remains vulnerable to several serious threats, including habitat loss and fragmentation, plague, changing climatic conditions, unauthorized take, and disturbance from recreational and economic land uses. Aplt. App. at 40. These threats can be reduced to two overriding concerns: (1) loss and fragmentation of

---

[13] These counts, discussed *supra* at footnote 5, show considerable annual fluctuations, ranging from a low of 1,866 in the 1976 spring count to a high of 7,527 in the 1989 spring count. Aplt. App. at 54; *see also* Aplt. App. at 56 (adult Utah prairie dog counts and trend line for all recovery units from 1976 to 2010), and Aplt. App. at 59 (adult Utah prairie dog counts by recovery unit from 1976 to 2010).

habitat; and (2) plague.  Aplt. App. at 40; *see also* 77 Fed. Reg. at 46,167 ("The species is listed as threatened primarily based on threats from development and plague").

Plague affects the Utah prairie dog range-wide, but residential and commercial development affects the species primarily on nonfederal land, where over 70% of the species' population occurs.[14]  77 Fed. Reg. at 46,167.  Recovery of the Utah prairie dog requires robust population numbers, sufficient habitat and population connectivity, and protection from the threats.  *Id.*; Aplt. App. at 41.

### D.  PETPO's Activities Restricted by the Section 4(d) Rule

Ten of PETPO's members complain of harm from the Section 4(d) Rule.  Of these, five are current or prospective property developers who complain the Rule has frustrated or prevented their property-development activities.  Bruce Hughes and Boyd Hall each assert ownership of parcels that cannot be sold or developed in an economically feasible manner due to the presence of prairie dogs.  Aplt. App. at 26-27, 29-30, 152.  Mark Bradshaw and Dave Morris each allege ownership of parcels that they would like to develop into car dealerships; they claim they have been unable to so develop the parcels or to sell them due to the presence of prairie dogs.  Aplt.

---

[14] The Recovery Plan specifically notes that, while previous recovery strategies "focused almost entirely on habitat enhancements and translocation of the animals to Federal lands . . . , [FWS] now believe[s] that increased conservation efforts on non-Federal lands (where the majority of the species' occupied habitat occurs) will be necessary to achieve recovery."  Administrative Record (AR) 2375, District Court Docket No. 49; *see also* 77 Fed. Reg. at 46,168 ("Because most of the Utah prairie dog population exists on private lands, recovery will be achieved in substantially less time if we are able to protect some of the most important colonies in these areas.").

App. at 27-28, 139.  Les Childs asserts the removal of prairie dogs from some lots within a residential subdivision he owns would be an economically infeasible means of recovering the right to build on the lots, such that they remain unsold and undeveloped; he also claims the unsold lots, prairie dog fences, and the prairie dog's presence generally cause a decline in lot values.  Aplt. App. at 28-29, 148-49.

Dean and Kathy Lamoreaux are farmers who acknowledge that many of their activities fall within the Section 4(d) Rule's agricultural exemption, but complain that prairie dog burrows damage their farming equipment, which increases the costs of their farming activities.  Aplt. App. at 25-26, 156.  Cedar City Corporation owns and operates recreational areas including a golf course, owns and operates the Cedar City Cemetery, and owns the Cedar City Regional Airport.  Aplt. App. at 22-23, 143.  It complains the Section 4(d) Rule has frustrated and increased the costs of operating each of those enterprises.  Aplt. App. at 22-23.  With respect to the golf course, Cedar City complains of increased maintenance costs, a decrease in suitability, and lost business.  Aplt. App. at 22-23, 143-44, 190-91.  With respect to the cemetery, Cedar City claims the prairie dog's presence has required increased maintenance, prevented a desired expansion, and rendered the cemetery less peaceful.  Aplt. App. at 23-24, 144.  Brenda and Daniel Webster assert prairie dogs have disturbed the gravesite of their late husband and father, respectively, and claim they are distressed by the possibility that prairie dogs will desecrate graves if they cannot be removed and kept away from

the cemetery.[15]  Aplt. App. at 24-25, 164.  Many of the foregoing PETPO members assert that they would like to remove Utah prairie dogs from the identified properties but fear prosecution by FWS for illegal take.  Aplt. App. at 140, 145, 149, 153, 157.

### E.  Procedural History

The district court decided the case on the basis of the parties' cross-motions for summary judgment.  On the issue of standing, the court held that the presence of additional barriers to PETPO's ultimate goal did not prevent the court from redressing alleged harms by removing an initial barrier.  Aplt. App. at 200.  On the Commerce Clause question, the court noted the parties' agreement that the Section 4(d) Rule could be justified under only the third category addressed in *United States v. Lopez*, 514 U.S. 549 (1995)—activities having a substantial relation to interstate commerce—and, "[a]pplying the relevant considerations as presented in [*United States v. Morrison*, 529 U.S. 598 (2000)]," held that the Commerce Clause does not authorize Congress to regulate Utah prairie dog take on nonfederal land.  Aplt. App. at 202.  It agreed with PETPO that the Rule is noneconomic because it regulates every activity that causes harm to a Utah prairie dog, regardless of the nature of the activity.  Aplt. App. at 202-03.  The court rejected as irrelevant the fact that the Rule has frustrated agricultural and commercial activities, stating that the proper focus of the substantial-effects test is the regulated activity, *i.e.*, the take of Utah prairie dogs, not the

---

[15] Brenda and Daniel Webster do not assert any property ownership.

regulation preventing the activity. Aplt. App. at 203. It acknowledged that the Utah prairie dog may have an effect on the ecosystem, but proclaimed its biological value to be inconsequential because that value does not establish that the species' take has a substantial effect on interstate commerce. Aplt. App. at 204. The court further determined the Utah prairie dog's commercial value to be too attenuated to justify the regulation. Aplt. App. at 204. On this point, the district court stated that there is no evidence that tourism in southern Utah would be negatively affected by takes of Utah prairie dogs on nonfederal land. Aplt. App. at 204. Similarly, the district court found the facts that scientific research has been done and books published on Utah prairie dogs to be too attenuated to establish a substantial relation between the species' take and interstate commerce. Aplt. App. at 204. Likewise, the court determined the possibility of future substantial effects through industries such as medicine to be too hypothetical and attenuated from the regulation to pass constitutional muster. Aplt. App. at 205.

The district court addressed the Necessary and Proper Clause separately and held that, while the ESA regulates some economic activity, the Section 4(d) Rule is not necessary to its economic scheme. Aplt. App. at 205-06. The court distinguished the case from *Gonzalez v. Raich*, 545 U.S. 1, 23 (2005), on the ground that "takes of the Utah prairie dog on non-federal land—even to the point of extinction—would not substantially affect the national market for any commodity regulated by the ESA." Aplt. App. at 206. On that basis, the court concluded that "congressional protection

of the Utah prairie dog is not necessary to the ESA's economic scheme." Aplt. App. at 207. The court declined to consider whether Utah prairie dog takes could be aggregated with takes of other "intrastate non-commercial" listed species for purposes of the analysis, finding "no reason to consider such aggregation" where PETPO was not seeking invalidation of any other regulations and there was no evidence that extinction of the Utah prairie dog would cause any other species to lose value or likewise become extinct. Aplt. App. at 206-07. The district court did not remand the rule, nor enter declaratory or injunctive relief. Instead, the court entered final judgment "in favor of the plaintiff" and found "that Congress has no authority to regulate takes of Utah prairie dogs on non federal land." Aplt. App. at 209.

## SUMMARY OF ARGUMENT

The Service's Section 4(d) Rule is a valid exercise of Congress's power under the Commerce Clause and the Necessary and Proper Clause. It is well-established that comprehensive regulatory statutes such as the ESA may be validly applied to local conduct that does not, when viewed in isolation, have a significant impact on interstate commerce. The district court misapplied the governing law, and its judgment marks a departure from a line of settled authority. The U.S. courts of appeals for the Fourth, Fifth, Ninth, Eleventh, and D.C. Circuits have all rejected constitutional challenges to the ESA similar to PETPO's challenge here.

The Section 4(d) Rule validly regulates activities that are part of an economic class of activities that have a substantial effect on interstate commerce. The Rule is entitled to a presumption of constitutionality because it is directed at commercial or economic activity. Whereas the statute at issue in *Gonzalez v. Raich*, 545 U.S. 1 (2005), prohibited possession of marijuana as a means of extinguishing a market, the ESA in general and the Section 4(d) Rule in particular limit the take of protected species as a means of conserving valuable national resources and preventing destructive interstate competition. The goals of the ESA are different than the goals of the statute at issue in *Raich*, but the activities regulated are no less economic, and the means chosen by Congress are no less rational.

Even if this Court finds that the Section 4(d) Rule is not directed at commercial or economic activity, the district court's judgment should still be reversed because there is ample evidence of the ESA's substantial effects on interstate commerce, and Congress had a rational basis for including the take of intrastate threatened and endangered species when it designed the comprehensive regulatory scheme. Conserving endangered and threatened species facilitates commerce in a number of industries, including pharmaceuticals, agriculture, aquaculture, scientific study, hunting, fishing, and tourism, because it preserves individual species and biodiversity which are important resources for these industries, either now or potentially in the future. Even if a particular species could have no independent commercial value, the interrelationships of species mean that the loss of one species can have significant

impacts on other species and interstate commerce.  The ESA also restricts commerce in a number of industries, including wildlife trade and commercial land development. Excising either intrastate endangered and threatened species or the regulation of take on nonfederal land from the ESA would open the door to piecemeal extinctions and leave a gaping whole in the scheme.  The district court erred in analyzing the Section 4(d) Rule in isolation; however, even so analyzed, the evidence of its effects on interstate commerce, including its protective effects on valuable natural resources and its restrictive effects on a number of commercial activities, shows that the link between it and interstate commerce is substantial, not attenuated.

Finally, the Section 4(d) Rule does not intrude into a traditional area of state responsibility, a fact that materially distinguishes this case from *United States v. Lopez*, 514 U.S. 549 (1995), and *United States v. Morrison*, 529 U.S. 598 (2000).  While states do have a significant role in the management of their resident wildlife, their authority over the nation's wildlife has always been shared with the federal government when the United States exercises one of its enumerated powers.  Further, the authority conferred in the ESA is not unbounded, but rather limited to the conservation of threatened and endangered species that are listed pursuant to a rigorous rulemaking progress.  The ESA acts as a floor.  Upon recovery, management responsibility is typically returned to the states.

# ARGUMENT

## The Section 4(d) Rule Is a Valid Exercise of Congress's Power Under the Commerce Clause and the Necessary and Proper Clause.

### The Rule Regulates Activities that are Part of an Economic Class of Activities that Have a Substantial Effect on Interstate Commerce.

The Endangered Species Act comprehensively provides for the conservation of endangered and threatened species and the ecosystems on which they depend. *See* 16 U.S.C. § 1531(b). Approximately 68% of listed species, including the Utah prairie dog, occur wholly within one state.[16] Central to the ESA's scheme is its protection of listed species—wherever they occur—from take. PETPO contends, and the district court held, that Congress has no power to protect the Utah prairie dog from take on nonfederal land pursuant to the ESA. PETPO and the district court are wrong.

Congress's authority lies in the Commerce Clause, Art. I, § 8, Cl. 3, which grants Congress the power to "regulate Commerce with foreign nations, and among the several States, and with the Indian Tribes," and the Necessary and Proper Clause, Art. I, § 8, Cl. 18, which further empowers Congress to "make all Laws which shall be necessary and proper for carrying into Execution" all of its other vested powers.

---

[16] *See* FWS, Environmental Conservation Online System, Generate Species List, http://ecos.fws.gov/tess_public/pub/adHocSpeciesForm.jsp (last visited Apr. 6, 2015). This figure was obtained through a manual species count.

The Commerce Clause "emerged as the Framers' response to the central problem giving rise to the Constitution itself: the absence of any federal commerce power under the Articles of Confederation." *Gonzalez v. Raich*, 545 U.S. 1, 16 (2005). The Supreme Court has construed this power expansively, *Morrison*, 529 U.S. at 608; but it does have "judicially enforceable outer limits," *Lopez*, 514 U.S. at 566; *see also NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 37 (1937) ("The scope of this power must be considered in the light of our dual system of government and may not be extended so as to embrace effects upon interstate commerce so indirect and remote that to embrace them . . . would effectually obliterate the distinction between what is national and what is local"). Specifically, Congress is empowered to adopt legislation that: (1) regulates the channels of interstate commerce; (2) regulates and protects the instrumentalities of interstate commerce, and persons or things in interstate commerce; or (3) regulates activities that substantially affect interstate commerce. *Raich*, 545 U.S. at 17 (citing *Perez*, 402 U.S. at 146).

The third category is at issue here. It extends to regulation of "purely local activities that are part of an economic 'class of activities' that have a substantial effect on interstate commerce." *Id.* (citing *Perez*, 402 U.S. at 151; *Wickard v. Filburn*, 317 U.S. 111, 128–29 (1942)). Congress may regulate purely intrastate activity on the basis of the substantial *aggregate* effect that all instances of that class of activity have on interstate commerce, even if the particular instance lacks such an effect. *See id.* ("When Congress decides that the 'total incidence' of a practice poses a threat to a

national market, it may regulate the entire class."); *id.* at 23 ("comprehensive regulatory statutes may be validly applied to local conduct that does not, when viewed in isolation, have a significant impact on interstate commerce"); *Lopez*, 514 U.S. at 558 ("where *a general regulatory statute bears a substantial relation to commerce*, the *de minimis* character of individual instances arising under that statute is of no consequence'" (quoting *Maryland v. Wirtz*, 392 U.S. 183, 196 n.27 (1968)) (emphasis in *Lopez*)).

Initially, we note the U.S. Supreme Court has repeatedly addressed the ESA, including the Act's take prohibition, and has not hinted in any decision that the Act may be unconstitutional. *See Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 661-73 (2007); *Babbitt v. Sweet Home Chapter of Communities for a Greater Oregon*, 515 U.S. 687, 708 (1995) (upholding the Secretary's interpretation of "take" as including significant habitat degradation); *Bennett v. Spear*, 520 U.S. 154 (1997); *TVA v. Hill*, 437 U.S. 153 (1978). Further, the U.S. courts of appeals for the Fourth, Fifth, Ninth, Eleventh, and D.C. circuits have all addressed constitutional challenges to the ESA similar to PETPO's challenge here, and have all found the protection of a listed species on nonfederal land to be within the scope of Congress's power. *Gibbs v. Babbitt*, 214 F.3d 483 (4th Cir. 2000), *cert. denied*, 531 U.S. 1145 (2001); *GDF Realty Invs. v. Norton*, 326 F.3d 622 (5th Cir. 2003), *cert. denied*, 545 U.S. 1114 (2005); *San Luis & Delta-Mendota Water Auth. v. Salazar*, 638 F.3d 1163 (9th Cir.), *cert. denied*, 132 S. Ct. 498 (2011); *Alabama-Tombigbee Rivers Coal. v. Kempthorne*, 477 F.3d 1250 (11th Cir. 2007), *cert. denied*, 552 U.S. 1097 (2008); *Rancho Viejo, LLC v. Norton*, 323 F.3d 1062 (D.C. Cir.

2003), *cert. denied*, 540 U.S. 1218 (2004); *Nat'l Ass'n of Homebuilders v. Babbitt*, 130 F.3d 1041 (D.C. Cir. 1997), *cert. denied*, 524 U.S. 937 (1998).

The district court did not even attempt to distinguish these cases, nor did it address *Wyoming v. U.S. Dep't of Interior*, 442 F.3d 1262, 1264 (10th Cir. 2006), in which this Court rejected a Tenth Amendment challenge to a federal exercise of authority under the ESA. In that case, Wyoming challenged the U.S. Department of the Interior's rejection of its plan to manage the threatened gray wolf on numerous statutory and constitutional grounds. *Wyoming v. U.S. Dep't of Interior*, 360 F. Supp. 2d 1214, 1224 (D. Wyo. 2005). The Wyoming district court found that the state failed to state a Tenth Amendment claim because it had not established that Congress had legislated outside its enumerated powers, as "[i]t is well settled that the ESA is a Constitutional exercise of Congressional authority under the Commerce Clause." *Id.* at 1240 (citing *Rancho Viejo, LLC v. Norton*, 323 F.3d 1062 (D.C. Cir. 2003)). This Court upheld the district court's judgment on the constitutional claims "for substantially the same reasons given in [the district court's] opinion." *Wyoming v. U.S. Dep't of Interior*, 442 F.3d at 1264. Similar to the Supreme Court, this Court has repeatedly addressed the ESA without suggesting that the Act may be unconstitutional. *See Forest Guardians v. U.S. Fish & Wildlife Serv.*, 611 F.3d 692, 708-10 (10th Cir. 2010); *Center for Biological Diversity v. Norton*, 262 F.3d 1077, 1081-83 (10th Cir. 2001); *New Mexico Cattle Growers Ass'n v. U.S. Fish & Wildlife Serv.*, 248 F.3d 1277, 1281-86 (10th Cir. 2001).

The constitutionality of the Section 4(d) Rule is particularly clear under *Raich* and this Court's precedent applying it. In *Raich*, the Supreme Court rejected a challenge to the Controlled Substances Act (CSA), 21 U.S.C. § 801 *et seq.*, to the extent it prohibited the intrastate possession, procurement, or manufacture of marijuana for medical use. 545 U.S. at 17. *Raich* clarified that Congress has the "power to regulate purely local activities that are part of an economic 'class of activities' that have a substantial effect on interstate commerce." *Id.* The Supreme Court reiterated that it has "never required Congress to legislate with scientific exactitude. When Congress decides that the 'total incidence' of a practice poses a threat to a national market, it may regulate the entire class." *Id.* (quoting *Perez*, 402 U.S. at 154-55).

Importantly, the Court in *Raich* explained that its task in assessing the scope of Congress's authority under the Commerce Clause "is a modest one." *Id.* at 22.

> We need not determine whether respondents' activities, taken in the aggregate, substantially affect interstate commerce in fact, but only whether a "rational basis" exists for so concluding.

*Id.* To answer that question, this Court considers whether:

> (1) the activity at which the statute is directed is commercial or economic in nature; (2) the statute contains an express jurisdictional element involving interstate activity that might limit its reach; (3) Congress has made specific findings regarding the effects of the prohibited activity on interstate commerce; and (4) the link between the prohibited conduct and a substantial effect on interstate commerce is attenuated.

*United States v. Patton*, 451 F.3d 615, 623 (10th Cir. 2006) (quoting *United States v. Grimmett*, 439 F.3d 1263, 1272 (10th Cir. 2006)); *see also United States v. Jeronimo-Bautista*,

425 F.3d 1266, 1269 (2005). "The first factor determines whether the regulated activity falls within the definition of 'commerce.'" *Patton*, 451 F.3d at 623. If it does, "there is a heavy—perhaps in reality irrebuttable—presumption that it affects more states than one, and falls within congressional power." *Id.* If it does not, the last three factors become significant, and look to three different sources of evidence to determine whether there is a substantial effect on interstate commerce: "the statutory text, the articulated congressional understanding, and independent evidence of whether the activity has a substantial effect in the aggregate." *Id.* at 624.[17]

For the reasons set forth below, both the ESA in general and the Section 4(d) Rule in particular are directed at commercial or economic activity. Even if this Court concludes the regulated activities are not commercial or economic, however, the substantial link between the activities regulated by the ESA and interstate commerce is more than sufficient to show that Congress had a rational basis for determining that takes of intrastate species protected by the ESA, viewed in the aggregate, have a substantial effect on interstate commerce.

---

[17] The ESA does not contain congressional findings on its interstate impact or an express jurisdictional requirement. It is well-established that neither is required. *Raich*, 545 U.S. at 21 ("we have never required Congress to make particularized findings in order to legislate"). These are potentially useful sources of evidence where a statute's substantial effects on interstate commerce are not apparent to the naked eye. For the reasons set forth in this brief and as the D.C. Circuit observed in *Rancho Viejo*, "the naked eye requires no assistance here." 323 F.3d at 1069.

**A. The ESA in general and the Section 4(d) Rule in particular are directed at commercial or economic activity.**

In *Raich*, the Supreme Court explained that "[p]rohibiting the intrastate possession or manufacture of an article of commerce is a rational (and commonly utilized) means of regulating commerce in that product." 545 U.S. at 26. In *Jeronimo-Bautista*, this Court applied the same rationale in concluding that the intrastate production of child pornography was economic in nature. 425 F.3d at 1271. While Congress enacted the statutes at issue in *Raich* and *Jeronimo-Bautista* to eliminate markets in particular commodities, it enacted the ESA to conserve valuable national resources, including biodiversity, and to protect those resources from destructive interstate competition.[18] The goals of the ESA are different, but the objects of regulation are no less commercial or economic. And the means chosen by Congress—regulating the take of threatened species such as the Utah prairie dog—are rational means of conserving the protected resources and restricting the commercial activities that impact them.

---

[18] Of course, Congress also had non-economic motives in enacting the ESA, just as it had other motives when it enacted the statutes at issue in *Raich* and *Jeronimo-Bautista*. So long as the regulation is a valid exercise of the commerce power, these motives do not undercut Congress's power to act. *See Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 257 (1964) ("Congress was not restricted by the fact that the particular obstruction to interstate commerce with which it was dealing was also deemed a moral and social wrong."); *see also Raich*, 545 U.S. at 19 n.29 (stating that the difference between Congress's objectives in the statutes at issue in *Wickard*, 317 U.S. 111 (1942), and *Raich* "is of no constitutional import").

As noted previously, all five U.S. courts of appeals to address the constitutionality of the ESA have upheld the Act. The courts have not all, however, approached the question in the same way, and three of the decisions, including both post-*Raich* decisions, do not opine specifically on either the scope of the regulated activity or its nature, focusing instead on evidence of the ESA's substantial effects on interstate commerce. *San Luis*, 638 F.3d at 1175-76 (stating that *Raich* requires courts to "evaluate the aggregate effect of the statute (rather than an isolated application)" and summarizing the reasons "why the protection of threatened or endangered species implicates economic concerns"); *Alabama-Tombigbee*, 477 F.3d at 1272-73 (stating that the "necessary first step in addressing [the appellant's as-applied challenge] is an examination of the total economic impact of the [ESA] itself" and concluding that the Act is a "general regulatory statute bearing a substantial relation to commerce"); *NAHB*, 130 F.3d at 1046 (explaining why the court "may look not only to the effect of the extinction of the individual endangered species at issue in this case, but also to the aggregate effect of the extinction of all similarly situated endangered species"); *id.* at 1058 (Henderson, J., concurring) (finding the requisite substantial effect due to loss of biodiversity and impact on the appellant's planned commercial development without identifying the precise scope of the regulated activity).

The three pre-*Raich* decisions that do opine on the nature of the regulated activity all reach the conclusion that it is commercial or economic, but take different approaches to that issue. These cases illustrate that, however the question is framed,

the answer is that the regulated activity is commercial or economic, such that "there is

a heavy—perhaps in reality irrebuttable—presumption that it affects more states than

one, and falls within congressional power." *Patton*, 451 F.3d at 623. As explained

below, the best and most complete analysis combines the approaches taken in these

cases.

In *Rancho Viejo*, the D.C. Circuit found the regulated activity to be the plaintiff's

planned commercial development, and not takes of the listed species. 323 F.3d at

1072. The D.C. Circuit reasoned that the ESA does not purport to tell listed species

what they may or may not do—"its prohibitions and corresponding penalties apply to

the persons who do the taking, not to the species that are taken." *Id.* It further

determined that both the regulated entity and the regulated conduct "have a plainly

commercial character." *Id.* By contrast, the Fifth Circuit in *GDF Realty* found the

proper focus of the inquiry to be the species takes. 326 F.3d at 634. It reasoned that,

while the effect of regulating take may be the prohibition of development in some

instances, the ESA does not directly regulate commercial development. *Id.* The

Court found that takes of the particular species at issue were, "in a sense, . . . neither

economic nor commercial." *Id.* at 638. Based on the interdependence of species,

however, the Fifth Circuit concluded that the "ESA's take provision is economic in

nature and supported by Congressional findings to that effect." *Id.* at 640. Finally, in

*Gibbs*, the Fourth Circuit rejected a challenge to a rule that, similar to the Section 4(d)

Rule at issue here, authorized limited take of a listed species. 214 F.3d at 488-89. In

doing so, it characterized the regulated activity as "the taking of red wolves on private land" and found that the challenged rule "regulates what is in a meaningful sense economic activity." *Id.* at 492.

These three decisions reflect different approaches both in terms of whether the proper focus is species takes or the activity restricted by the ESA's limits on such takes, and on the breadth of the activity under review. With respect to breadth, both *GDF Realty* and *Gibbs* frame the inquiry in terms of species takes, but *GDF Realty* ultimately opines that the ESA's take provision is economic in nature, whereas the conclusion in *Gibbs* is limited to the taking of red wolves on private land. *Compare GDF Realty*, 326 F.3d at 640, *with Gibbs*, 214 F.3d at 492.

Characterizing the regulated activity as either species takes or the activity restricted by the ESA's limits on such takes are both understandable approaches that lead to the conclusion that the regulated activity is indeed commercial or economic— they are also two sides of the same coin. The ESA is a comprehensive resource-conservation statute that at once protects listed species from take and restricts commercial activities from taking listed species. *See United States v. Hickman*, 179 F.3d 230, 231 (5th Cir. 1999) (*en banc*) (Higginbotham, J., dissenting) (observing that regulation may protect, enhance, or restrict activity). It is thus directed at both activities or, viewed differently, it is directed at the complete act of taking listed species in context. "Regulation of commons resources [including endangered species] cannot be separated into regulation of either the appropriator or the resource being

appropriated."  Blake Hudson, *Commerce in the Commons: A Unified Theory of Natural Capital Regulation Under the Commerce Clause*, 35 Harv. Envtl. L. Rev. 375, 426 (2011). This is because the "resources are inseparable from the activities impacting them— without this interaction there would be no regulation in the first instance."  *Id.* Recognizing both components is particularly warranted after *Raich*, in which the Supreme Court "interpreted the contours of the third category by reference to 'economics' rather than 'commerce,' and included the 'consumption of commodities' as well as their production and distribution within that definition."  *Patton*, 451 F.3d at 625.  Even if only one component is considered, however, its presence materially distinguishes this case from *Lopez* and *Morrison*, where "neither the actors nor their conduct ha[d] a commercial character."  *Morrison*, 529 U.S. at 611 (quoting *Lopez*, 514 U.S. at 580 (Kennedy, J., concurring)).

Here, the Utah prairie dog's value is evident from the record, which reflects that it is: (1) an important keystone species of the western grassland ecosystem; (2) of interest to wildlife viewers and photographers who travel interstate; and (3) a subject of scientific study.  Aplt. App. at 65, 101-134; *see also discussion supra* at 10-12.  The conservation of the species pursuant to the ESA preserves its known value as well as value that may as yet be unknown and biodiversity.  "Who knows, or can say, what potential cures for cancer or other scourges, present or future, may lie locked up in the structures of plants which may yet be undiscovered, much less analyzed?"  H.R. Rep. No. 93–412, pp. 4–5 (1973), *quoted with emphasis in TVA*, 437 U.S. at 178.  As the

Fourth Circuit recognized in *Gibbs*, the loss of one species can have unintended consequences on other species, resulting in losses to items of interstate commerce. *Gibbs*, 214 F.3d at 495 (citing studies showing how removal of one species could affect others).

The Section 4(d) Rule also directly restricts commercial activities. This is evident from the Rule itself, which is tailored to reduce conflicts between landowners and Utah prairie dogs, and includes specific exceptions for standard agricultural practices, among other things. 50 C.F.R. § 17.40(g)(2), (4), and (5); *see also* 77 Fed. Reg. at 46,168 (explaining how the Rule is designed to reduce conflicts where prairie dogs create human safety hazards or disturb the sanctity of significant human cultural or human burial sites, such as at airports, golf courses, and cemeteries). It is also evident from the host of commercial activities that PETPO's members would like freer rein to pursue, which include (1) operating an airport; (2) operating a golf course; (3) operating and expanding a cemetery; (4) farming; and (5) residential and commercial property development, including the construction and operation of car dealerships. Aplt. App. at 22-30, 139-157, 190-191. That all of PETPO's members may not be traditional profit-seeking businesses is immaterial, as it is well-established that the Commerce Clause applies to charitable and non-profit entities. *Camps Newfound/Owatonna, Inc. v. Town of Harrison*, 520 U.S. 564, 584 (1997); *United States v. Grassie*, 237 F.3d 1199, 1209 (10th Cir.), *cert. denied*, 533 U.S. 960 (2001). As illustrated

by the facts of this case, such entities participate in multiple lines of commerce.[19] *Camps*, 520 U.S. at 584-85; *Grassie*, 237 F.3d at 1209-10.

This case is similar in a number of respects to *Gibbs*. The plaintiffs in *Gibbs* challenged a rule that, like the Section 4(d) Rule at issue here, authorized limited take of a single listed species, the red wolf. *Gibbs*, 214 F.3d at 486-89. The red wolf's decline, like the Utah prairie dog's decline, was "'directly related to man's activities,'" in particular "'the drainage of vast wetland areas for agricultural purposes . . . and predator control efforts.'" *Id.* at 488, (quoting 51 Fed. Reg. 41,790, 41,791 (1986)). After FWS increased the red wolf's numbers through a captive-breeding program, the Service issued a rule authorizing limited take to insure that other agencies and the public would accept FWS's plan to reintroduce the red wolves in two federal wildlife refuges, from which the wolves might stray. *Id.* at 488-89. Like the Section 4(d) Rule at issue here, the rule at issue in *Gibbs* relaxed the absolute take prohibition that would have otherwise applied.[20] *Id.* at 488. In explaining why the rule regulated economic

---

[19] *Camps* involved the dormant Commerce Clause; however, "[t]he definition of 'commerce' is the same when relied on to strike down or restrict state legislation as when relied on to support some exertion of federal control or regulation." *Hughes v. Oklahoma*, 441 U.S. 322 (1979), quoted in *Camps*, 520 U.S. at 574.

[20] Because the red wolf was listed as endangered rather than threatened, the rule in *Gibbs* was issued pursuant to ESA Section 10(j), 16 U.S.C. § 1539(j), to relax the absolute take prohibition that would have otherwise applied pursuant to ESA Section 9, 16 U.S.C. § 1538. *Gibbs*, 214 F.3d at 488. Because the Utah prairie dog is listed as threatened, FWS acted pursuant to ESA Section 4(d), 16 U.S.C. § 1533(d), to define what is necessary and advisable to provide for the conservation of the species; the special Section 4(d) Rule relaxes the absolute take prohibition that would have

activity, in contrast to the provisions the Supreme Court held invalid in *Morrison* and

*Lopez*, the Fourth Circuit stated:

> Yet the taking of a red wolf on private land is unlike gender-motivated violence or guns near schools. The protection of commercial and economic assets is a primary reason for taking the wolves. Farmers and ranchers take wolves mainly because they are concerned that the animals pose a risk to commercially valuable livestock and crops. Indeed, appellants' arguments focus quite explicitly on these economic concerns—they want freer rein to protect their property and investments in the land.

*Id.* at 492. The Fourth Circuit also considered the economic value of the red wolf,

explaining that without the species there would be "no red wolf related tourism, no

scientific research, and no commercial trade in pelts." *Id.*

The rationale in *Gibbs* demonstrates why the taking of Utah prairie dogs on

private land is economic in nature. The protection of commercial and economic

assets is a primary reason PETPO's members want greater latitude to take the species.

Like the red wolf, the Utah prairie dog is viewed by some as a pest and was listed as

endangered and remains threatened in large part due to human activities, including

control efforts. Also similar to the red wolf, the Utah prairie dog has known

economic value. *See* discussion *supra* at 10-12.

The district court concluded that the Rule is noneconomic simply because it

regulates every activity, regardless of the activity's nature, that causes harm to a Utah

---

otherwise applied pursuant to the Service's blanket Section 4(d) Rule. *See* discussion
*supra* at 6.

38

prairie dog.  Aplt. App. at 202-03.  The same can be said of the statutes at issue in *Raich* and *Jeronimo-Bautista*, which reached the purely intrastate possession of marijuana and child pornography, respectively.  *Raich*, 545 U.S. at 25-26; *Jeronimo-Bautista*, 425 F.3d at 1271.  The district court erred.  The question is not hypothetically whether the Rule could reach some noncommercial activity (the district court did not actually identify any noncommercial activity it reaches), but whether the means chosen by Congress are a rational means of regulating commerce.  Just as prohibiting the intrastate possession of marijuana and child pornography are rational means of regulation intended to eliminate those markets, regulating the take of the threatened Utah prairie dog is a rational means of regulation intended to protect the species from commerce and preserve its current and future value.

### B.  The ESA substantially affects interstate commerce, and Congress had a rational basis for including takes of intrastate species on nonfederal land in the scheme.

A determination that the regulated activity is not commercial or economic does not end the inquiry; it merely channels the analysis to evidence of the statute's effects.  *Patton*, 451 F.3d at 625.  Similar to the Section 4(d) Rule challenged by PETPO but on a much larger scale, the ESA substantially affects interstate commerce in a number of ways, both protective and restrictive.

As mentioned above, three of the circuit-court decisions upholding the ESA, including both of the post-*Raich* decisions, focus on the ESA's effects without

precisely defining the scope of the specific regulated activity at issue. It is unnecessary to do so, because *Raich* reaffirms and clarifies Congress's "power to regulate purely local activities that are part of an economic class of activities that have a substantial effect on interstate commerce." *Raich*, 545 U.S. at 17. Congress is not required to "legislate with scientific exactitude. When Congress decides that the 'total incidence' of a practice poses a threat to a national market, it may regulate the entire class." *Id.* (citing *Perez*, 402 U.S. at 154-55).

Accordingly, a plaintiff cannot circumscribe the scope of the effects analysis simply by crafting a narrow as-applied challenge. As the Ninth Circuit observed, "[p]ursuant to *Raich*, when a statute is challenged under the Commerce Clause, courts must evaluate the aggregate effect of the statute (rather than an isolated application) in determining whether the statute relates to commerce or any sort of economic enterprise."[21] *San Luis*, 638 F.3d at 1175; *see also Alabama-Tombigbee*, 477 F.3d at 1272 (stating that the foregoing principle "poses a problem for the [plaintiff's] as-applied challenge, because 'when a general regulatory statute bears a substantial relation to commerce, the *de minimis* character of individual instances arising under that statute is

---

[21] Nonetheless, for the reasons discussed *supra* at 34-38, we argue in the alternative that, even viewed in isolation, the link between the Section 4(d) Rule and interstate commerce is substantial, not attenuated. Regardless of whether this Court concludes that the activity regulated by the Rule is commercial or economic in nature, evidence of the Rule's effects, including its protective effects on valuable natural resources including the Utah prairie dog and its restrictive effects on numerous commercial activities, demonstrates this substantial link. Aplt. App. at 65, 101-134; *see also discussion supra* at 10-12; Aplt. App. at 22-30, 139-157, 190-191.

of no consequence"') (quoting *Raich*, 545 U.S. at 17 (quoting *Lopez*, 514 U.S. at 558)).

Notably, all five of the circuits to consider the question have concluded that the ESA is a "general regulatory statute" bearing "a substantial relation to commerce." *Gibbs*, 214 F.3d at 497; *GDF Realty*, 326 F.3d at 640; *Rancho Viejo*, 323 F.3d at 1073; *San Luis*, 638 F.3d at 1176; *Alabama–Tombigbee*, 477 F.3d at 1273; *NAHB*, 130 F.3d at 1046.

Because the ESA both conserves valuable resources and restricts a number of commercial activities that affect those resources, the economic activities it impacts are more numerous than the activities that many other statutes impact. The statute at issue in *Raich*, for instance, sought to extinguish the national market in Schedule I controlled substances including marijuana; it did not seek to simultaneously conserve the substances for use in other lawful commercial enterprises. 545 U.S. at 39. Similarly, the statute this Court upheld in *Jeronimo-Bautista* sought to extinguish the national market in child pornography; it did not seek to also conserve any resource for a lawful commercial use. 425 F.3d at 1269-70. These cases illustrate the well-established principle that "the power to regulate interstate commerce 'extends not only to those regulations which aid, foster and protect the commerce, but embraces those which prohibit it.'" *Raich*, 545 U.S. at 39-40 (quoting *United States v. Darby*, 312 U.S. 100, 113 (1941), and citing *Hipolite Egg Co. v. United States*, 220 U.S. 45, 58 (1911), and *Lottery Case*, 188 U.S. 321, 354 (1903)).

Of the statutes considered by the Supreme Court in the Commerce Clause context, the ESA is most analogous to the Surface Mining Control and Reclamation

Act (SMCRA) upheld in *Hodel v. Virginia Surface Mining and Reclamation Ass'n, Inc.*, 452 U.S. 264, 277 (1981) (*Hodel v. Virginia*), and *Hodel v. Indiana*, 452 U.S. 314 (1981), in that it both conserves valuable resources and restricts commercial activities (including destructive interstate competition) that threaten those resources. Congress adopted SMCRA "to ensure that production of coal for interstate commerce would not be at the expense of agriculture, the environment, or public health and safety, injury to any of which interests would have deleterious effects on interstate commerce." *Hodel v. Indiana*, 452 U.S. at 329; *see NAHB*, 130 F.3d at 1055-56 (discussing parallels). SMCRA is similar to the ESA in that it is a comprehensive resource management scheme that "adjust[s] the burdens and benefits of economic life," entitling it to a "presumption of constitutionality." *Hodel v. Indiana*, 452 U.S. at 323.

### 1. The ESA protects current and future commercial or economic activity.

Conserving endangered and threatened species facilitates commerce in a number of industries, including pharmaceuticals, agriculture, aquaculture, scientific study, hunting, fishing, and tourism, because it conserves individual species and biodiversity which are important resources for these industries, either now or potentially in the future. *See San Luis*, 638 F.3d at 1176 (identifying tourism, scientific study, agriculture, and aquaculture as industries affected by the ESA); *Alabama-Tombigbee*, 477 F.3d at 1273-74 (identifying medicine, agriculture, aquaculture, fishing, hunting, and tourism); *Gibbs*, 214 F.3d at 494 (identifying tourism, scientific research,

and medicine); *NAHB*, 130 F.3d at 1052-53 (identifying medicine and agriculture). Quite simply, "[t]he economic value of endangered species extends far beyond their sale price." *Alabama-Tombigbee*, 477 F.3d at 1273. Numerous industries "fundamentally depend on a diverse stock of wildlife, and the [ESA] is designed to safeguard that stock." *Id.*

That Congress intended to preserve the value, known and unknown, of endangered and threatened species is evident from the ESA's legislative history. With respect to a bill containing the Act's essential features, Congress explained that,

> [f]rom the most narrow possible point of view, it is in the best interests of mankind to minimize the losses of genetic variations. The reason is simple: they are potential resources. They are keys to puzzles which we cannot solve, and may provide answers to questions which we have not yet learned to ask.
>
> To take a homely, but apt, example: one of the critical chemicals in the regulation of ovulations in humans was found in a common plant. Once discovered, and analyzed, humans could duplicate it synthetically, but had it never existed—or had it been driven out of existence before we knew its potentialities—we would never have tried to synthesize it in the first place.
>
> Who knows, or can say, what potential cures for cancer or other scourges, present or future, may lie locked up in the structures of plants which may yet be undiscovered, much less analyzed? . . . Sheer self-interest impels us to be cautious.
>
> The institutionalization of that caution lies at the heart of H.R. 37 . . . .

H.R. Rep. No. 93–412, pp. 4–5 (1973), *quoted with emphasis in TVA*, 437 U.S. at 178.

Even if a particular species could have no independent commercial value, the interrelationships of species mean that the loss of one species can have significant

impacts on other species and interstate commerce. *NAHB*, 130 F.3d at 1052; *see also id.* at 1058-59 (Henderson, J., concurring). In *Gibbs*, for instance, the Fourth Circuit recognized that loss of the endangered red wolf could have unintended consequences on other species resulting in losses to crops and other items of interstate commerce. *Gibbs*, 214 F.3d at 495 (citing studies showing how removal of one species could affect others). With respect to future value, the Fourth Circuit also explained that,

> [e]xtinction, after all, is irreversible. If a species becomes extinct, we are left to speculate forever on what we might have learned or what we may have realized. If we conserve the species, it will be available for the study and benefit of future generations.

*Id.* at 496; *see also NAHB*, 130 F.3d at 260 (explaining that the extinction of even a single species deprives the economy of that species' option value).

The ESA's legislative history reflects that Congress was aware of at least three ways in which the Act could protect commerce. First, Congress recognized that the ESA could "permit the regeneration of [a formerly exploited] species to a level where controlled exploitation can be resumed," leading to "profit from the trading and marketing of that species for an indefinite number of years, where otherwise it would have been completely eliminated from commercial channels." S. Rep. No. 91-526, at 3, *reprinted in* 1969 U.S.C.C.A.N. at 1415; *see also* H.R. Rep. No. 93-412, at 6 (noting that species' value "should encourage [countries] to maintain healthy and viable stocks of these animals as a resource"); *see, e.g., Gibbs*, 214 F.3d at 495 (discussing recovery of American alligator as an example).

Second and "[p]otentially more important," S. Rep. No. 91-526, at 3, *reprinted in* 1969 U.S.C.C.A.N. at 1415, Congress recognized the "genetic variations" of protected species to be "potential resources" with a value that is "quite literally, incalculable." H.R. Rep. No. 93-412, at 4-5; *see, e.g., Alabama-Tombigbee*, 477 F.3d at 1274 (citing example of rosy periwinkle, which was driven nearly to extinction before scientists discovered that it contained substances now used to treat cancer).

Finally, Congress was aware "that many of these animals perform vital biological services to maintain a 'balance of nature' within their environments." S. Rep. No, 93-307, at 1, *reprinted in* 1973 U.S.C.C.A.N. at 2990; *see also TVA*, 437 U.S. at 178–79 ("Congress was concerned about the unknown uses that endangered species might have and about the unforeseeable place such creatures may have in the chain of life on this planet."); H.R. Rep. No. 93-412, at 6 (discussing recent awareness of "the critical nature of the interrelationships of plants and animals between themselves and with their environment").

> "Every species is part of an ecosystem, an expert specialist of its kind, tested relentlessly as it spreads its influence through the food web. To remove it is to entrain changes in other species, raising the populations of some, reducing or even extinguishing others, risking a downward spiral of the larger assemblage."

*NAHB*, 130 F.3d at 1053 n.11 (*quoting* Edward O. Wilson, *The Diversity of Life* 308 (1992)). The commerce power includes the power to protect potential future commercial value. *See Preseault v. ICC*, 494 U.S. 1, 17-19 (1990) (finding that Congress has authority under the Commerce Clause to provide for conversion of rail lines to

interim recreational-trail use to preserve rights-of-way for possible future reactivation of rail service); *Alabama-Tombigbee*, 477 F.3d at 1276 (applying *Preseault* to the ESA); *Gibbs*, 214 F.3d at 496 (same).

### 2. The ESA restricts commercial or economic activity.

The ESA also restricts commerce in a number of respects. As the Eleventh Circuit succinctly observed, "[t]he Act prohibits all interstate and foreign commerce in endangered species." *Alabama-Tombigbee*, 477 F.3d at 1273. The United Nations Environment Programme has estimated that the illegal component of the worldwide trade in wildlife generates $5 billion to $8 billion in proceeds annually; other reports state that illegal trade in wildlife products is second only to trade in illegal narcotics among the world's largest black markets. *Id.* at 1274 (citing Int'l Inst. for Env't & Dev. & Traffic Int'l, *Making a Killing or Making a Living* 12 (2002)); *see also San Luis*, 638 F.3d at 1176 (same); *NAHB*, 130 F.3d at 1047 (identifying trade in species as affected by the take prohibition). With respect to development, the Fifth Circuit observed in *GDF Realty* that, "[a]side from the economic effects of species loss, it is obvious that the majority of takes would result from economic activity." *GDF Realty*, 326 F.3d at 639; *see also Rancho Viejo*, 323 F.3d at 1072 (finding the regulated activity in question to be the plaintiff's planned housing development).

It is well-established that "[t]he prevention of this sort of destructive interstate competition is a traditional role for congressional action under the Commerce Clause." *Hodel v. Virginia*, 452 U.S. at 282. Relying on this rationale, the *Hodel v.*

*Virginia* Court affirmed the constitutionality of the Surface Mining Control and Reclamation Act under the Commerce Clause upon a congressional finding of a purpose to "insure that competition in interstate commerce among sellers of coal produced in different states" would not undermine the congressional goal of preventing the "loss of fish and wildlife resources" and "destruction of wildlife habitat" that result from surface coal mining. *Id.* at 279, 281-82 (internal quotation marks omitted).

That Congress intended to reach and restrict commerce when it enacted the ESA is evident in its seminal legislative finding that various species "have been rendered extinct *as a consequence of economic growth and development untempered by adequate concern and conservation.*" 16 U.S.C. § 1531(a)(1) (emphasis added). As the D.C. Circuit found in *Rancho Viejo*, Congress's intent to regulate such economic growth and development reflects the statute's plainly commercial character. *Rancho Viejo*, 323 F.3d at 1072-73 ("So too does the 'design' of the statute [have a plainly commercial character]: the ESA seeks in part to regulate 'economic growth and development untempered by adequate concern and conservation,' which, Congress found, had the consequence of rendering 'various species . . . extinct.'") (quoting 16 U.S.C. § 1531(a)(1)). Further support for this conclusion is found in Congress's identification of "pollution, destruction of habitat and the *pressures of trade*" as the three most significant threats to species' existence. H.R. Rep. No. 93-412, at 2 (1973) (emphasis added).

### 3. *Congress had a rational basis for including the take of intrastate endangered and threatened species in the comprehensive scheme.*

The district court acknowledged that the ESA regulates some economic activity, but concluded that the Section 4(d) Rule is not necessary to its economic scheme because, unlike the statute at issue in *Raich*, "takes of the Utah prairie dog on non-federal land—even to the point of extinction—would not substantially affect the national market for any commodity regulated by the [statute]." Aplt. App. at 206-07. Related to this, the district court refused to consider the aggregate effect of the ESA on the grounds that: (1) PETPO did not ask for invalidation of any other regulation; and (2) there was no evidence that extinction of the Utah prairie dog would cause any other species to lose value or become extinct. Aplt. App. at 207. The district court erred because it was not at liberty to substitute its judgment for Congress's as to the ESA's necessary scope. It is Congress's province to define the class of activities subject to a comprehensive legislative scheme. The reviewing court's modest task is to determine whether Congress had a rational basis for concluding that failure to regulate the particular intrastate activity would leave a gaping whole in the statute. *Raich*, 545 U.S. at 22, 24; *Alabama-Tombigbee*, 477 F.3d at 1274 (finding the ESA's listing process to be an essential part of its larger regulation of economic activity); *Gibbs*, 214 F.3d at 497-98 (finding the challenged regulation to be an essential part of the ESA's larger regulation of economic activity, in which the regulatory scheme could be undercut if the intrastate activity were not regulated).

Congress had such a rational basis here. As noted above, approximately 68% of listed species are found entirely within one state. Excising individual species from the Act because they do not currently cross state lines or have a current demonstrated commercial value could lead to piecemeal extinctions and undercut the regulatory scheme. As the Fourth Circuit recognized in *Gibbs*, "[i]t would be perverse indeed if a species nearing extinction were found to be beyond Congress's power to protect while abundant species were subject to full federal regulatory power." 214 F.3d at 498; *see also Alabama-Tombigbee*, 477 F.3d at 1275-76; *GDF Realty*, 326 F.3d at 640 (the regulation of takes of intrastate species is an essential part of the ESA's economic regulatory scheme). Excising nonfederal land from the ESA's scope would remove a powerful form of protection that was an important driver of the Act and similarly undercut the scheme. The ESA "was motivated in part by the need to extend takings regulation beyond the limited confines of federal land." *Gibbs*, 214 F.3d at 494 (citing Note, *Evolution of Wildlife Legislation in the United States: An Analysis of the Legal Efforts to Protect Endangered Species and the Prospects for the Future*, 5 Geo. Int'l Envtl. L. Rev. 441, 556 (1993)).

Importantly, PETPO does not challenge the constitutionality of the ESA itself. Where, as here, the constitutionality of the underlying statute cannot be reasonably challenged, the Necessary and Proper Clause requires only that the challenged application be a limited and rational extension of congressional power. *United States v. Brune*, 767 F.3d 1009, 1017 (10th Cir. 2014), *cert. denied*, 135 S.Ct. 1469 (2015)

(upholding registration requirements as necessary and proper means for regulating the interstate trafficking of child pornography); *see also Alabama-Tombigbee*, 477 F.3d at 1276 ("Even if we found a commercial nexus completely lacking here, we could not 'excise individual applications of a concededly valid statutory scheme'") (quoting *Raich*, 545 U.S. at 72). The Section 4(d) Rule is such an extension.

### C. The ESA does not intrude on an area of traditional state authority.

In *Lopez* and *Morrison*, the Supreme Court struck down two statutes that had only tenuous connections to interstate commerce and that attempted to regulate in areas of traditional state authority. As the Fourth Circuit observed in *Gibbs*, ultimately "*Lopez* and *Morrison* rest on the principle that where a federal statute has only a tenuous connection to commerce and infringes on areas of traditional state concern, the courts should not hesitate to exercise their constitutional obligation to hold that the statute exceeds an enumerated federal power." *Gibbs*, 214 F.3d at 491.

For the reasons set forth above, the connection between the ESA and commerce is substantial. Further, the statute does not intrude on an area of traditional state concern. While states do have a significant role in the management of their resident wildlife, their authority over the nation's wildlife has always been shared with the federal government. *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 204 (1999) ("Although States have important interests in regulating wildlife and natural resources within their borders, this authority is shared with the

Federal Government when the Federal Government exercises one of its enumerated constitutional powers . . . .").  Indeed, the Supreme Court has regularly affirmed federal jurisdiction over endangered, threatened, and migratory wildlife.  *See, e.g.*, *Missouri v. Holland*, 252 U.S. 416, 431-35 (1920) (upholding the Migratory Bird Treaty Act against a Tenth Amendment challenge).

Moreover, as the Fourth Circuit explained in *Gibbs*, the ESA "permit[s] the exercise of federal power only to conserve those species that are 'endangered' or 'threatened.'"  214 F.3d at 503-04.  The Fourth Circuit noted the procedures that must be followed to list a species as endangered or threatened, and concluded that "[t]he rationale for upholding . . . the ESA generally . . . is restricted to the special relationship between endangered species and interstate commerce . . . .  It is not a connection that can be drawn outside of the endangered species context to support federal regulation of just any local or intrastate object with a medical, scientific, or economic value."  214 F.3d at 504.

The ESA's restrictions on take are a measured response to a discrete but vital problem of truly national scope: the elimination of species that meet defined criteria for being "endangered" or "threatened," and the resulting loss—commercial and noncommercial—to the nation and to national markets.  The conservation of the Utah prairie dog is an example of the Act's measured approach—the restrictions on take are less now that the species has moved from endangered to threatened status—

and the restrictions will be removed altogether if and when the species no longer meets the definition of a threatened or endangered species. The ESA acts as a floor. Upon a species' recovery, management responsibility is typically returned to the states. This approach does not threaten to extend Congress's powers beyond those enumerated in the Constitution, or to infringe on areas of traditional state responsibility.

Every circuit to consider the question has concluded that the ESA is a "general regulatory statute" bearing "a substantial relation to commerce." *Gibbs*, 214 F.3d at 498; *GDF Realty*, 326 F.3d at 640; *Rancho Viejo*, 323 F.3d at 1073; *San Luis*, 638 F.3d at 1176; *Alabama–Tombigbee*, 477 F.3d at 1273; *NAHB*, 130 F.3d at 1046. The district court erred in concluding otherwise.

## CONCLUSION

The district court's judgment should be reversed.

Respectfully submitted,

JOHN C. CRUDEN
Assistant Attorney General

DAVID C. SHILTON
MARY HOLLINGSWORTH
ANNA T. KATSELAS
*s/ Anna T. Katselas*
Attorneys
U.S. Department of Justice
Environment & Natural Resources Division
P.O. Box 7415
Washington, D.C. 20044
(202) 514-2772
anna.katselas@usdoj.gov

APRIL 2015
90-8-6-07542

## STATEMENT REGARDING ORAL ARGUMENT

The Federal Appellants believe that oral argument would benefit the Court given the significance of the issue presented. Oral argument would also be beneficial if the Court has factual questions.

*s/ Anna T. Katselas*
ANNA T. KATSELAS

## CERTIFICATE OF COMPLIANCE

As required by Fed. R. App. P. 32(a)(7)(C), I certify that this brief complies with the applicable volume limitations because it is proportionally spaced and contains 12,634 words.  I certify that the information on this form is true and correct to the best of my and knowledge and brief formed after a reasonable inquiry.


*s/ Anna T. Katselas*
ANNA T. KATSELAS

# FORM CERTIFICATIONS

I hereby certify that:

•    There is no information in this brief subject to the privacy redaction requirements of 10th Cir. R. 25.5; and

•    The hard copies of this brief to be submitted to the Court are exact copies of the version submitted electronically; and

•    This brief was scanned with System Center Endpoint Protection, version 1.195.3308, updated April 14, 2015, and according to the program the brief is free of viruses.


                                    _s/ Anna T. Katselas_
                                    ANNA T. KATSELAS

# STATUTORY AND
# REGULATORY ADDENDUM

# EXCERPTS FROM THE ENDANDERED SPECIES ACT

**16 U.S.C. § 1531 [ESA § 2]. Congressional findings and declaration of purposes and policy**

(a) Findings

The Congress finds and declares that--

> (1) various species of fish, wildlife, and plants in the United States have been rendered extinct as a consequence of economic growth and development untempered by adequate concern and conservation;
>
> (2) other species of fish, wildlife, and plants have been so depleted in numbers that they are in danger of or threatened with extinction;
>
> (3) these species of fish, wildlife, and plants are of esthetic, ecological, educational, historical, recreational, and scientific value to the Nation and its people;
>
> (4) the United States has pledged itself as a sovereign state in the international community to conserve to the extent practicable the various species of fish or wildlife and plants facing extinction, pursuant to--
>
>> (A) migratory bird treaties with Canada and Mexico;
>>
>> (B) the Migratory and Endangered Bird Treaty with Japan;
>>
>> (C) the Convention on Nature Protection and Wildlife Preservation in the Western Hemisphere;
>>
>> (D) the International Convention for the Northwest Atlantic Fisheries;
>>
>> (E) the International Convention for the High Seas Fisheries of the North Pacific Ocean;
>>
>> (F) the Convention on International Trade in Endangered Species of Wild Fauna and Flora; and
>>
>> (G) other international agreements; and

(5) encouraging the States and other interested parties, through Federal financial assistance and a system of incentives, to develop and maintain conservation programs which meet national and international standards is a key to meeting the Nation's international commitments and to better safeguarding, for the benefit of all citizens, the Nation's heritage in fish, wildlife, and plants.

(b) Purposes

The purposes of this chapter are to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, to provide a program for the conservation of such endangered species and threatened species, and to take such steps as may be appropriate to achieve the purposes of the treaties and conventions set forth in subsection (a) of this section.

(c) Policy

(1) It is further declared to be the policy of Congress that all Federal departments and agencies shall seek to conserve endangered species and threatened species and shall utilize their authorities in furtherance of the purposes of this chapter.

(2) It is further declared to be the policy of Congress that Federal agencies shall cooperate with State and local agencies to resolve water resource issues in concert with conservation of endangered species.

## 16 U.S.C. § 1532 [ESA § 3]. Definitions

For the purposes of this chapter--

(1) The term "alternative courses of action" means all alternatives and thus is not limited to original project objectives and agency jurisdiction.

(2) The term "commercial activity" means all activities of industry and trade, including, but not limited to, the buying or selling of commodities and activities conducted for the purpose of facilitating such buying and selling: Provided, however, That it does not include exhibition of commodities by museums or similar cultural or historical organizations.

(3) The terms "conserve", "conserving", and "conservation" mean to use and the use of all methods and procedures which are necessary to bring any

endangered species or threatened species to the point at which the measures provided pursuant to this chapter are no longer necessary. Such methods and procedures include, but are not limited to, all activities associated with scientific resources management such as research, census, law enforcement, habitat acquisition and maintenance, propagation, live trapping, and transplantation, and, in the extraordinary case where population pressures within a given ecosystem cannot be otherwise relieved, may include regulated taking.

(4) The term "Convention" means the Convention on International Trade in Endangered Species of Wild Fauna and Flora, signed on March 3, 1973, and the appendices thereto.

(5)(A) The term "critical habitat" for a threatened or endangered species means--

> (i) the specific areas within the geographical area occupied by the species, at the time it is listed in accordance with the provisions of section 1533 of this title, on which are found those physical or biological features (I) essential to the conservation of the species and (II) which may require special management considerations or protection; and

> (ii) specific areas outside the geographical area occupied by the species at the time it is listed in accordance with the provisions of section 1533 of this title, upon a determination by the Secretary that such areas are essential for the conservation of the species.

(B) Critical habitat may be established for those species now listed as threatened or endangered species for which no critical habitat has heretofore been established as set forth in subparagraph (A) of this paragraph.

(C) Except in those circumstances determined by the Secretary, critical habitat shall not include the entire geographical area which can be occupied by the threatened or endangered species.

(6) The term "endangered species" means any species which is in danger of extinction throughout all or a significant portion of its range other than a species of the Class Insecta determined by the Secretary to constitute a pest whose protection under the provisions of this chapter would present an overwhelming and overriding risk to man.

(7) The term "Federal agency" means any department, agency, or instrumentality of the United States.

(8) The term "fish or wildlife" means any member of the animal kingdom, including without limitation any mammal, fish, bird (including any migratory, nonmigratory, or endangered bird for which protection is also afforded by treaty or other international agreement), amphibian, reptile, mollusk, crustacean, arthropod or other invertebrate, and includes any part, product, egg, or offspring thereof, or the dead body or parts thereof.

(9) The term "foreign commerce" includes, among other things, any transaction--

　　(A) between persons within one foreign country;

　　(B) between persons in two or more foreign countries;

　　(C) between a person within the United States and a person in a foreign country; or

　　(D) between persons within the United States, where the fish and wildlife in question are moving in any country or countries outside the United States.

(10) The term "import" means to land on, bring into, or introduce into, or attempt to land on, bring into, or introduce into, any place subject to the jurisdiction of the United States, whether or not such landing, bringing, or introduction constitutes an importation within the meaning of the customs laws of the United States.

(11) Repealed. Pub.L. 97-304, § 4(b), Oct. 13, 1982, 96 Stat. 1420.

(12) The term "permit or license applicant" means, when used with respect to an action of a Federal agency for which exemption is sought under section 1536 of this title, any person whose application to such agency for a permit or license has been denied primarily because of the application of section 1536(a) of this title to such agency action.

(13) The term "person" means an individual, corporation, partnership, trust, association, or any other private entity; or any officer, employee, agent, department, or instrumentality of the Federal Government, of any State,

municipality, or political subdivision of a State, or of any foreign government; any State, municipality, or political subdivision of a State; or any other entity subject to the jurisdiction of the United States.

(14) The term "plant" means any member of the plant kingdom, including seeds, roots and other parts thereof.

(15) The term "Secretary" means, except as otherwise herein provided, the Secretary of the Interior or the Secretary of Commerce as program responsibilities are vested pursuant to the provisions of Reorganization Plan Numbered 4 of 1970; except that with respect to the enforcement of the provisions of this chapter and the Convention which pertain to the importation or exportation of terrestrial plants, the term also means the Secretary of Agriculture.

(16) The term "species" includes any subspecies of fish or wildlife or plants, and any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature.

(17) The term "State" means any of the several States, the District of Columbia, the Commonwealth of Puerto Rico, American Samoa, the Virgin Islands, Guam, and the Trust Territory of the Pacific Islands.

(18) The term "State agency" means any State agency, department, board, commission, or other governmental entity which is responsible for the management and conservation of fish, plant, or wildlife resources within a State.

(19) The term "take" means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct.

(20) The term "threatened species" means any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range.

(21) The term "United States", when used in a geographical context, includes all States.

## § 1533 [ESA § 4]. Determination of endangered species and threatened species

(a) Generally

(1) The Secretary shall by regulation promulgated in accordance with subsection (b) of this section determine whether any species is an endangered species or a threatened species because of any of the following factors:

>   (A) the present or threatened destruction, modification, or curtailment of its habitat or range;

>   (B) overutilization for commercial, recreational, scientific, or educational purposes;

>   (C) disease or predation;

>   (D) the inadequacy of existing regulatory mechanisms; or

>   (E) other natural or manmade factors affecting its continued existence.

(2) With respect to any species over which program responsibilities have been vested in the Secretary of Commerce pursuant to Reorganization Plan Numbered 4 of 1970--

>   (A) in any case in which the Secretary of Commerce determines that such species should--

>>      (i) be listed as an endangered species or a threatened species, or

>>      (ii) be changed in status from a threatened species to an endangered species,

>   he shall so inform the Secretary of the Interior, who shall list such species in accordance with this section;

>   (B) in any case in which the Secretary of Commerce determines that such species should--

>>      (i) be removed from any list published pursuant to subsection (c) of this section, or

(ii) be changed in status from an endangered species to a threatened species,

he shall recommend such action to the Secretary of the Interior, and the Secretary of the Interior, if he concurs in the recommendation, shall implement such action; and

(C) the Secretary of the Interior may not list or remove from any list any such species, and may not change the status of any such species which are listed, without a prior favorable determination made pursuant to this section by the Secretary of Commerce.

(3)(A) The Secretary, by regulation promulgated in accordance with subsection (b) of this section and to the maximum extent prudent and determinable--

(i) shall, concurrently with making a determination under paragraph (1) that a species is an endangered species or a threatened species, designate any habitat of such species which is then considered to be critical habitat; and

(ii) may, from time-to-time thereafter as appropriate, revise such designation.

(B)(i) The Secretary shall not designate as critical habitat any lands or other geographical areas owned or controlled by the Department of Defense, or designated for its use, that are subject to an integrated natural resources management plan prepared under section 670a of this title, if the Secretary determines in writing that such plan provides a benefit to the species for which critical habitat is proposed for designation.

(ii) Nothing in this paragraph affects the requirement to consult under section 1536(a)(2) of this title with respect to an agency action (as that term is defined in that section).

(iii) Nothing in this paragraph affects the obligation of the Department of Defense to comply with section 1538 of this title, including the prohibition preventing extinction and taking of endangered species and threatened species.

(b) Basis for determinations

(1)(A) The Secretary shall make determinations required by subsection (a) (1) of this section solely on the basis of the best scientific and commercial data available to him after conducting a review of the status of the species and after taking into account those efforts, if any, being made by any State or foreign nation, or any political subdivision of a State or foreign nation, to protect such species, whether by predator control, protection of habitat and food supply, or other conservation practices, within any area under its jurisdiction, or on the high seas.

(B) In carrying out this section, the Secretary shall give consideration to species which have been--

> (i) designated as requiring protection from unrestricted commerce by any foreign nation, or pursuant to any international agreement; or

> (ii) identified as in danger of extinction, or likely to become so within the foreseeable future, by any State agency or by any agency of a foreign nation that is responsible for the conservation of fish or wildlife or plants.

(2) The Secretary shall designate critical habitat, and make revisions thereto, under subsection (a) (3) of this section on the basis of the best scientific data available and after taking into consideration the economic impact, the impact on national security, and any other relevant impact, of specifying any particular area as critical habitat. The Secretary may exclude any area from critical habitat if he determines that the benefits of such exclusion outweigh the benefits of specifying such area as part of the critical habitat, unless he determines, based on the best scientific and commercial data available, that the failure to designate such area as critical habitat will result in the extinction of the species concerned.

(3)(A) To the maximum extent practicable, within 90 days after receiving the petition of an interested person under section 553(e) of Title 5, to add a species to, or to remove a species from, either of the lists published under subsection (c) of this section, the Secretary shall make a finding as to whether the petition presents substantial scientific or commercial information indicating that the petitioned action may be warranted. If such a petition is found to present such information, the Secretary shall promptly commence a review of the status of the species concerned. The Secretary shall promptly publish each finding made under this subparagraph in the Federal Register.

(B) Within 12 months after receiving a petition that is found under subparagraph (A) to present substantial information indicating that the petitioned action may be warranted, the Secretary shall make one of the following findings:

(i) The petitioned action is not warranted, in which case the Secretary shall promptly publish such finding in the Federal Register.

(ii) The petitioned action is warranted, in which case the Secretary shall promptly publish in the Federal Register a general notice and the complete text of a proposed regulation to implement such action in accordance with paragraph (5).

(iii) The petitioned action is warranted, but that--

(I) the immediate proposal and timely promulgation of a final regulation implementing the petitioned action in accordance with paragraphs (5) and (6) is precluded by pending proposals to determine whether any species is an endangered species or a threatened species, and

(II) expeditious progress is being made to add qualified species to either of the lists published under subsection (c) of this section and to remove from such lists species for which the protections of this chapter are no longer necessary,

in which case the Secretary shall promptly publish such finding in the Federal Register, together with a description and evaluation of the reasons and data on which the finding is based.

(C)(i) A petition with respect to which a finding is made under subparagraph (B)(iii) shall be treated as a petition that is resubmitted to the Secretary under subparagraph (A) on the date of such finding and that presents substantial scientific or commercial information that the petitioned action may be warranted.

(ii) Any negative finding described in subparagraph (A) and any finding described in subparagraph (B) (i) or (iii) shall be subject to judicial review.

(iii) The Secretary shall implement a system to monitor effectively the status of all species with respect to which a finding is made under subparagraph (B)(iii) and shall make prompt use of the authority under paragraph 7 to prevent a significant risk to the well being of any such species.

(D)(i) To the maximum extent practicable, within 90 days after receiving the petition of an interested person under section 553(e) of Title 5, to revise a critical habitat designation, the Secretary shall make a finding as to whether the petition presents substantial scientific information indicating that the revision may be warranted. The Secretary shall promptly publish such finding in the Federal Register.

(ii) Within 12 months after receiving a petition that is found under clause (i) to present substantial information indicating that the requested revision may be warranted, the Secretary shall determine how he intends to proceed with the requested revision, and shall promptly publish notice of such intention in the Federal Register.

(4) Except as provided in paragraphs (5) and (6) of this subsection, the provisions of section 553 of Title 5 (relating to rulemaking procedures), shall apply to any regulation promulgated to carry out the purposes of this chapter.

(5) With respect to any regulation proposed by the Secretary to implement a determination, designation, or revision referred to in subsection (a)(1) or (3) of this section, the Secretary shall--

    (A) not less than 90 days before the effective date of the regulation--

        (i) publish a general notice and the complete text of the proposed regulation in the Federal Register, and

        (ii) give actual notice of the proposed regulation (including the complete text of the regulation) to the State agency in each State in which the species is believed to occur, and to each county or equivalent jurisdiction in which the species is believed to occur, and invite the comment of such agency, and each such jurisdiction, thereon;

    (B) insofar as practical, and in cooperation with the Secretary of State, give notice of the proposed regulation to each foreign nation in which the species is believed to occur or whose citizens harvest the species on the high seas, and invite the comment of such nation thereon;

    (C) give notice of the proposed regulation to such professional scientific organizations as he deems appropriate;

(D) publish a summary of the proposed regulation in a newspaper of general circulation in each area of the United States in which the species is believed to occur; and

(E) promptly hold one public hearing on the proposed regulation if any person files a request for such a hearing within 45 days after the date of publication of general notice.

(6)(A) Within the one-year period beginning on the date on which general notice is published in accordance with paragraph (5)(A)(i) regarding a proposed regulation, the Secretary shall publish in the Federal Register--

(i) if a determination as to whether a species is an endangered species or a threatened species, or a revision of critical habitat, is involved, either--

(I) a final regulation to implement such determination,

(II) a final regulation to implement such revision or a finding that such revision should not be made,

(III) notice that such one-year period is being extended under subparagraph (B) (i), or

(IV) notice that the proposed regulation is being withdrawn under subparagraph (B) (ii), together with the finding on which such withdrawal is based; or

(ii) subject to subparagraph (C), if a designation of critical habitat is involved, either--

(I) a final regulation to implement such designation, or

(II) notice that such one-year period is being extended under such subparagraph.

(B)(i) If the Secretary finds with respect to a proposed regulation referred to in subparagraph (A)(i) that there is substantial disagreement regarding the sufficiency or accuracy of the available data relevant to the determination or revision concerned, the Secretary may extend the one-year period specified in subparagraph (A) for not more than six months for purposes of soliciting additional data.

(ii) If a proposed regulation referred to in subparagraph (A)(i) is not promulgated as a final regulation within such one-year period (or longer period if extension under clause (i) applies) because the Secretary finds that there is not sufficient evidence to justify the action proposed by the regulation, the Secretary shall immediately withdraw the regulation. The finding on which a withdrawal is based shall be subject to judicial review. The Secretary may not propose a regulation that has previously been withdrawn under this clause unless he determines that sufficient new information is available to warrant such proposal.

(iii) If the one-year period specified in subparagraph (A) is extended under clause (i) with respect to a proposed regulation, then before the close of such extended period the Secretary shall publish in the Federal Register either a final regulation to implement the determination or revision concerned, a finding that the revision should not be made, or a notice of withdrawal of the regulation under clause (ii), together with the finding on which the withdrawal is based.

(C) A final regulation designating critical habitat of an endangered species or a threatened species shall be published concurrently with the final regulation implementing the determination that such species is endangered or threatened, unless the Secretary deems that--

> (i) it is essential to the conservation of such species that the regulation implementing such determination be promptly published; or

> (ii) critical habitat of such species is not then determinable, in which case the Secretary, with respect to the proposed regulation to designate such habitat, may extend the one-year period specified in subparagraph (A) by not more than one additional year, but not later than the close of such additional year the Secretary must publish a final regulation, based on such data as may be available at that time, designating, to the maximum extent prudent, such habitat.

(7) Neither paragraph (4), (5), or (6) of this subsection nor section 553 of Title 5 shall apply to any regulation issued by the Secretary in regard to any emergency posing a significant risk to the well-being of any species of fish or wildlife or plants, but only if—

> (A) at the time of publication of the regulation in the Federal Register the Secretary publishes therein detailed reasons why such regulation is necessary; and

(B) in the case such regulation applies to resident species of fish or wildlife, or plants, the Secretary gives actual notice of such regulation to the State agency in each State in which such species is believed to occur.

Such regulation shall, at the discretion of the Secretary, take effect immediately upon the publication of the regulation in the Federal Register. Any regulation promulgated under the authority of this paragraph shall cease to have force and effect at the close of the 240-day period following the date of publication unless, during such 240-day period, the rulemaking procedures which would apply to such regulation without regard to this paragraph are complied with. If at any time after issuing an emergency regulation the Secretary determines, on the basis of the best appropriate data available to him, that substantial evidence does not exist to warrant such regulation, he shall withdraw it.

(8) The publication in the Federal Register of any proposed or final regulation which is necessary or appropriate to carry out the purposes of this chapter shall include a summary by the Secretary of the data on which such regulation is based and shall show the relationship of such data to such regulation; and if such regulation designates or revises critical habitat, such summary shall, to the maximum extent practicable, also include a brief description and evaluation of those activities (whether public or private) which, in the opinion of the Secretary, if undertaken may adversely modify such habitat, or may be affected by such designation.

(c) Lists

(1) The Secretary of the Interior shall publish in the Federal Register a list of all species determined by him or the Secretary of Commerce to be endangered species and a list of all species determined by him or the Secretary of Commerce to be threatened species. Each list shall refer to the species contained therein by scientific and common name or names, if any, specify with respect to each such species over what portion of its range it is endangered or threatened, and specify any critical habitat within such range. The Secretary shall from time to time revise each list published under the authority of this subsection to reflect recent determinations, designations, and revisions made in accordance with subsections (a) and (b) of this section.

(2) The Secretary shall--

(A) conduct, at least once every five years, a review of all species included in a list which is published pursuant to paragraph (1) and which is in effect at the time of such review; and

(B) determine on the basis of such review whether any such species should--

(i) be removed from such list;

(ii) be changed in status from an endangered species to a threatened species; or

(iii) be changed in status from a threatened species to an endangered species.

Each determination under subparagraph (B) shall be made in accordance with the provisions of subsections (a) and (b) of this section.

(d) Protective regulations

Whenever any species is listed as a threatened species pursuant to subsection (c) of this section, the Secretary shall issue such regulations as he deems necessary and advisable to provide for the conservation of such species. The Secretary may by regulation prohibit with respect to any threatened species any act prohibited under section 1538(a)(1) of this title, in the case of fish or wildlife, or section 1538(a)(2) of this title, in the case of plants, with respect to endangered species; except that with respect to the taking of resident species of fish or wildlife, such regulations shall apply in any State which has entered into a cooperative agreement pursuant to section 1535(c) of this title only to the extent that such regulations have also been adopted by such State.

(e) Similarity of appearance cases

The Secretary may, by regulation of commerce or taking, and to the extent he deems advisable, treat any species as an endangered species or threatened species even though it is not listed pursuant to this section if he finds that--

(A) such species so closely resembles in appearance, at the point in question, a species which has been listed pursuant to such section that enforcement

personnel would have substantial difficulty in attempting to differentiate between the listed and unlisted species;

(B) the effect of this substantial difficulty is an additional threat to an endangered or threatened species; and

(C) such treatment of an unlisted species will substantially facilitate the enforcement and further the policy of this chapter.

(f) Recovery plans

(1) The Secretary shall develop and implement plans (hereinafter in this subsection referred to as "recovery plans") for the conservation and survival of endangered species and threatened species listed pursuant to this section, unless he finds that such a plan will not promote the conservation of the species. The Secretary, in developing and implementing recovery plans, shall, to the maximum extent practicable--

(A) give priority to those endangered species or threatened species, without regard to taxonomic classification, that are most likely to benefit from such plans, particularly those species that are, or may be, in conflict with construction or other development projects or other forms of economic activity;

(B) incorporate in each plan--

(i) a description of such site-specific management actions as may be necessary to achieve the plan's goal for the conservation and survival of the species;

(ii) objective, measurable criteria which, when met, would result in a determination, in accordance with the provisions of this section, that the species be removed from the list; and

(iii) estimates of the time required and the cost to carry out those measures needed to achieve the plan's goal and to achieve intermediate steps toward that goal.

(2) The Secretary, in developing and implementing recovery plans, may procure the services of appropriate public and private agencies and institutions, and other qualified persons. Recovery teams appointed pursuant to this subsection shall not be subject to the Federal Advisory Committee Act.

(3) The Secretary shall report every two years to the Committee on Environment and Public Works of the Senate and the Committee on Merchant Marine and Fisheries of the House of Representatives on the status of efforts to develop and implement recovery plans for all species listed pursuant to this section and on the status of all species for which such plans have been developed.

(4) The Secretary shall, prior to final approval of a new or revised recovery plan, provide public notice and an opportunity for public review and comment on such plan. The Secretary shall consider all information presented during the public comment period prior to approval of the plan.

(5) Each Federal agency shall, prior to implementation of a new or revised recovery plan, consider all information presented during the public comment period under paragraph (4).

(g) Monitoring

(1) The Secretary shall implement a system in cooperation with the States to monitor effectively for not less than five years the status of all species which have recovered to the point at which the measures provided pursuant to this chapter are no longer necessary and which, in accordance with the provisions of this section, have been removed from either of the lists published under subsection (c) of this section.

(2) The Secretary shall make prompt use of the authority under paragraph 7 [FN1] of subsection (b) of this section to prevent a significant risk to the well being of any such recovered species.

(h) Agency guidelines; publication in Federal Register; scope; proposals and amendments: notice and opportunity for comments

The Secretary shall establish, and publish in the Federal Register, agency guidelines to insure that the purposes of this section are achieved efficiently and effectively. Such guidelines shall include, but are not limited to--

 (1) procedures for recording the receipt and the disposition of petitions submitted under subsection (b)(3) of this section;

(2) criteria for making the findings required under such subsection with respect to petitions;

(3) a ranking system to assist in the identification of species that should receive priority review under subsection (a)(1) of this section; and

(4) a system for developing and implementing, on a priority basis, recovery plans under subsection (f) of this section.

The Secretary shall provide to the public notice of, and opportunity to submit written comments on, any guideline (including any amendment thereto) proposed to be established under this subsection.

(i) Submission to State agency of justification for regulations inconsistent with State agency's comments or petition

If, in the case of any regulation proposed by the Secretary under the authority of this section, a State agency to which notice thereof was given in accordance with subsection (b)(5)(A)(ii) of this section files comments disagreeing with all or part of the proposed regulation, and the Secretary issues a final regulation which is in conflict with such comments, or if the Secretary fails to adopt a regulation pursuant to an action petitioned by a State agency under subsection (b)(3) of this section, the Secretary shall submit to the State agency a written justification for his failure to adopt regulations consistent with the agency's comments or petition.

## § 1538 [ESA § 9]. Prohibited acts

(a) Generally

(1) Except as provided in sections 1535(g)(2) and 1539 of this title, with respect to any endangered species of fish or wildlife listed pursuant to section 1533 of this title it is unlawful for any person subject to the jurisdiction of the United States to--

> (A) import any such species into, or export any such species from the United States;

> (B) take any such species within the United States or the territorial sea of the United States;

> (C) take any such species upon the high seas;

(D) possess, sell, deliver, carry, transport, or ship, by any means whatsoever, any such species taken in violation of subparagraphs (B) and (C);

(E) deliver, receive, carry, transport, or ship in interstate or foreign commerce, by any means whatsoever and in the course of a commercial activity, any such species;

(F) sell or offer for sale in interstate or foreign commerce any such species; or

(G) violate any regulation pertaining to such species or to any threatened species of fish or wildlife listed pursuant to section 1533 of this title and promulgated by the Secretary pursuant to authority provided by this chapter.

(2) Except as provided in sections 1535(g)(2) and 1539 of this title, with respect to any endangered species of plants listed pursuant to section 1533 of this title, it is unlawful for any person subject to the jurisdiction of the United States to--

(A) import any such species into, or export any such species from, the United States;

(B) remove and reduce to possession any such species from areas under Federal jurisdiction; maliciously damage or destroy any such species on any such area; or remove, cut, dig up, or damage or destroy any such species on any other area in knowing violation of any law or regulation of any State or in the course of any violation of a State criminal trespass law;

(C) deliver, receive, carry, transport, or ship in interstate or foreign commerce, by any means whatsoever and in the course of a commercial activity, any such species;

(D) sell or offer for sale in interstate or foreign commerce any such species; or

(E) violate any regulation pertaining to such species or to any threatened species of plants listed pursuant to section 1533 of this title and promulgated by the Secretary pursuant to authority provided by this chapter.

(b) Species held in captivity or controlled environment

(1) The provisions of subsections (a)(1)(A) and (a)(1)(G) of this section shall not apply to any fish or wildlife which was held in captivity or in a controlled environment on (A) December 28, 1973, or (B) the date of the publication in the Federal Register of a final regulation adding such fish or wildlife species to any list published pursuant to subsection (c) of section 1533 of this title: Provided, That such holding and any subsequent holding or use of the fish or wildlife was not in the course of a commercial activity. With respect to any act prohibited by subsections (a)(1)(A) and (a)(1)(G) of this section which occurs after a period of 180 days from (i) December 28, 1973, or (ii) the date of publication in the Federal Register of a final regulation adding such fish or wildlife species to any list published pursuant to subsection (c) of section 1533 of this title, there shall be a rebuttable presumption that the fish or wildlife involved in such act is not entitled to the exemption contained in this subsection.

(2)(A) The provisions of subsection (a) (1) of this section shall not apply to--

(i) any raptor legally held in captivity or in a controlled environment on November 10, 1978; or

(ii) any progeny of any raptor described in clause (i);

until such time as any such raptor or progeny is intentionally returned to a wild state.

(B) Any person holding any raptor or progeny described in subparagraph (A) must be able to demonstrate that the raptor or progeny does, in fact, qualify under the provisions of this paragraph, and shall maintain and submit to the Secretary, on request, such inventories, documentation, and records as the Secretary may by regulation require as being reasonably appropriate to carry out the purposes of this paragraph. Such requirements shall not unnecessarily duplicate the requirements of other rules and regulations promulgated by the Secretary.

(c) Violation of Convention

(1) It is unlawful for any person subject to the jurisdiction of the United States to engage in any trade in any specimens contrary to the provisions of the Convention, or to possess any specimens traded contrary to the provisions of the Convention, including the definitions of terms in article I thereof.

(2) Any importation into the United States of fish or wildlife shall, if--

> (A) such fish or wildlife is not an endangered species listed pursuant to section 1533 of this title but is listed in Appendix II to the Convention,

> (B) the taking and exportation of such fish or wildlife is not contrary to the provisions of the Convention and all other applicable requirements of the Convention have been satisfied,

> (C) the applicable requirements of subsections (d), (e), and (f) of this section have been satisfied, and

> (D) such importation is not made in the course of a commercial activity,

be presumed to be an importation not in violation of any provision of this chapter or any regulation issued pursuant to this chapter.

(d) Imports and exports

> (1) In general

> It is unlawful for any person, without first having obtained permission from the Secretary, to engage in business--

>> (A) as an importer or exporter of fish or wildlife (other than shellfish and fishery products which (i) are not listed pursuant to section 1533 of this title as endangered species or threatened species, and (ii) are imported for purposes of human or animal consumption or taken in waters under the jurisdiction of the United States or on the high seas for recreational purposes) or plants; or

>> (B) as an importer or exporter of any amount of raw or worked African elephant ivory.

> (2) Requirements

> Any person required to obtain permission under paragraph (1) of this subsection shall--

(A) keep such records as will fully and correctly disclose each importation or exportation of fish, wildlife, plants, or African elephant ivory made by him and the subsequent disposition made by him with respect to such fish, wildlife, plants, or ivory;

(B) at all reasonable times upon notice by a duly authorized representative of the Secretary, afford such representative access to his place of business, an opportunity to examine his inventory of imported fish, wildlife, plants, or African elephant ivory and the records required to be kept under subparagraph (A) of this paragraph, and to copy such records; and

(C) file such reports as the Secretary may require.

(3) Regulations

The Secretary shall prescribe such regulations as are necessary and appropriate to carry out the purposes of this subsection.

(4) Restriction on consideration of value or amount of African elephant ivory imported or exported

In granting permission under this subsection for importation or exportation of African elephant ivory, the Secretary shall not vary the requirements for obtaining such permission on the basis of the value or amount of ivory imported or exported under such permission.

(e) Reports

It is unlawful for any person importing or exporting fish or wildlife (other than shellfish and fishery products which (1) are not listed pursuant to section 1533 of this title as endangered or threatened species, and (2) are imported for purposes of human or animal consumption or taken in waters under the jurisdiction of the United States or on the high seas for recreational purposes) or plants to fail to file any declaration or report as the Secretary deems necessary to facilitate enforcement of this chapter or to meet the obligations of the Convention.

(f) Designation of ports

(1) It is unlawful for any person subject to the jurisdiction of the United States to import into or export from the United States any fish or wildlife (other than shellfish

and fishery products which (A) are not listed pursuant to section 1533 of this title as endangered species or threatened species, and (B) are imported for purposes of human or animal consumption or taken in waters under the jurisdiction of the United States or on the high seas for recreational purposes) or plants, except at a port or ports designated by the Secretary of the Interior. For the purpose of facilitating enforcement of this chapter and reducing the costs thereof, the Secretary of the Interior, with approval of the Secretary of the Treasury and after notice and opportunity for public hearing, may, by regulation, designate ports and change such designations. The Secretary of the Interior, under such terms and conditions as he may prescribe, may permit the importation or exportation at nondesignated ports in the interest of the health or safety of the fish or wildlife or plants, or for other reasons if, in his discretion, he deems it appropriate and consistent with the purpose of this subsection.

(2) Any port designated by the Secretary of the Interior under the authority of section 668cc-4(d) of this title, shall, if such designation is in effect on December 27, 1973, be deemed to be a port designated by the Secretary under paragraph (1) of this subsection until such time as the Secretary otherwise provides.

(g) Violations

It is unlawful for any person subject to the jurisdiction of the United States to attempt to commit, solicit another to commit, or cause to be committed, any offense defined in this section.



RULES and REGULATIONS

DEPARTMENT OF THE INTERIOR

Fish and Wildlife Service

50 CFR Part 17

[Docket No. FWS-R6-ES-2011-0030: FXES11130900000C6-123-FF09E30000: 92220-1113-0000-C6]

RIN 1018-AW02

Endangered and Threatened Wildlife and Plants; Revising the Special Rule for the Utah Prairie Dog

Thursday, August 2, 2012

AGENCY: Fish and Wildlife Service, Interior.

**\*46158** ACTION: Final rule.

SUMMARY: Under the Endangered Species Act of 1973, as amended (ESA), we, the U.S. Fish and Wildlife Service (Service/USFWS), revise our special regulations for the conservation of the Utah prairie dog. We are revising our special regulations to provide limits to the allowable take, including limits to where permitted take can occur—agricultural lands, properties within 0.8 kilometers (km) (0.5 miles (mi)) of conservation lands, and areas where Utah prairie dogs cause serious human safety hazards or disturb the sanctity of significant human cultural or human burial sites; the amount of take that can be permitted; methods of take that can be permitted; and seasonal limitations on direct lethal take. We are also allowing entities other than the Utah Division of Wildlife Resources to permit take. We are also issuing new incidental take exemptions for otherwise legal activities associated with standard agricultural practices. All other provisions of the special rule not relating to these amendments remain unchanged.

DATES: The effective date of this rule is September 4, 2012.

ADDRESSES: This final rule is available on the Internet at http://www.regulations.gov, Docket No. FWS-R6-ES-2011-0030. Comments and materials received, as well as supporting documentation used in the preparation of this rule, are available for public inspection, by appointment, during normal business hours at: U.S. Fish and Wildlife Service, Utah Ecological Services Field Office, 2369 West Orton Circle, West Valley City, UT 84119; telephone 801-975-3330; facsimile 801-975-3331. Persons who use a telecommunications device for the deaf (TDD) may call the Federal Information Relay Services (FIRS) at 800-877-8339.

FOR FURTHER INFORMATION CONTACT: Larry Crist, Field Supervisor, Utah Ecological Services Field Office, 2369 West Orton Circle, Suite 50, West Valley City, UT 84119 (telephone 801-975-3330; facsimile 801-975-3331). Individuals who are hearing-impaired or speech-impaired may call the Federal Information Relay Service (FIRS) at 800-877-8339.

SUPPLEMENTARY INFORMATION:

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Executive Summary

*Purpose of the Regulatory Action*

Under the ESA, we revise our previous special rule for the conservation of the Utah prairie dog in the Code of Federal Regulations (CFR) at 50 CFR 17.40(g). The previous special rule, administered by the Utah Division of Wildlife Resources (UDWR), was established in 1984, and amended in 1991. Since that time, we have evaluated the take authorized by this rule and the methods used to implement it.

We considered the available information and public and peer review comments, and we revise the established exemptions to prohibited take. We are revising the regulations for where take is allowed to occur, who may permit take, the amount of take that may be permitted, and methods of take that may be permitted. We include a take exemption for areas where Utah prairie dogs create serious human safety hazards or disturb the sanctity of significant human cultural and human burial sites. We also provide an exemption for incidental take for otherwise legal activities associated with standard agricultural practices.

This amendment is largely consistent with past and current practices and permitting as administered by the UDWR and Utah Code (R657-19-6, R657-19-7) under the 1984 special rule, as amended in 1991 (hereafter referred to as "the previous special rules"). Utah prairie dog populations have remained stable to increasing throughout implementation of these special rules, as implemented under the UDWR permit system.

*Summary of the Major Provisions of the Regulatory Action*

Table 1 describes the previous 1984 special rules, as amended in 1991, and this final rule.

Table 1—Comparison of the Previous Special Rule and Practice (1991) and This Final Rule

|  | Previous rule and practice (1991) | Final rule (2012) * |
|---|---|---|
| Part II |  |  |
| Who Can Allow Take | UDWR | UDWR, or other entities with the Service's written approval. |
|  |  | Add that no permit is needed where prairie dogs create serious human safety hazards or disturb the sanctity of significant human cultural or human burial sites. Written approval from the Service is sufficient in these circumstances. |
| Where Direct Take Is Allowed | Existing Special Rule—private lands | Retain agricultural lands. |
|  | Utah Code—agricultural lands | Add properties where prairie dogs create serious human safety hazards or disturb the sanctity of significant human cultural or human burial sites. |
|  |  | Add properties within 0.8 km (0.5 mi) of conservation lands. |
| Amount of Rangewide Direct Take Al- | 6,000 animals annually | The upper annual permitted take limit |

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

lowed

of 6,000 animals annually is removed.

The upper permitted take limit may not exceed 10 percent of the estimated rangewide population annually; and, on agricultural lands, may not exceed 7 percent of the estimated annual rangewide population annually.

Take in areas where prairie dogs create serious human safety hazards or disturb the sanctity of significant human cultural or human burial sites does not contribute to the take allowance.

Site-specific Limits on Amount of Direct Take

No restrictions specified

Add limits for agricultural lands and properties within 0.8 km (0.5 mi) of conservation lands.

Add that there are no limits on the amount of direct take where prairie dogs create serious human safety hazards or disturb the sanctity of significant human cultural or human burial sites.

Timing of Allowed Direct Take

June 1 to December 31

June 15 to December 31 seasonal limits on agricultural lands and properties neighboring conservation lands.

Add that there is no timing restriction where prairie dogs create serious human safety hazards or disturb the sanctity of significant human cultural or human burial sites, except that translocations will be conducted before lethal measures of control are allowed.

Methods Allowed to Implement Direct Take

Existing Special Rule—no restrictions specified

Add restrictions on methods of allowed take on agricultural lands and properties within 0.8 km (0.5 mi) of conservation lands to conform to Utah Code.

Utah Code—limited to firearms and trapping, and chemical toxicants specifically prohibited

Add that no restrictions on methods to implement direct take are applied to areas where prairie dogs create serious human safety hazards or disturb the sanctity of significant human cul-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

| | | tural or human burial sites, except that translocations will be conducted before lethal measures of control are allowed. |
| Service Ability to Further Restrict Direct Take | The Service may immediately prohibit or restrict such taking as appropriate for the conservation of the species | Unchanged. |
| Incidental Take for Agricultural Activities | Not authorized | Provide an exemption for incidental take for otherwise legal activities associated with standard agricultural practices. |

**\*46159** Special Rules Under ESA Section 4(d)

A 4(d) special rule functions by prescribing those regulations that are necessary and advisable to conserve a threatened species. We have elected to extend all prohibitions under section 9 of the ESA (16 U.S.C. 1531 et seq.) to threatened species through a "blanket 4(d) rule" unless otherwise specified in a separate 4(d) rule (see 50 CFR 17.31). Section 9 prohibitions make it illegal for any person subject to the jurisdiction of the United States to take (including harass, harm, pursue, shoot, wound, kill, trap, capture, or collect; or attempt any of these), import or export, ship in interstate commerce in the course of commercial activity, or sell or offer for sale in interstate or foreign commerce any wildlife species listed as endangered, without written authorization. It also is illegal under section 9(a)(1) of the ESA to possess, sell, deliver, carry, transport, or ship any such wildlife that is taken illegally.

We have the option of creating tailored 4(d) regulations rather than using the blanket 4(d) rule. In those cases, the species-specific 4(d) regulation replaces the blanket regulation. Because the blanket rule effectively extends all available prohibitions to threatened species, separate 4(d) rules could be viewed as "exempting," "allowing," or "permitting" acts that would otherwise be prohibited under the blanket rule. As a result, there may be some prohibitions that apply to other threatened species that do not apply to the threatened species at issue. In the interest of providing a clear rule with simple language, we will be using "exempt" and "allow" in order to convey that this Utah prairie dog 4(d) rule will not prohibit certain actions. It is important to note that this use of language is for clarity only. The 4(d) rule will still function by prescribing the regulations necessary and advisable to conserve the Utah prairie dog.

Background

*Previous Federal Actions*

The Utah prairie dog (Cynomys parvidens) was listed as an endangered species on June 4, 1973 (38 FR 14678), pursuant to the Endangered Species Conservation Act of 1969. On January 4, 1974, this listing was incorporated into the ESA of 1973, as amended (39 FR 1158; see page 1175).

On May 29, 1984, the Service reclassified the Utah prairie dog from endangered to threatened (49 FR 22330) and developed a special rule under section 4(d) of the ESA, applying the prohibitions for threatened animals (50 CFR 17.31) to the Utah prairie dog except: allowing regulated take of up to 5,000 animals annually on private lands in Iron County, Utah. On June 14, 1991, we amended the special rule to allow regulated take of up to 6,000 animals annually on private lands throughout the species' range (56 FR 27438).

On February 3, 2003, we received a petition to reclassify the Utah prairie dog from threatened to endangered (Forest

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Guardians 2003, entire). The petition was based in part on threats to the species associated with the previous 4(d) special rules (Forest Guardians 2003, pp. 104-108). On February 21, 2007 (72 FR 7843), we found that the petition did not provide substantial scientific or commercial information indicating that reclassification may be warranted. This decision was challenged by WildEarth Guardians in litigation (described below).

On February 4, 2005, we received a petition under the Administrative Procedure Act (APA) requesting that we issue a rule to restrict the translocation of Utah prairie dogs and to terminate the special 4(d) rule allowing regulated take of Utah prairie dogs (Forest Guardians 2005, entire). On April 6, 2005, we acknowledged receipt of this petition. On February 23, 2009, we issued a final decision in which we denied the petitioned action (USFWS 2009, entire). However, this response acknowledged that we had initiated a process to amend the special 4(d) rule and that we anticipated that a proposed amended special 4(d) rule would be published in the Federal Register for public comment (USFWS 2009, p. 1). This decision also was challenged by WildEarth Guardians.

On September 28, 2010, United States District Court for the District of Columbia vacated and remanded our **46160** February 21, 2007 (72 FR 7843), not-substantial petition finding back to us for further consideration (WildEarth Guardians v. Salazar, Case 1:08-cv-01596-CKK (D.D.C.), 2010). In the same order, the court upheld our February 23, 2009, decision on the APA petition. This ruling noted that although the level of take allowed in the 1991 special rule may not be biologically sound, some permitted take is advantageous to the Utah prairie dogs' recovery. The court specifically noted that controlled take can stimulate population growth, reduce high-density populations prone to decimation by plague, and, consequently, curb the species' boom-and-bust population cycle. The court declined to weigh in on the precise level of take that should be permitted, concluding that this is a matter squarely within the Service's technical and scientific expertise.

On June 2, 2011 (76 FR 31906), we announced a proposed rule to revise our 4(d) special regulations for the conservation of the Utah prairie dog. Our proposed rule included limits to the allowable take, and new incidental take exemptions for otherwise legal activities associated with standard agricultural practices. We sought comments from the public and other agencies regarding the scope and implementation of the special rule. We also sought independent peer review of the science in the proposed rule to ensure that our final rule is based on scientifically sound data, assumptions, and analyses. We requested public and peer review comments be received or postmarked on or before August 1, 2011.

On June 21, 2011 (76 FR 36053), we announced our revised 90-day finding on a petition to reclassify the Utah prairie dog from threatened to endangered under the ESA. As we concluded in our 90-day finding published on February 21, 2007, we found that the February 3, 2003, petition did not present substantial information indicating that reclassifying the Utah prairie dog from threatened to endangered may be warranted. Therefore, we did not initiate a status review in response to the February 3, 2003, petition.

On April 26, 2012 (77 FR 24195), we notified the public that we were making changes to our proposed rule of June 2, 2011, to revise the 4(d) special rule for the Utah prairie dog. These changes included allowing take where Utah prairie dogs cause serious human safety hazards or disturb the sanctity of significant human cultural or human burial sites, allowing entities other than the UDWR to permit take, and changes to the seasonal and numeric limits for take. We reopened the comment period for 30 days, ending May 29, 2012, and we considered and incorporated as appropriate all comments for this final rule.

*Species Information*

Prairie dogs belong to the Sciuridae family of rodents, which also includes squirrels, chipmunks, and marmots. There are five species of prairie dogs, all of which are native to North America, and all of which have non-overlapping geographic

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

ranges (Hoogland 2003, p. 232). The Utah prairie dog is the smallest species of prairie dog, with individuals that are typically 250 to 400 millimeters (mm) (10 to 16 inches (in.)) long (Hoogland 1995, p. 8)). Weight varies from 300 to 900 grams (g) (0.66 to 2.0 pounds (lb)) in the spring and 500 to 1,500 g (1.1 to 3.3 lb) in the late summer and early fall (Hoogland 1995, p. 8). Utah prairie dogs range in color from cinnamon to clay. The Utah prairie dog is distinguished from other prairie dog species by a relatively short (30 to 70 mm (1.2 to 2.8 in.)) white- or gray-tipped tail (Pizzimenti and Collier 1975, p. 1; Hoogland 2003, p. 232) and a black "eyebrow" above each eye. They are closely related to the white-tailed prairie dog (Hoogland 1995, p. 8).

Life History

Utah prairie dogs are hibernators and spend 4 to 6 months underground each year during the harsh winter months, although they are seen above ground during mild weather (Hoogland 1995, pp. 18-19). Adult males cease surface activity during August and September, and females follow suit several weeks later. Juvenile prairie dogs remain above ground 1 to 2 months longer than adults and usually go into hibernation by late November. Emergence from hibernation usually occurs in late February or early March (Hoogland 2003, p. 235).

Mating begins 2 to 5 days after the females emerge from hibernation, and can continue through early April (Hoogland 2003, p. 236). Female Utah prairie dogs come into estrus (period of greatest female reproductive responsiveness, usually coinciding with ovulation) and are sexually receptive for several hours for only 1 day during the breeding season (Hoogland 2003, p. 235). However, on average 97 percent of adult female Utah prairie dogs are in breeding condition each year and successfully produce a litter (Mackley 1988, pp. 1, 9).

The young are born after a 28- to 30-day gestation period, in April or May (Hoogland 2003, p. 236). Litters range in size from 1 to 7 pups; mean observed litter size after emergence of juveniles from their burrows ranges from 3.64 pups to 5.5 pups (Pizzmenti and Collier 1975, p. 2; Elmore et al. 1976, p. 6; Wright-Smith 1978, p. 10; Mackley 1988, pp. 8-9; Hoogland 2001, p. 923). Young prairie dogs depend almost entirely on nursing while in their burrow (Hoogland 2003, p. 236). The young emerge above ground by approximately mid-June, and by that time they are no longer dependent on their mother and primarily forage on their own (Hoogland 2003, p. 236). Because of the relatively large litter sizes, the observed summer population numbers of prairie dogs are much greater than the number of animals seen above ground in the spring.

Prairie dog pups attain adult size by October and reach sexual maturity at the age of 1 year (Wright-Smith 1978, p. 9). Less than 50 percent of Utah prairie dogs survive to breeding age (Hoogland 2001, p. 919). Male Utah prairie dogs frequently cannibalize juveniles, which may eliminate 20 percent of the litter (Hoogland 2003, p. 238). After the first year, female survivorship is higher than male survivorship, though still low for both sexes. Only about 20 percent of females and less than 10 percent of males survive to age 4 (Hoogland 2001, Figures 1 and 2, pp. 919-920). Utah prairie dogs rarely live beyond 5 years of age (Hoogland 2001, p. 919). The sex ratio of juveniles at birth is 1:1, but the adult sex ratio is skewed toward females, with adult female:adult male sex ratios varying from 1.8:1 (Mackley 1988, pp. 1, 6-7) to 2:1 (Wright-Smith 1978, p. 8).

Natal dispersal (movement of first-year animals away from their area of birth) and breeding dispersal (movement of a sexually mature individual away from the areas where it copulated) are comprised mostly of male prairie dogs. Thus, individual male prairie dogs have a high mortality rate through predation. Young male Utah prairie dogs disperse in the late summer, with average dispersal events of 0.56 kilometers (km) (0.35 mile (mi)) and long distance dispersal events of up to 1.7 km (1.1 mi) (Mackley 1988, p. 10). Most dispersers move to adjacent territories (Hoogland 2003, p. 239).

Utah prairie dogs are organized into social groups called clans, consisting of an adult male, several adult females, and

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

their offspring (Wright-Smith 1978, p. 38; Hoogland 2001, p. 918). Clans maintain geographic territorial boundaries, which only the young regularly cross, although all animals use common feeding grounds. Prairie dog colonies may contain one or several clans. Colonies are groups of animals with associated mounds, burrows, and **\*46161** food resources that are within calling distance. These units are genetically similar and vulnerable to local catastrophes including epizootic disease outbreaks.

Major predators include coyotes (Canis latrans), badgers (Taxidea taxis), long-tailed weasels (Mustela frenata), various raptor species (Buteo spp., Aquila chrysaetos), and snakes (Crotalus spp., Pituophus spp.) (Hoogland 2001, p. 922). In established colonies, predators probably do not exert a controlling influence on numbers of prairie dogs (Collier and Spillett 1972, p. 36).

Utah prairie dog populations are susceptible to sylvatic plague (Yersinia pestis), a bacterium introduced to the North American continent in 1899 (Cully 1993, p. 38). Plague occurs in prairie dog colonies as enzootic and epizootic events. Enzootic plague is an infection that is persistent in the population over time and causes a low rate of mortality. Epizootic plague occurs when the disease spreads from enzootic hosts to more susceptible animals, resulting in a rapidly spreading die-off cycle (Barnes 1993, pp. 28-32; Cully and Williams 2001, pp. 898-899; Gage and Kosoy 2005, p. 506). During epizootic plague events, large numbers of animals can die within a few days (Lechleitner et al. 1962, entire; Cully 1993, p. 39). Plague results in local extirpations, reduced colony sizes, increased variation in local population sizes, and increased distances between colonies (Cully and Williams 2001, p. 895).

There is a limited understanding of the variables that determine when sylvatic plague will impact prairie dog populations. Enzootic plague may be influenced by factors including genetics, prairie dog immunity and physiologic state, and interactions with other bacteria (Gage and Kosoy 2005, p. 509). The factors that result in epizootic plague outbreaks are still being researched, but may include host density, flea density, and climatic conditions (Cully 1989, p. 49; Parmenter et al. 1999, pp. 818-820; Cully and Williams 2001, pp. 899-901; Encore et al. 2002, p. 192; Stapp et al. 2004, pp. 236-237; Gage and Kosoy 2005, pp. 509, 513; Ray and Collinge 2005, pp. 204, 206-208; Stenseth et al. 2006, entire; Sn[auml]ll et al. 2008, pp. 244-246; Biggins et al. 2010, pp. 21-24).

Habitat Requirements and Food Habits

Utah prairie dogs occur in semiarid shrub-steppe and grassland habitats (McDonald 1993, p. 4; Roberts et al. 2000, p. 2; Bonzo and Day 2003, p. 1). Within these habitats, they prefer swale-type formations where moist herbaceous vegetation is available (Collier 1975, p. 43; Crocker-Bedford and Spillett 1981, p. 24). Plentiful high-quality food found in swales enables prairie dogs to attain a large body mass, thus enhancing survival and increasing litter sizes and juvenile growth rates (Hoogland 2001, p. 923).

Soil characteristics are an important factor in the location of Utah prairie dog colonies (Collier 1975, p. 53). A well-drained area is necessary for home burrows. The soil should be deep enough to allow burrowing to depths sufficient to provide protection from predators and insulation from environmental and temperature extremes. Prairie dogs must be able to inhabit a burrow system 1 meter (m) (3.3 feet (ft)) underground without becoming wet.

Prairie dogs are predominantly herbivores, though they also eat insects (Crocker-Bedford and Spillett 1981, p. 8; Hoogland 2003, p. 238). Grasses are the staple of their annual diet (Crocker-Bedford and Spillett 1981, p. 8; Hasenyager 1984, p. 27), but other plants are selected during different times of the year. Utah prairie dogs only select shrubs when they are in flower, and then only eat the flowers (Crocker-Bedford and Spillet 1981, p. 8). Forbs are consumed in the spring. Forbs also may be crucial for the survival of prairie dogs during drought (Collier 1975, p. 48).

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Utah prairie dogs prefer areas with deep, productive soils. These are the same areas preferred by agricultural producers. Agricultural tilling practices create unusually deep, soft soils optimum for burrowing; irrigation increases vegetation productivity; and plantings of favored moist forb species (such as alfalfa) likely make these areas more productive than they were historically (Collier 1975, pp. 42-43). Additionally, Utah prairie dogs grow faster and attain larger body weights (Crocker-Bedford and Spillett 1981, p. 1), and thus have higher overwinter survival, in alfalfa crops versus native habitats (Crocker-Bedford and Spillett 1981, p. 16). Reproduction and weaning of young also may be more successful in agricultural areas that provide abundant forage resources that are otherwise unavailable in drier native habitats (Crocker-Bedford and Spillett 1981, p. 17). Similarly, colonies in agricultural areas expand more rapidly than those in native habitats (Crocker-Bedford and Spillett 1981, p. 16). Finally, predator mortality is generally low for Utah prairie dogs in agricultural fields (see Life History) because farmers control badgers and coyotes in these areas (Crocker-Bedford and Spillett 1981, p. 17). Overall, Utah prairie dog densities are approximately twice as high at sites associated with agriculture compared to sites not associated with agriculture (Crocker-Bedford and Spillett 1981, pp. 16, 23, 26). While we believe that the valley bottoms have probably always supported more prairie dogs than surrounding drier sites, it is likely that the high densities and abundances occurring in these areas are unnaturally augmented by today's agricultural practices (Collier 1975, pp. 43, 53; Crocker-Bedford and Spillett 1981, pp. 15-17, 22).

Distribution and Abundance

The Utah prairie dog is the westernmost member of the genus Cynomys. Historically, the species' distribution extended much farther north than it does today (Collier 1975, pp. 15-17; Pizzimenti and Collier 1975, p. 1). Utah prairie dog populations declined dramatically when control programs to eradicate the species were initiated in the 1920s. The actual numeric population reduction is not known, because historical population figures were not scientifically derived (Collier and Spillett 1973, pp. 83-84). However, poisoning is estimated to have removed prairie dogs from approximately 8,094 hectares (ha) (20,000 acres (ac)) of their range prior to 1963 (Collier and Spillett 1972, pp. 33-35). Other factors that resulted in the historical decline of Utah prairie dogs were drought, habitat alteration from conversion of lands to agricultural crops, unregulated shooting, and disease (Collier and Spillett 1972, pp. 32-35).

The species' range is now limited to the southwestern quarter of Utah in Iron, Beaver, Washington, Garfield, Wayne, Piute, Sevier, and Kane Counties (USFWS 2012, p. 1.3-3). The Utah prairie dog has the most restricted range of the four prairie dog species in the United States.

The best available information concerning Utah prairie dog habitat and population trends comes from survey and mapping efforts conducted by the UDWR annually since 1976. These surveys (hereafter referred to as "counts" or "spring counts") count adult Utah prairie dogs on all known and accessible colonies annually, in April and May, after the adults have emerged, but before the young are above ground in June (see Life History). Some non-Federal lands with active Utah prairie dog colonies are not surveyed due to lack of access. However, we believe that over 90 percent of prairie dog colonies are known and annually surveyed (Brown 2010, pers. comm.).**46162** Therefore, actual rangewide prairie dog numbers may be somewhat higher than reported, though probably not substantially higher.

Utah prairie dog surveys are completed in the spring ("spring counts") by visually scanning each colony area and counting the numbers of prairie dogs observed. Biologists spend approximately 8 to 10 weeks with 3 to 5 people per week surveying prairie dog colonies in the field each year in accordance with our survey protocol (USFWS 2012, Appendix H). Only 40 to 60 percent of Utah prairie dogs are above ground at any one time (USFWS 2012, p. 1.3-4). Therefore, spring counts represent approximately 50 percent of the adult population. Total rangewide population estimates are larger than the estimated adult population because they include reproduction and juveniles. Based on the male to female ratio, number of breeding females, average litter size, and observed spring count versus total spring population (see the Life His-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

tory section) (Wright-Smith 1978, p. 8; Mackley 1988, pp. 1, 6-9; Hoogland 2001, pp. 919-920; 923), the total population estimate (adults and juveniles) can be calculated from spring counts as follows: [(2 x spring adult count) x 0.67 (proportion of adult females) x 0.97 (proportion of breeding females) x 4 (average number of young per breeding female)] plus (2 x spring adult count). Thus, the total population estimate (adults and juveniles) is about 7.2 x the spring count. Hereafter whenever we refer to "total rangewide population estimate" or "total population estimate" we mean the calculated Utah prairie dog population based on the occurrence of both adult and juvenile animals.

It should be noted that spring count surveys and total population estimates are not censuses. Rather, they are designed to monitor population trends over time. Based on the spring counts, the rangewide population trends for the Utah prairie dog are stable to increasing over the last 30 years (see Application of the Utah Prairie Dog Special Rule Through the Present, below).

In addition to population trend information, the UDWR surveys provide information on the amount of mapped and occupied habitat across the species' range. We define mapped habitat as all areas within the species' range that were identified and delineated as being occupied by Utah prairie dogs in any year since 1972. These areas may or may not be occupied by prairie dogs in any given year. The database of all mapped habitat is maintained by the UDWR and updated annually. Occupied habitats are defined as areas that support Utah prairie dogs (i.e., where prairie dogs are seen or heard or where active burrows or other signs are found).

The UDWR has mapped 24,142 ha (59,656 ac) of habitat rangewide (UDWR 2010a, entire). The Utah prairie dog occurs in three geographically identifiable areas within southwestern Utah, which are identified as recovery units in our Final Revised Recovery Plan (USFWS 2012, pp. 1.3-3, 3.2-1), including: (1) Awapa Plateau; (2) Paunsaugunt, and (3) West Desert. The Awapa Plateau recovery unit encompasses portions of Piute, Garfield, Wayne, and Sevier Counties. The Paunsaugunt recovery unit is primarily in western Garfield County, with small areas in Iron and Kane Counties. The West Desert recovery unit is primarily in Iron County, but extends into southern Beaver County and northern Washington County. Table 2 provides information on each recovery unit, including average percentage of the total rangewide population and average percentage of prairie dogs occurring on non-Federal land (averages for 2000 to 2009). Additional information on each recovery unit's distribution, abundance, and trends can be found in our Final Revised Recovery Plan (USFWS 2012, section 1.3.2).

Table 2—Population and Occupancy Data for Each Recovery Unit

| Recovery unit | Average percentage of rangewide population | Average percentage of prairie dogs occurring on non-federal land |
|---|---|---|
| Awapa Plateau | 8.9 | 47.6 |
| Paunsaugunt | 16.9 | 71.0 |
| West Desert | 74.2 | 85.1 Note: Averages calculated from 2000 to 2009. Source: UDWR 2009, 2010b. |

Summary of Comments and Recommendations

In our proposed rule published on June 2, 2011 (76 FR 31906), we requested that all interested parties submit written comments on the proposal by August 1, 2011. Similarly, in our revision to the proposed rule on April 26, 2012 (77 FR

24915), we requested that all interested parties submit written comments on the proposal by May 29, 2012. We contacted appropriate Federal and State agencies, scientific experts and organizations, and other interested parties and invited them to comment on the proposal. We did not receive any requests for a public hearing. During the public comment period on the June 2, 2011, proposed rule, we received a total of 10 comment letters. Following the end of that public comment period, we also received a comment letter from the State of Utah. During the public comment period on our April 26, 2012, revision to the proposed rule, we received a total of 11 comment letters.

All substantive information provided during the comment periods (and including the State of Utah's comment letter) was either incorporated directly into this final determination or is addressed below.

*Peer Review*

In accordance with our peer review policy published on July 1, 1994 (59 FR 34270), we solicited expert opinion from six knowledgeable individuals with scientific expertise that included familiarity with prairie dog ecology, population modeling, and lethal control of prairie dogs. We received comments from four of the peer reviewers.

We reviewed all comments we received from the peer reviewers for substantive issues and new information regarding the Utah prairie dog. In general, the peer reviewers agreed with the value of having a special rule for Utah prairie dogs. They raised some concern regarding our use of the available prairie dog population models and our interpretation of available data. However, the peer reviewers did not provide specific information on how they would improve the final rule based on the available information. Peer reviewer comments are addressed in the following summary and incorporated into the final rule as appropriate.

*Peer Reviewer Comments*

(1) Comment: One peer reviewer stated that we should specify that the mean litter size is really the mean observed litter size after emergence of juveniles from their burrows.

Our Response: We updated the Life History section of the rule accordingly.

(2) Comment: One peer reviewer recommended that we add the definition for "colony" to the rule.

Our Response: We added descriptions of Utah prairie dog clans and colonies in the Life History section of the rule.

(3) Comment: The peer reviewers stated their support for various facets of the rule, including agreement that we used most of the pertinent literature, agreement with our conclusion that landowner and community support is important for species recovery, and appreciation that the rule recognizes the role of the State in managing the Utah prairie dog.

**\*46163** Our Response: We retained the discussions relevant to these points in our final rule.

(4) Comment: One peer reviewer stated that the data presented in Figure 1 demonstrates weak support for what is called a fluctuating harvest-rate model.

Our Response: We agree with the peer reviewer and did not intend to imply that Figure 1 (i.e., the permitting process under the previous 1984 and 1991 special rules) showed a fluctuating harvest-rate model. To the contrary, the previous special rules essentially used a potentially fixed rate harvest-model in which 6,000 animals could be taken annually regardless of the Utah prairie dog spring count data. We clarified the rule accordingly (see Limiting the Amount and Distribution of Direct Take That Can Be Permitted).

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

(5) Comment: One peer reviewer questioned our observation (based on 25 years of data) that colony extinction has not increased under our previous special rules. This peer reviewer said that an assessment of metapopulation dynamics of this species is necessary, including when colonies go extinct from control, disease, or natural predation, and how often and how quickly are they recolonized.

Our Response: While metapopulation dynamics are important to long-term conservation of a species, we do not believe this type of an assessment is needed for analyzing the effects of our special rule. We believe our 25 years of prairie dog population information and take levels under the previous special rules—this is what actually happened on the ground, including the resulting stable to increasing rangewide prairie dog populations—provides a robust dataset on which we can predict future effects associated with this special rule. In addition, we are not aware of any colonies that have been extirpated due to implementation of our special rules.

(6) Comment: One peer reviewer concluded that a visual inspection of the line graph presented in Figure 1 suggests that high levels of actual take under the existing special rules are correlated with declines in population abundance in following years. Therefore, the peer reviewer inferred that the data suggest that existing levels of take may be having a larger impact on Utah prairie dog population abundance than acknowledged in the proposed rule revision. Thus, the peer reviewer concluded that our 10 percent take limit is likely not viable long term.

Our Response: Based on this comment, we ran a regression analysis (a statistical technique for the investigation of relationships between variables) on the available data. There was not a significant relationship between rangewide reported take under the 1984 and 1991 special rules and the total rangewide spring counts the following year (Brown 2012). This information combined with 25 years of stable to increasing population trends indicate that these levels of take are not negatively impacting the rangewide Utah prairie dog population.

(7) Comment: One peer reviewer was concerned that our 10 percent take limit is higher than actual take that has been reported under the prior special rules.

Our Response: Although our allowable take of up to 10 percent is higher than actual take, available modeling on other prairie dog species (Reeve and Vosburgh 2006, p. 123; Colorado Division of Wildlife (CDOW) 2007, p. 135) shows that fluctuating harvest rates of 20 to 25 percent of the population are sustainable, and our 10 percent take limit is much less than these rates. In addition, it is likely that actual harvest will always be much less than permitted harvest, as our experience over the past 25 years shows, and we added this information to Table 3. The special rule allows us to modify or discontinue take in the future should we experience population effects that are inconsistent with Utah prairie dog conservation.

(8) Comment: One peer reviewer recommended that we consider a spatial analysis of prairie dog demographics and the associated impacts of take in different parts of the species' range. This reviewer questioned the potential long-term impacts across the species' range of a spatially clustered take of comparatively higher intensity in one portion of the range, compared to a more uniform and widespread distribution of removal.

Our Response: We added a requirement to the rule that take will be spatially distributed across the three Recovery Units, based on the distribution of the annual total rangewide count within each Recovery Unit (see Limiting the Amount and Distribution of Direct Take That Can Be Permitted, "Agricultural Lands," below).

(9) Comment: A couple of peer reviewers stated that smaller populations are more susceptible to localized extinction and that colony size should be considered when permitting take.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Our Response: We agree that smaller populations are more susceptible to localized extinction. As described in our rule, available modeling on the impacts of shooting to prairie dogs was completed on other prairie dog species, not Utah prairie dogs. However, because this represents the best available information, we reviewed the literature to determine relative impacts based on colony size. Populations of Gunnison's prairie dogs, even in the presence of enzootic plague, showed strong population growth rates with no risk of extinction as long as their initial population sizes were greater than or equal to 50 animals (CDOW 2007, p. 128). Accordingly, our final rule states that a minimum spring count of 7 animals (total population estimate of 50 animals) in each colony is required for the issuance of any permits under this rule. In addition, we added a provision to the rule that directs permitting biologists to consider colony size when issuing permits (see Limiting the Amount and Distribution of Direct Take That Can Be Permitted). Because we have stable to increasing rangewide Utah prairie dog populations under the previous rules, it is reasonable to assume that restricting permits to even larger colony sizes under this final rule will result in continued positive population trends.

(10) Comment: One peer reviewer and a couple of commenters stated that the available literature does not have an accurate assessment of plague risk related to colony density. They stated that there is not sufficient evidence to support our conclusion that taking Utah prairie dogs will lower plague risk by maintaining lower densities. Another peer reviewer recommended that we consider plague as a factor when evaluating the sustainability of a given level of take.

Our Response: We agree that colony density and plague are not always directly related. We revised the rule to include additional literature regarding plague dynamics in prairie dog populations, particularly noting that there are a variety of factors that play a role in the occurrence and extent of enzootic and epizootic plague events. Thus, we are not able to conclude that reducing prairie dog population densities will always result in the reduction of plague occurrence or significance. Plague is considered a factor when evaluating a given level of take to the extent that annual take is based on a percentage of the estimated annual population of prairie dogs. Fluctuations in prairie dog populations due to plague outbreaks could affect the total amount of authorized take in a given year.

(11) Comment: One peer reviewer recommended that we consider how competition for resources (e.g., how reduced competition can promote higher reproductive success and survivorship) and plague (e.g., **46164 controlling density can reduce the impact of plague) can be balanced to achieve optimal demographic robustness for long-term conservation of Utah prairie dogs.

Our Response: This special 4(d) rule is not intended to evaluate all conservation aspects for the Utah prairie dog. Under the revised Utah prairie dog Recovery Plan, we consider all demographic and metapopulation dynamics in our efforts to recover the species. The special 4(d) rule does consider how implementation of some level of prairie dog control can positively affect populations by reducing competition for resources and reducing the potential for plague outbreaks in some scenarios (see Limiting Where Take is Allowed, "Conservation Benefits of Allowing Take on Specific Lands," below).

(12) Comment: One peer reviewer requested that we provide some information regarding the time and effort expended to conduct annual spring count surveys.

Our Response: The UDWR estimates that surveys require 8 to 10 weeks, with 3 to 5 biologists annually. We added this information to the rule.

(13) Comment: A couple of peer reviewers recommended we use mean litter size of 3.88 juveniles instead of the 4 juveniles used in our population estimate calculation in the "Distribution and Abundance" section of the rule. Mean litter size of 3.88 juveniles is supported by the literature.

Our Response: Based on the available literature, we conclude that the use of 4 juveniles is appropriate in our population

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

estimate calculation. We included additional citations in the rule that show litter sizes varying from 1 to 8 pups, with means varying from 3.64 to 5.5.

(14) Comment: One peer reviewer questioned whether maintaining prairie dogs at baseline populations on private lands adjacent to conservation lands would be sufficient to maintain a functioning metapopulation across the boundary between private land and conservation property land.

Our Response: The selection and establishment of conservation lands takes into consideration spatial distribution, colony size, colony persistence, and connectivity between habitats. We make our decisions on the contribution of these lands to recovery for the Utah prairie dog including the assumption that the nearby properties (within 0.8 km (0.5 mile) of the conservation land) would be maintained at baseline prairie dog populations. Therefore, the conservation lands themselves are initially assessed for their ability to contribute to Utah prairie dog metapopulation dynamics and recovery. We added information to the rule that explains how conservation lands are selected.

(15) Comment: A couple of peer reviewers recommended that we more closely analyze the applicability of available population models to the Utah prairie dog, in particular a model used by the CDOW (now Colorado Parks and Wildlife) (2007). One peer reviewer gave an example—there is clearly some level of interaction between prairie dogs and agricultural activity in Colorado as there is in Utah, which means that the results of the analysis in CDOW (2007) may have a greater degree of relevance than what is stated in the proposed rule revision.

Our Response: We evaluated the available prairie dog population models in both our proposed and final rules (see Limiting the Amount and Distribution of Direct Take That Can Be Permitted; Reeve and Vosburgh 2006, entire; CDOW 2007, entire). We considered these models in light of expected differences between habitats and behaviors of the various prairie dog species; we do not believe that the models are strictly applicable to Utah prairie dogs. In addition, we considered these models in conjunction with our own data showing 25 years of stable to increasing rangewide Utah prairie dog populations with implementation of similar special rules that have allowed take on agricultural lands. We reevaluated these models for this final rule and made a couple of changes to the rule, including an increased minimum colony size (spring count = 7 animals) for permitting, and a change in the dates when shooting is allowed (June 15 to December 31). We agree with the peer reviewer that there are likely some similarities between prairie dogs and agricultural activity in Colorado and Utah. However, implementation of this rule is largely for colonies occurring on agricultural lands, whereas the available models include a broad range of habitat types for prairie dog species in other States.

(16) Comment: Two peer reviewers expressed concern that the proposed rule had a percent take per colony higher than previously experienced, and questioned if this amount of within-colony take would be viable for the long term. Two peer reviewers supported our requirement that within-colony take would be limited to one-half of a colony's estimated annual production (approximately 36 percent of estimated total population). One peer reviewer recommended we consider that the impact of percent within-colony take will vary based on colony size, and another peer reviewer recommended the most important factor in population stability is seasonal restrictions on shooting.

Our Response: The UDWR has used this same within-colony take limit under the previous special rules, and, as described in the rule, the affected colonies remain stable. Based on the peer review comments, we further evaluated the possible correlation of actual take and declines in population abundance at a sample of colonies that have had numerous take permits under our previous special rules. Although we only had small sample sizes, our regression analysis of the available data showed that there is no correlation between actual take in 1 year and spring counts the following year at specific colonies (Brown 2012); the permitted take in these situations was determined by UDWR using one-half of a colony's estimated annual production. However, we agree that the overall impact of within-colony take may vary based

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

on colony size. We added a condition to the rule that colony size will be taken into consideration by the permitting biologist when evaluating the permittee's property and determining appropriate take levels. No take can be authorized if the spring count at a colony is less than 7 (population estimate = 50). In addition, the rule provides seasonal restrictions on take.

(17) Comment: One peer reviewer was concerned that development of the take limits was based on evaluation of information and modeling of other prairie dog species, not Utah prairie dogs.

Our Response: We acknowledge in the rule that literature from species other than Utah prairie dogs was used in support of the rule revision. However, this is the best available information and is appropriate to review because of the similarity in activities; the models addressed recreational shooting of prairie dogs, and we evaluated controlled lethal take. In addition, we are able to compare the results of these models with over 25 years of data specific to the Utah prairie dog under the previous special rules.

(18) Comment: One peer reviewer recommended including gas cartridges, anticoagulants, and explosive devices as prohibited take methods.

Our Response: We revised the document to prohibit the use of gas cartridges, anticoagulants, and explosive devices to control prairie dogs on agricultural lands and properties within 0.8 km (0.5 mi) of conservation lands. These techniques were not employed by UDWR under the previous rule and are **46165** explicitly prohibited by this rule because they do not allow control agents to target a specific number of prairie dogs or track actual take.

(19) Comment: One peer reviewer recommended that we require any shot prairie dogs be disposed of by burying them outside of the colony boundary.

Our Response: We evaluated the potential effects to the environment of lead in the draft and final environmental assessments. We determined that the use of lead shot for prairie dog control would not have significant effects to the environment based largely on the limited area in which 4(d) permits and lethal take are authorized. Therefore, we did not require measures such as disposing of shot prairie dogs in a specific manner.

*Comments From States*

(20) Comment: The State of Utah and several commenters expressed support for the revised rule and recommended its final adoption and implementation. They concluded that the rule is vital to our continued success of working with private landowners and the recovery of the Utah prairie dogs, and that cooperative efforts between landowners and wildlife agencies offer the best hope for recovery of the species.

Our Response: We agree that the rule is necessary and advisable to address continued conflicts between landowners and Utah prairie dogs by providing for ecologically based population control that also alleviates some of the impacts that prairie dogs can cause to agricultural operations, the safety of operation such as airports, and the sanctity of significant human cultural and human burial sites.

(21) Comment: The State of Utah found that one section of the proposed rule said 7 percent of 10 percent is the take limit for agricultural lands. This equals 0.7 percent of overall rangewide population and conflicts with the 7 percent estimate elsewhere.

Our Response: We fixed this sentence to reflect that 7 percent of the rangewide population can be authorized for take on agricultural lands.

(22) Comment: The State of Utah said that the terms "annual rangewide population" and "estimated population" were not always clearly defined in the proposed rule. The commenter recommended that we clarify throughout the rule that the estimated population is number of animals occurring in late spring and summer when both adults and juveniles are present above ground.

Our Response: We revised the text to ensure clarity in the use of terms associated with spring counts (adult prairie dogs) versus estimated population sizes (adults and juveniles).

(23) Comment: The State of Utah recommended that the rule should allow for entities other than the UDWR to issue permits for control of Utah prairie dogs.

Our Response: We revised the special rule to allow for other entities to evaluate and permit properties for take, if those entities are approved in writing by our agency.

(24) Comment: The State of Utah was concerned that the inclusion of two maximum annual take limits—6,000 animals and 10 percent of the estimated rangewide population—may be confusing to some readers.

Our Response: We removed the upper limit of 6,000 animals from the final rule. The maximum allowable total annual permitted take will be no more than 10 percent of the estimated rangewide population.

(25) Comment: The State of Utah suggested that the cumulative annual take be 10 percent of the rangewide population regardless of the source (i.e., agricultural lands or conservation lands).

Our Response: We retained a 7 percent take on agricultural lands and the remaining take (totaling 10 percent) to lands within 0.8 km (0.5 mi) of Utah prairie dog conservation lands. We determined the 7 percent take limit on agricultural lands based on evaluating the permitted and actual levels under the previous rules (56 FR 27438, June 14, 1991; 49 FR 22330, May 29, 1984).

(26) Comment: The State of Utah asked for clarification whether all agricultural lands within 0.5 mile of a conservation property automatically fall into the Properties Near Conservation Lands take category.

Our Response: We added a statement to the rule (see Limiting Where Take is Allowed) clarifying that all private properties within 0.8 km (0.5 mi) automatically fall into the Properties Near Conservation Lands take category.

(27) Comment: The State of Utah and a couple of commenters recommended expanding the rule to include take authorization for areas such as cemeteries, schools, athletic facilities, golf course, airports, and ballparks.

Our Response: We modified the rule to allow control on areas where prairie dogs are creating serious human safety hazards or disturbing the sanctity of significant human cultural or human burial sites. Lethal take in all cases is only a last resort and is only allowable after all practicable measures to resolve the conflict are implemented. We agree with the commenters that the species benefits when the public supports recovery efforts and prairie dog conflicts are reduced in some public gathering areas. However, excluding all areas where there are impacts to recreation only rather than serious health and safety concerns is not consistent with recovery of the Utah prairie dog.

*Comments From Elected Officials*

(28) Comment: One commenter thought that fence specifications should be provided on a case-by-case basis instead of relying on a one-size-fits-all fence.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Our Response: We agree that fencing specifications will not be the same for each situation. Our final rule does not preclude site-specific prairie-dog-proof fence designs. For example, the most recent fence designs at the Parowan Airport and Paragonah Cemetery are different because of site-specific needs.

(29) Comment: One commenter requested that the seasonal sex and weight limits of translocated prairie dogs be removed for sites under this special rule given the severity of impacts to human safety or disruption to cultural or burial sites.

Our Response: We have revised the final rule to remove the seasonal sex and weight limits for translocations from fenced sites. Any prairie dogs not removed from these areas would be allowed to be lethally removed following the translocation effort; therefore, the sex and weight of the animals is not meaningful.

(30) Comment: One commenter wanted to know what criteria we would use to determine the areas where prairie dogs create safety hazards or disturb the sanctity of significant human cultural or human burial sites under this rule.

Our Response: Because there are likely to be differing circumstances resulting in the need for take at certain sites, the criteria will be determined largely on a site-specific basis. However, the rule is clear in stating that take will only be allowed in areas where a credible, serious public safety hazard or harm to significant human cultural or human burial sites can be clearly demonstrated. We certainly agree that prairie dogs are a concern at the Parowan Airport and Paragonah Cemetery, and we have already helped to meet the needs of fencing at these locations.

(31) Comment: One commenter asked what we would do if the number of prairie dogs within a fenced area is "more than small"—will lethal take still be allowed? The rule states that "these sites are relatively small areas, would be fenced, and prairie dogs would be removed by translocation prior to the permitting of lethal take. Thus we **\*46166** expect that the numbers of Utah prairie dogs lethally removed would be small."

Our Response: The intent of this discussion in the rule is to identify in part why we believe these areas are not important for the conservation of the Utah prairie dog. We can expect that properly maintained fencing will keep out the majority of prairie dogs. Thus, lethal take will be allowed as long as the conditions of the rule are followed. If numerous prairie dogs are breaching the fence, we would inspect the fence to determine why the breaches are occurring, at which time some fence maintenance may be required in order for lethal take to be allowed to continue.

(32) Comment: One commenter supported giving local government entities, such as counties, management authority under this rule.

Our Response: The ability for entities other than UDWR to permit take was added in this final rule.

(33) Comment: One commenter said that we should not limit within-colony take on agricultural lands. If an entire colony is not translocated, then the remaining animals will continue causing damage, and it is inevitable the numbers will continue to increase.

Our Response: It is not the intent of this rule to extirpate colonies that occur on agricultural lands. The intent of this special rule is to support the conservation of the Utah prairie dog by managing unnaturally high populations that occur in areas such as agricultural lands. We conclude in this rule that our ability to manage these populations will assist with recovery efforts for the Utah prairie dog.

(34) Comment: A couple of commenters, including one elected official, were concerned that two fences have already been constructed at the Paragonah Cemetery in accordance with Service specifications, and now they are being asked to build a third fence, 6 feet deep. The uncertainty in adequate fence specifications erodes trust between the government and

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

local communities.

Our Response: The Service was not asked to review and approve the prior fences at the cemetery, one of which is above ground, and the other which is 18 inches below ground. Regardless, the existing fence is ineffective at keeping prairie dogs out of the cemetery. The Service and State of Utah have offered to fund and construct a new fence at the cemetery that will be a more effective prairie dog barrier. Under this rule, after the fence is constructed, the City of Paragonah will be given a permit to lethally take any prairie dogs that breach the fence at any time during the year, following an initial translocation effort. We agree that prairie dogs should not be in the cemetery. We also agree that there should be a standard for fence specifications, recognizing site-specific differences. As such, we have worked with the Utah Prairie Dog Recovery Implementation Team to develop prairie dog-proof fencing specifications.

*Public Comments*

(35) Comment: One commenter questioned the science and intentions behind the "4(d) program." This commenter believes that this action is simply political and is being done because of the "big money in agribusiness." The commenter does not believe that killing prairie dogs is advantageous to the species. The commenter also stated that this action requires an environmental impact statement.

Our Response: Under section 4(d) of the ESA, we are required to issue protective regulations deemed necessary and advisable to provide for the conservation of listed threatened species. This 4(d) rule is based on the best available science and is a regulatory tool to assist in species conservation. This rule is intended to relieve prairie dog population pressures in overcrowded portions of the range as well as alleviate some impacts to agricultural operations, properties within 0.8 km (0.5 mi) of prairie dog conservation lands, and areas where human safety or the sanctity of significant human cultural or human burial sites is a concern. We evaluated the effects of our action in accordance with the National Environmental Policy Act by completing an environmental assessment. We solicited public comments on our environmental assessment (77 FR 24915, April 26, 2012). Based on the comments we received, we completed a finding of no significant impact. Therefore, we will not develop an environmental impact statement on our action, and do not believe an environmental impact statement is required.

(36) Comment: One commenter stated that we are wasting time and money working on Utah prairie dog issues because the animals occur everywhere, including central and eastern Utah. Specifically, this commenter stated that our range data are inaccurate because Utah prairie dogs occur in Emery and Carbon Counties.

Our Response: As described in the rule, the distribution of the Utah prairie dog is limited to the southwestern quarter of Utah in Iron, Beaver, Washington, Garfield, Wayne, Piute, Sevier, and Kane Counties. The species that occurs in Carbon and Emery Counties, and other portions of central and eastern Utah, is the white-tailed prairie dog (Cynomys leucurus). The Gunnison's prairie dog (Cynomys gunnisoni) occurs in the southeastern portion of the State. The best available scientific and commercial information indicates that the Utah prairie dog meets the definition of a threatened species under the ESA.

(37) Comment: One commenter stated that climate change may become a real threat to Utah prairie dogs based on work that is being done on black-tailed and Gunnison's prairie dogs in similarly arid grasslands.

Our Response: We agree that climate change may impact Utah prairie dogs. Our Utah Prairie Dog Final Revised Recovery Plan (USFWS 2012, pp. 1.7-15) discusses climate change. In addition, our use of an annual limit based on a percentage of the total estimated annual Utah prairie dog population takes into account changes in prairie dog numbers across the species' range due to climate change or other factors.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

(38) Comment: One commenter stated that it is very important that prairie dogs on agricultural lands and lands adjacent to conservation areas are allowed to be taken.

Our Response: We agree with this comment. The ability to take prairie dogs in these areas is included in the rule (see Limiting Where Take is Allowed).

(39) Comment: One commenter stated that maintaining healthy predator populations on grazing land is important to controlling Utah prairie dogs in areas where they are not wanted. Predators can naturally and effectively control prairie dog populations so that there is no need for human control.

Our Response: We agree that predators can naturally control Utah prairie dog populations, and this is described in the rule (see "Life History" and "Habitat Requirements and Food Habits"). However, we do not have the ability to manage predators on the properties to which this rule applies; private agricultural lands are managed systems that usually include predator removal.

(40) Comment: One commenter recommended that we revise our timing of permitted take to be June 1 in the West Desert recovery unit and July 1 on the Awapa Plateau and Paunsaugunt recovery units.

Our Response: We reviewed the available literature and discussed these dates with the Utah Prairie Dog Recovery Team members. We concluded that the date of permitted take should be changed to June 15, particularly to **46167** accommodate higher elevations where prairie dog pups often emerge from their dens later as compared to lower elevations, and we changed the date in this final rule.

(41) Comment: A few commenters expressed concern that allowing take of up to 6,000 prairie dogs annually is too large of a number because the annual count of prairie dogs does not reach these levels. They were concerned that the take was too high given other aspects of the species' status, including declines in Utah prairie dog populations over the last century, small colony sizes, poor habitat conditions, overgrazing, habitat fragmentation, and plague. One commenter stated that Utah prairie dog populations have declined dramatically in the last 100 years, and thus the level of take provided in the rule is too great.

Our Response: This rule limits the amount of annual take to a maximum of 10 percent of the rangewide population. The upper limit of 6,000 animals is not included in the final rule. Based on the best available science and models, we believe this take limit is consistent with recovery goals for the species. The Utah prairie dog rangewide population trend is stable to increasing over the last 30 years.

(42) Comment: One commenter stated that Utah prairie dog recovery efforts have not been successful over the last 25 years. This commenter also stated that our primary goal should be to expand Utah prairie dog populations. This commenter urged us to implement more strategic solutions that work with landowners to implement more strategic solutions to compensate for lost income and encourage support for Utah prairie dog recovery, instead of implementing outdated lethal control methods.

Our Response: This rule emphasizes control of Utah prairie dog in certain locations that we have determined are not essential to the recovery of the Utah prairie dog. However, our recovery effort is a multi-phased approach to species' conservation on a landscape scale. Our new Utah Prairie Dog Final Revised Recovery Plan describes many of the ongoing and newer strategic conservation solutions on public and private lands, including conservation banks, Utah prairie dog Habitat Credit Exchange (a market-based form of mitigation banking), safe harbor program, Utah prairie dog Recovery Implementation Program, habitat conservation planning, translocations, plague management, and habitat conservation

plans (HCPs) (USFWS 2012, section 1.9). We believe that the sum of all of these efforts, including allowing control on lands as identified under this rule, will cumulatively work to expand and protect populations and recover the Utah prairie dog.

(43) Comment: One commenter agreed that agricultural lands tend to support high numbers of prairie dogs. However, this commenter stated that prairie dog populations do not increase to the same high levels on grazing land. Therefore, the justification that we use for control cannot be applied to both situations.

Our Response: We agree that in many cases prairie dog populations do not increase on grazing lands to the same degree as they do on agricultural lands, particularly if those are public rangelands without improvements. However, under this rule, we more specifically define agricultural lands on which control can be considered; see Limiting Where Take is Allowed. Many of the pasturelands that fall under this category are improved landscapes, which likely result in increased prairie dog populations. In addition, to ensure that we only consider control under proper conditions, the rule requires that we verify the land is being physically or economically impacted by prairie dogs.

(44) Comment: One commenter requested information on how we estimate rangewide prairie dog populations. This commenter suggested that pups should not be included in the estimate because many do not survive their first year.

Our Response: The equation for estimating Utah prairie dog population size is included in the "Distribution and Abundance" section of the rule. The total population estimate includes juveniles. The commenter is correct in stating that many pups do not survive their first year, so for recovery purposes we rely heavily on spring counts (adults only) to determine population trends. We included the calculation for total population estimate (adults and juveniles) in the rule because it helps the reader to understand that the rule allows control on agricultural lands during the summer months when impacts from prairie dogs can increase dramatically due to the high numbers of animals on the landscape.

(45) Comment: A few commenters stated that the rule should be expanded to allow all private property owners to remove prairie dogs from their lands because of the high degree of economic and physical impacts (i.e., prairie dog mounds), as well as human safety issues, associated with the presence of prairie dogs. For example, many people cannot find a buyer for their property if it has prairie dogs on it or adjoins a lot with prairie dogs. Many people are forced to purchase and install prairie dog fencing to keep prairie dogs off their lot. There also is a shifting tax burden placed on every resident in the county because people who have prairie dogs on their property have successfully petitioned the State to have the value of their property reduced.

Our Response: We acknowledge prairie dogs can have economic and physical impacts. These impacts contributed to the listing of the species, because prairie dogs were controlled heavily by humans prior to listing. Many private properties are likely to be developed, particularly in the urban areas. Development of private lands results in the permanent loss of prairie dog habitats and populations. Therefore, we believe that retaining the prohibition for take on private lands except where allowed by this rule is necessary and advisable for the conservation of the species. The mechanism to authorize take on private lands that are not included in this rule is the ESA section 10(a)(1)(B) process and implementation of HCPs.

(46) Comment: One commenter stated that it is absurd to consider prairie dogs as endangered or threatened because their total estimated population is about 34,000 animals on Federal land. A couple of commenters also were concerned that we only count numbers of prairie dogs on Federal lands toward recovery.

Our Reponse: Rangewide (public and private lands) prairie dog spring counts were as high as 7,527 animals in 1989 (summer population estimate = 54,194) and a low spring count of 1,866 animals in 1976 (summer population estimate =

13,435). The average spring count on all lands for the past 34 years is 4,187 animals (summer population estimate = 30,150). The species is listed as threatened primarily based on threats from development and plague. Plague affects the species rangewide. Development affects the species largely on non-Federal lands through residential and commercial development. Over 70 percent of the Utah prairie dog population occurs on non-Federal lands that will likely be developed in the foreseeable future. To recover the Utah prairie dog, we need both robust population numbers and protection from the threats, in the form of permanent habitat protection. In this regard, private lands are counted toward recovery when they are permanently protected through acquisitions or conservation easements.

(47) Comment: One commenter asked why the Federal government cannot move the prairie dogs to Federal land and manage them there, allowing homeowners to rid their properties of these animals.

**\*46168** Our Response: The Utah prairie dog recovery effort includes a 2-tiered approach of establishing and managing prairie dogs on Federal lands and protecting existing colonies on private lands where willing landowners agree to conservation easements or fee title purchases. Because most of the Utah prairie dog population exists on private lands, recovery will be achieved in substantially less time if we are able to protect some of the most important colonies in these areas.

(48) Comment: One commenter recommended that prairie dogs be thinned via relocation where they are in conflict with landowners.

Our Response: The special rule allows and encourages live-trapping and translocation of prairie dogs from the lands where take is authorized (see Limiting Methods Allowed to Implement Direct Take).

(49) Comment: One commenter stated that our proposed revisions to the special rule are flawed because they require "all practicable measures" to be taken to remove and keep prairie dogs out of airports and cemeteries. A couple of commenters did not believe that fencing is practical because the fence would need to be several feet subterranean, a few feet high aboveground, and of a material that cannot be chewed through; open gates would need to be monitored; and the fencing is expensive. One commenter said that acceptable fence specification should be made clear to everyone. A couple of commenters expressed concern about who would pay for fencing and the maintenance of that fence.

Our Response: We agree that no fence is likely to be completely impermeable to prairie dogs, and our rule acknowledges this issue. We have worked with the Utah Prairie Dog Recovery Implementation Team to develop fencing specifications that meet some of the commenters' concerns—fencing 6 feet below ground and 3 feet above ground with prairie-dog proof materials. Long-term monitoring and maintenance of any fence is necessary for that fence to maintain its functionality, regardless of the intended purpose of that fence, e.g., prairie dogs or livestock. We, and the State of Utah, have provided funding and equipment to complete prairie-dog proof barriers at the Parowan Airport and Paragonah Cemetery. We will continue to assist with funding as it is available to meet both community and recovery needs for this species; however, we also anticipate that local communities and private entities also may fund fencing projects.

(50) Comment: One commenter agreed with the idea of controlling animals that intrude into areas such as cemeteries and airports, and that these prairie dogs should either be killed or translocated to Federal lands.

Our Response: The final rule allows for both lethal take and translocation of prairie dogs from areas where prairie dogs create human safety hazards (e.g., airports) or disturb the sanctity of significant human cultural or human burial sites.

(51) Comment: One commenter stated that they would like to be able to trap and translocate prairie dogs in public areas where the safety of visitors is being compromised, such as in public parking areas, public event seating areas, livestock corrals, and non-irrigated pastureland. One related comment from elected officials said that the requirement of a fence

should not be a precedent for all private property owners. The commenters stated that fencing areas is not always feasible.

Our Response: We added language to the final rule to allow filling of burrows and translocations of animals from areas where Utah prairie dogs create human safety hazards or disturb the sanctity of significant human cultural or human burial sites, but where fencing of these areas is not practicable. However, a prairie-dog proof fence must first be constructed before we would authorize lethal take in these areas under this final rule.

(52) Comment: One commenter was concerned that the shortened timeframe for direct take (changing the start date for take from June 1 to June 15) would be problematic.

Our Response: The purpose of this special rule is to provide for the long-term conservation of the Utah prairie dog. Therefore, the specifications of the special rule are based on the biological needs of the species. Additionally, we consider the 15-day change to be a relatively minor alteration to the rule.

(53) Comment: One commenter expressed concern that the take allowance for human safety, cultural, and burial sites would be unnecessarily constrained to "only areas where a credible, serious public safety hazard or harm to significant human cultural or human burial sites could be clearly demonstrated."

Our Response: We do not believe that this constraint is impractical or burdensome. The ability to control prairie dogs in these situations is certainly important to local communities, and as such we believe it also is beneficial for Utah prairie dog recovery efforts. However, we intend that the rule is only applied in site-specific situations where there is a credible concern.

(54) Comment: One commenter questioned the constitutionality of this 4(d) rule and Federal regulation of the Utah prairie dog, based on the Commerce Clause.

Our Response: We believe this 4(d) rule is constitutional. The courts have issued several rulings on the constitutionality of the ESA under the Commerce Clause. The final environmental assessment evaluates the effects of this final rule to the human environment, including socioeconomics.

Application of the Utah Prairie Dog Special Rule Through the Present

As explained above in the Special Rules Under ESA Section 4(d) section, under section 4(d) of the ESA, the Secretary of the Interior may extend to a threatened species those protections provided to an endangered species as deemed necessary and advisable to provide for the conservation of the species. When the Utah prairie dog was reclassified from endangered to threatened status in 1984, we issued a special rule applying all of the ESA's prohibitions to the Utah prairie dog except for take occurring in specific delineated portions of the Cedar and Parowan Valleys in Iron County, Utah, when permitted by the UDWR and in accordance with the laws of the State of Utah, provided that such take did not exceed 5,000 animals annually and that such take was confined to the period from June 1 to December 31 (49 FR 22330, May 29, 1984). The rule required quarterly reporting by UDWR and allowed us to immediately prohibit or restrict such taking as appropriate for the conservation of the species if we received substantive evidence that the allowed take was having an effect that was inconsistent with the conservation of the Utah prairie dog (49 FR 22330, May 29, 1984).

In 1991, we amended the special rule (56 FR 27438, June 14, 1991), expanding the authorized taking area to include all private land within the species' range, and raised the maximum allowable take to 6,000 animals annually (50 CFR 17.40(g)). The rule required UDWR to maintain records on permitted take and make them available to the Service upon

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

request (50 CFR 17.40(g)). Under this rule, we retained the ability to immediately prohibit or restrict such take as appropriate for the conservation of the species if we received substantive evidence that the permitted take was having an effect that was inconsistent with the conservation of the species (50 CFR 17.40(g)).

**\*46169** Both rules (49 FR 22330, May 29, 1984; 56 FR 27438, June 14, 1991) were intended to relieve Utah prairie dog population pressures in overcrowded portions of the range that could not otherwise be relieved. The rules indicated that agricultural practices were making the habitat more productive than it was historically, thus allowing the prairie dog population to achieve unnaturally high densities. We concluded that the resulting overpopulation pressures increased the risk of sylvatic plague (Yersinia pestis) outbreaks (see "Habitat Requirements and Food Habits," above; 49 FR 22333, May 29, 1984; 56 FR 27439-27440, June 14, 1991). We also concluded that removing individuals during summer when populations were highest would reduce competition in overpopulated areas and result in increased overwinter survival among remaining animals (49 FR 22334, May 29, 1984; 56 FR 27439-27441, June 14, 1991).

Finally, these rules were necessary and advisable to address the growing conflicts between landowners and prairie dogs by providing for ecologically based population control that also alleviated some of the impacts to agricultural operations (49 FR 22330, May 29, 1984; 56 FR 27438, June 14, 1991). The rules expressed concern that without control actions, these factors could have a substantially negative effect on populations and reverse the recovery progress made since listing (49 FR 22330, May 29, 1984; 56 FR 27440, June 14, 1991). The 1991 rule referenced data that demonstrated that Utah prairie dog population levels in areas with controlled take increased 88 percent during the first 4 years (1985-1989) of implementation of the special rule (56 FR 27438, June 14, 1991).

In practice, and under Utah State Code (R657-19-6, R657-19-7), the UDWR permitted taking only by shooting or trapping on agricultural lands where prairie dogs are causing damage and limits the number of animals taken on an individual colony to no more than half of a colony's estimated productivity for that year. Over time, UDWR has permitted fewer than 6,000 animals every year for the last 25 years. Annual permitted take amounts averaged 5.7 percent of the total rangewide population estimate (range equals 1.8 to 13.0 percent); actual take averaged 2.6 percent of the total rangewide estimated population (range equals 0.9 to 5.3 percent). Table 3 provides detailed information on permitted and reported take as a percent of the total rangewide population from 1985 to 2010 (UDWR 2010b, 2011, entire; Day 2012, pers. comm.). Reported take was always well below permitted take, averaging 48 percent of permitted take across 25 years. As previously described, UDWR could have permitted take of up to 6,000 prairie dogs annually under the 1991 special rule, regardless of the spring count data.

Figure 1 illustrates annual rangewide population estimates from 1985 to 2010 with a population trend line. Throughout implementation of the previous special rules (49 FR 22330, May 29, 1984; 56 FR 27438, June 14, 1991; 50 CFR 17.40(g)), both the rangewide population estimates and numbers of prairie dogs in individual colonies subject to control remain stable to increasing (Figure 1; Day 2010, pers. comm.).

Table 3—Amount of Utah Prairie Dog Take Permitted and Reported Under the ESA 4(d) Rule by UDWR, 1985-2010

| [UDWR 2010b, 2011; Day 2012, pers. comm.] | | | | | | | |
|---|---|---|---|---|---|---|---|
| Year * | Spring count | Rangewide population estimate | Permitted take | Permitted take percentage of rangewide population | Reported take | Reported take | Reported take |

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

| | | | estimate | | percentage of rangewide population estimate | | percentage of permitted take |
|---|---|---|---|---|---|---|---|
| 1985 | 3,299 | 23,753 | 845 | 3.6 | 426 | 1.8 | 50 |
| 1986 | 4,400 | 31,680 | 2,040 | 6.4 | 1,247 | 3.9 | 61 |
| 1987 | 4,771 | 34,351 | 975 | 2.8 | 370 | 1.1 | 38 |
| 1988 | 4,640 | 33,408 | 2,415 | 7.2 | 528 | 1.6 | 22 |
| 1989 | 7,527 | 54,194 | 3,050 | 5.6 | 838 | 1.5 | 27 |
| 1991 | 4,492 | 32,342 | 4,200 | 13.0 | 1,632 | 5.0 | 39 |
| 1992 | 4,067 | 29,282 | 3,520 | 12.0 | 1,543 | 5.3 | 44 |
| 1993 | 3,954 | 28,469 | 1,050 | 3.7 | 599 | 2.1 | 57 |
| 1994 | 3,702 | 26,654 | 1,190 | 4.5 | 779 | 2.9 | 65 |
| 1995 | 3,576 | 25,747 | 630 | 2.4 | 461 | 1.8 | 73 |
| 1996 | 3,917 | 28,202 | 520 | 1.8 | 436 | 1.5 | 84 |
| 1997 | 4,359 | 31,385 | 1,065 | 3.4 | 589 | 1.9 | 55 |
| 1998 | 5,106 | 36,763 | 1,220 | 3.3 | 717 | 1.9 | 59 |
| 1999 | 5,068 | 36,490 | 2,496 | 6.8 | 1,233 | 3.4 | 49 |
| 2000 | 5,892 | 42,422 | 3,700 | 8.7 | 1,386 | 3.3 | 37 |
| 2001 | 4,223 | 30,406 | 3,719 | 12.2 | 1,626 | 5.3 | 43 |
| 2002 | 4,933 | 35,518 | 3,781 | 10.6 | 1,760 | 4.9 | 46 |
| 2003 | 3,729 | 26,849 | 2,620 | 9.8 | 1,195 | 4.4 | 45 |
| 2004 | 4,102 | 29,534 | 1,360 | 4.6 | 363 | 1.2 | 27 |
| 2005 | 5,375 | 38,700 | 1,470 | 3.8 | 673 | 1.7 | 46 |
| 2006 | 5,524 | 39,773 | 1,060 | 2.7 | 343 | 0.9 | 32 |
| 2007 | 5,991 | 43,135 | 944 | 2.2 | 482 | 1.1 | 51 |
| 2008 | 5,791 | 41,695 | 1,204 | 2.9 | 561 | 1.3 | 47 |
| 2009 | 5,827 | 41,954 | 1,532 | 3.6 | 558 | 1.3 | 36 |
| 2010 | 5,648 | 40,666 | 1,870 | 4.7 | 1,425 | 3.6 | 76 |
| AVG | 4,796 | 34,535 | 1,939 | 5.7 | 814 | 2.6 | 48 |

FN* In 1990, colonies on private lands were not counted, due to staffing and budget limit-ations. Thus, these incomplete estimates are excluded from this table. In addition, take from 1985 to 1990 occurred only on non-Federal lands in Cedar and Parowan Valleys, Iron

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

County. Take from 1991 to present was authorized on non-Federal lands rangewide.

**46170** BILLING CODE 4310-55-P



FIGURE 1. Utah Prairie Dog Spring Counts, with Rangewide Population Trend Line, 1985–2010 (UDWR 2010b, 2011).

* Surveys from 1990 are not included, because they were incomplete (*i.e.*, they did not include private lands), due to staffing and budget limitations.

**46171** BILLING CODE 4310-55-C

Amendments to the 4(d) Special Rule for Utah Prairie Dogs

Based on new scientific information and 25 years of available data, we amend the previous 4(d) special rule. This amendment clarifies the previous special rules, by more specifically identifying locations and situations where lethal take is allowed because we have determined it to be compatible with recovery of the species; these are agricultural lands, properties within 0.8 km (0.5 mi) of conservation lands, and areas where Utah prairie dogs create serious human safety hazards or disturb the sanctity of significant human cultural or human burial sites. We also are providing a take exemption for otherwise legal activities associated with standard agricultural practices. In these circumstances, imposing the take prohibitions is not considered necessary and advisable for the conservation of the Utah prairie dog. In fact, allowing take in these specific situations likely will result in greater conservation gains for the Utah prairie dog than would the application of all section 9 prohibitions (see Limiting Where Take Is Allowed and Incidental Take From Normal Agricultural Practices, below). We also are providing limits to the amount and methods of take that may be allowed. Finally, we are providing the opportunity for entities other than UDWR to evaluate and permit control on lands specified under this rule.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Our amendments are largely consistent with the past practices and permitting as administered by UDWR under the previous special rules. Utah prairie dog populations have remained stable to increasing throughout implementation of the previous special rules as implemented under the UDWR permit system (see Figure 1). Our amendments are necessary and advisable to ensure sufficient conservation for Utah prairie dogs and the species' continuing stable-to-increasing, long-term population trends. Below we describe the restrictions on direct take and the new take provisions.

This regulation extends the prohibitions in section 9(a)(1) of the ESA to Utah prairie dogs on all other lands across the species' range, where not specifically exempted by this 4(d) rule. We have determined that the regulation of take in the areas specified in this 4(d) rule is necessary and advisable for the conservation of the Utah prairie dog.

*Permitting Take*

Agricultural Lands

The previous special rules (49 FR 22330, May 29, 1984; 56 FR 27438, June 14, 1991) allowed take of Utah prairie dogs when permitted by UDWR. Under these rules, UDWR biologists were required to count Utah prairie dogs, determine extent of damage, determine level of take, and issue permits to applicants who requested the ability to control prairie dogs on their lands. At the time the previous rules were published, UDWR biologists were likely the only persons with the expertise to perform these permitting tasks. However, we now have a larger partnership effort, in the form of the Utah Prairie Dog Recovery Implementation Program, in which members of other State, Federal, Tribal, and local entities and the public are working together on various programs to facilitate the species' recovery (USFWS 2012, p. 1.9-11). Because of this partnership, we can reasonably assume that other entities may hire biologists or individuals with expertise in Utah prairie dogs, and that these individuals may be available to conduct many of the permitting responsibilities previously undertaken by the UDWR. Approved permitting entities would at a minimum be required to employ a sufficient number of professional wildlife biologists to conduct all permitting responsibilities; request and complete permitting training from the UDWR for staff assigned to permitting; complete the USFWS's annual Utah prairie dog survey training; and maintain a complete reporting and tracking system for take, including annual reports on the number and location of permits issued, spring population counts and boundaries of permitted colonies, number of animals allowed to be taken, number of animals actually taken, method of take, and method of disposal of all Utah prairie dogs taken. Thus, this special rule allows, with the Service's written approval, other entities to perform the UDWR permitting and reporting tasks for control activities. For simplicity, this rule refers throughout to "permitting entities," and thus applies to UDWR or other permitting entities should those entities take over specific responsibilities under this special rule.

Safety Hazards, Human Cultural and Burial Sites

Take would be allowed where Utah prairie dogs create serious human safety hazards or disturb the sanctity of significant human cultural or human burial sites (see Limiting Where Take is Allowed, Safety Hazards, Human Cultural and Burial Sites, below) when Utah prairie dogs are determined, with the written approval of the Service, to be presenting serious human safety hazards (e.g., airport safety areas, recreational sports fields, nursing homes, schools), or disturbing the sanctity of a significant human cultural or human burial site sites (e.g., public cemetery, sacred Tribal sites) if these lands are determined not necessary for the conservation of the species. No permit would be required in these instances.

*Limiting Where Take Is Allowed*

The 1991 special rule allowed take on private lands anywhere within the range of the Utah prairie dog. However, in practice and in accordance with Utah Code (R657-19-6, R657-19-7), UDWR permitted take only on agricultural lands where prairie dogs were causing damage. In this revision to the special rule, we limit the locations where take is allowed to ag-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

ricultural lands, private property within 0.8 km (0.5 mi) of conservation lands, and areas where Utah prairie dogs create serious human safety hazards or disturb the sanctity of significant human cultural or human burial sites.

Agricultural Lands

Permitting entities will issue permits for direct take on agricultural lands. This is consistent with UDWR's permitting procedures under the previous special rules. However, this revision provides a specific definition for agricultural lands for clarification purposes. Specifically, the above activities are exempted from the take prohibition only on lands meeting the Utah Farmland Assessment Act of 1969 definition of agricultural lands (Utah Code Annotated Sections 59-2-501 through 59-2-515). Thus, to be considered agricultural land under this amendment, lands must: (1) Meet the general classification of irrigated, dryland, grazing land, orchard, or meadow; (2) be capable of producing crops or forage; (3) be at least 2 contiguous ha (5 contiguous ac) (smaller parcels may qualify where devoted to agriculture use in conjunction with other eligible acreage under identical legal ownership); (4) be managed in such a way that there is a reasonable expectation of profit; (5) have been devoted to agricultural use for at least 2 successive years immediately preceding the year in which application is made; and (6) meet State average annual (per-acre) production requirements. Limiting permitted take to agricultural lands is consistent with the justification **46172** provided in the previous special rules for the species (as summarized above).

Additionally, agricultural operators must demonstrate to the permitting entity that their land is being physically or economically impacted by Utah prairie dogs. Before an application can be approved, the permitting entity must conduct a visual census of the applicant's property to verify that the land is being physically or economically impacted by Utah prairie dogs. The visual census will count prairie dogs on the applicant's property and determine a total population estimate (adults and juveniles) for the colony. A minimum spring count of seven animals is required to ensure that permits are authorized only where resident prairie dogs have become established on agricultural lands (Day 2011, pers. comm.). Thus, lands being minimally impacted by dispersing prairie dogs are not covered. These restrictions are consistent with past UDWR practice. Utah prairie dog populations have remained stable to increasing throughout implementation of the previous special rules and past practices, as implemented under the UDWR permit system. As described below, we also have concluded that allowing take on agricultural lands benefits Utah prairie dog conservation efforts (see "Conservation Benefits of Allowing Take on Specific Lands"). Therefore, consistent with past practice and data that indicate these restrictions will support the ongoing conservation of the species, we adopt these restrictions.

Properties Near Conservation Lands

Permitting entities will be allowed to issue permits for direct take on private properties within 0.8 km (0.5 mi) of Utah prairie dog conservation lands. All private properties within 0.8 km (0.5 mi) of conservation lands automatically fall into this category even if they also are agricultural lands. Although the 1991 special rule already allowed for take in this situation (i.e., take was allowed on private lands across the species' range), such take was not previously authorized by UDWR practice or Utah Code (R657-19-6, R657-19-7). However, we believe the continuation of this provision in our rulemaking is important for Utah prairie dog recovery efforts. Permitting take in this manner on private property within 0.8 km (0.5 mi) of conservation lands promotes landowner and community support for Utah prairie dog recovery on non-Federal lands.

Conservation lands are areas set aside for the preservation of Utah prairie dogs and are managed specifically or primarily toward that purpose. Conservation lands are generally selected or approved by the Recovery Team, taking into consideration spatial distribution, colony size, colony persistence, connectivity between habitats, and their ability to contribute to the species' recovery (USFWS 2012, p. 3.5-4). Conservation lands may include, but are not limited to, non-Federal prop-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

erties set aside as conservation banks, fee title purchased properties, properties under conservation easements, or properties subject to a safe harbor agreement. In order to be recognized as Utah prairie dog conservation land, a description of the parcel must be submitted to the permitting entity, accompanied by documentation that clearly defines the conservation benefits to the Utah prairie dog. In addition, documentation must be available describing the location of all private properties within 0.8 km (0.5 mi) of the conservation land parcel; the baseline populations of prairie dogs on the private properties (the highest estimated population size (adults and juveniles) of the last 5 years prior to the establishment of the conservation property); and the methods of Utah prairie dog control that will be allowed on the private properties. If no UDWR surveys were conducted during the previous 5-year period prior to establishment of the conservation property, then the baseline population is the estimated total (summer) population size on that property as determined in the first survey conducted after the establishment of the conservation property. The amount of permitted take on properties within 0.8 km (0.5 mi) of conservation lands, discussed further below, will be limited each year to the number of animals that exceed the baseline estimated population size (adults and juveniles) (see Limiting the Amount and Distribution of Direct Take That Can Be Permitted, "Properties Near Conservation Lands," below).

As described below (see "Conservation Benefits of Allowing Take on Specific Lands"), we find that this addition to the special rule is prudent for the conservation of Utah prairie dogs. We can lose recovery opportunities for the species if nearby landowners believe that activities on their lands will be encumbered in the future if prairie dogs migrate from conservation lands to nearby properties. This change to the 4(d) rule should greatly facilitate conservation opportunities by removing opposition to those efforts by other stakeholders that could be affected.

Safety Hazards, Human Cultural and Burial Sites

Take is allowed in areas where Utah prairie dogs are determined, with the written approval of the Service, to be presenting serious human safety hazards (e.g., airport safety areas, recreational sports fields, nursing homes, schools), or disturbing the sanctity of significant human burial or human cultural sites if these lands are determined not necessary for the conservation of the species. Significant human burial sites may include public cemeteries and tribal burial grounds (for example, as described by the Native American Graves Protection and Repatriation Act; Pub. L. 101-601; 25 U.S.C. 3001-3013). Significant human cultural sites may include sacred tribal sites such as Pow Wow grounds and sacred structures. No permit is required in these instances once written approval is received from the Service.

Take will only be allowed by the Service in areas where a credible, serious public safety hazard or harm to significant human cultural or human burial sites could be clearly documented. Areas of serious human safety concern do not include public rangelands or properties being developed for residential, commercial, or transportation uses. In addition, we do not intend for this rule to be used to eliminate prairie dogs because of concerns regarding plague transmission to humans, unless this disease becomes a proven human safety issue in the future, and directly linked to the presence of Utah prairie dogs.

To reduce hazards, prairie dog burrows may be filled with dirt if they are directly creating human hazards or disturbing the sanctity of significant human cultural or human burial sites. Utah prairie dogs also may be translocated from these sites to approved translocation sites by properly trained personnel using a Service-approved translocation protocol. Lethal take in approved situations is considered a last resort, and is only allowable after all practicable measures to resolve the conflict are implemented. All practicable measures means, with respect to these situations, the: (1) Construction of prairie-dog proof fence, above and below grade to specifications approved by the Service, around the area in which there is concern, and (2) translocation of Utah prairie dogs out of the area in which there is a concern. Translocations will include all animals that can be captured within the fenced area, regardless of the weight or sex of that animal. Lethal take is allowed only to remove prairie dogs that remain in **46173** these areas after the measures to fence and translocate are

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

successfully carried out. Despite our best engineering efforts, prairie-dog proof fences may still be breached by prairie dogs. The local communities or private entities are required to maintain the fence, fix any breaches, and modify the fences as necessary to limit access of prairie dogs in order for the lethal take authorization to be sustained long term. These circumstances will be certified in writing by the Service following any necessary site visits and coordination with the requesting entity. As stated above, no permit will be required to allow take under these conditions.

Conservation Benefits of Allowing Take on Specific Lands

Overall, continuing to allow permitted take on agricultural lands, lands within 0.8 km (0.5 mi) of conservation lands, and lands where Utah prairie dogs create serious human safety concerns or disturb the sanctity of significant human cultural or human burial sites is critical to facilitating the species' recovery. As previously described, Utah prairie dogs can reach unnaturally high densities and abundance on agricultural lands because of increased forage quantity and quality, and lower predator numbers (see "Habitat Requirements and Food Habits" section, above). If prairie dog populations on agricultural lands are left uncontrolled, the consequent crowding may result in diminished forage resources, leading to decreased reproduction and survival or increased emigration (Crocker-Bedford and Spillett 1981, pp. 21-22; Reeve and Vosburgh 2006 pp. 122-123). Controlling populations by removing some prairie dogs decreases competition for limited food resources, consequently resulting in increased reproduction and decreased mortality (Cully 1997, pp. 153-156; Reeve and Vosburgh 2006, pp. 122-123).

Controlled removal also may help mediate the potential for plague outbreaks on prairie dog colonies in some situations. High animal densities can play a role in facilitating the transmission of the disease between individuals (Cully 1989, p. 49; Anderson and Williams 1997, p. 730; Gage and Kosoy 2005, pp. 509 and 519-520). Therefore, allowing control on agricultural lands may enhance the long-term conservation of the Utah prairie dog on these lands by maintaining more sustainable populations (i.e., more natural animal densities are less likely to degrade their forage resources, and less likely to have large-scale plague outbreaks). However, as previously described (see "Life History"), there are a variety of factors that play a role in the occurrence and extent of enzootic and epizootic plague events, and thus we are not able to conclude that reducing prairie dog population densities will always result in the reduction of plague occurrence or its resulting impacts to prairie dog colonies.

We have concluded that allowing some control of Utah prairie dogs will increase the participation of landowners and local communities in the species' conservation and recovery. Until recently, Utah prairie dog recovery efforts focused on habitat enhancements and translocation of the animals to Federal lands (USFWS 1991, pp. 19-33). Consequently, recovery was largely dependent on achieving sufficient population numbers on Federal lands, without considering the potential for conservation benefits that could be achieved on private lands. We now have concluded that recovery will be achieved more rapidly if we increase conservation efforts on private and other non-Federal lands (where the majority of the species' occupied habitat occurs). Our new Utah Prairie Dog Revised Recovery Plan emphasizes conservation efforts on private and other non-Federal lands (USFWS 2012, p. 2.3-2).

New or increased Federal regulations can be disincentives for recovery efforts. These disincentives may be nearly insurmountable for State, Tribal, and private landowners. Many agricultural producers feel that Utah prairie dogs impact their operations through loss of forage for their cattle; equipment damage from driving across burrows; livestock injury if animals step in burrows; and decreased crop yields (e.g., prairie dogs eat crop vegetation such as alfalfa) (Elmore and Messmer 2006, p. 9). Local communities and congressional representatives are concerned regarding safety and sacredness issues associated with prairie dogs that occur respectively along airport runways and in local cemeteries. In addition, we expect that increased focus on establishing and managing non-Federal conservation lands will likely increase the size and extent of prairie dog colonies on and adjacent to these conservation lands. Thus, as recovery becomes more and more

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

successful on non-Federal lands, regulatory relief will become increasingly important.

To achieve recovery, we will need to create incentives for private landowners and local communities to participate in prairie dog habitat improvement and protection measures. We can achieve this only if we demonstrate that the benefits of prairie dog conservation outweigh the costs to the landowner and communities, and if control programs that address landowner concerns and opposition are available when needed (Elmore and Messmer 2006, p. 13). Some producers are interested in working with us on habitat and range improvement projects that benefit livestock and Utah prairie dogs simultaneously, or participating in conservation easements that benefit the species (Elmore and Messmer 2006, pp. 10-11, 13). However, agricultural producers want the ability to control or translocate prairie dogs to minimize levels of damage (Elmore and Messmer 2006, pp. 10, 13). Similarly, local communities want the ability to control Utah prairie dogs in specific situations where they cause serious human safety concerns or disturb the sanctity of human cultural or human burial sites.

Our recent experiences show that if we are mindful of landowner, community, and safety needs, and if we provide mechanisms to control Utah prairie dogs where they conflict with certain human land uses or create serious safety hazards, we can improve landowner and local community support for the species' conservation. For example, in a 2005 safe harbor agreement, a landowner agreed to restore habitat and allow the establishment of a new colony of prairie dogs on his property through translocations (USFWS 2005, entire), but conditioned his willingness to accept translocated animals on the fact that his safe harbor agreement allowed him to control animals if they impacted his livestock operations (USFWS 2005, pp. 5-6). Between 2005 and 2007, we completed five individual Utah prairie dog safe harbor agreements, all of which include the ability for a landowner to control some prairie dogs where they may impact their agricultural activities. These five safe harbor agreements provide habitat improvements for Utah prairie dogs on 1,230 ac (497 ha) of habitat.

Additionally, there may be opportunities to protect Utah prairie dogs and their habitats through fee-title purchase or conservation easements with willing landowners. We are more likely to gain community support for these land protection mechanisms if we can provide regulatory flexibility for neighboring landowners. For example, in 2001, the UDWR and Iron County purchased 73 ha (180 ac) in Parowan Valley, and renamed the area as the Parowan Valley Wildlife Management Area, designating it for the protection of a large Utah prairie dog colony. At the time, there was concern that **46174** neighboring landowners would be negatively impacted if prairie dog management activities resulted in the growth and expansion of the existing prairie dog colony. Therefore, to support the purchase and protection of this important colony, we worked with the landowner to allow the control of prairie dogs (above a 2001 baseline number on each property) for properties within 0.8 km (0.5 mi) of the Parowan Valley Wildlife Management Area. Because of the issuance of this permit, the local community supported the purchase and management of the property for conservation of the Utah prairie dog.

Another opportunity to promote the use of conservation easements is the Utah Prairie Dog Habitat Credit Exchange program (hereafter referred to as the "habitat credit exchange") or similar conservation banking opportunities. The credit exchange allows a program administrator (in this case, the Panoramaland Resource Conservation and Development Council, Inc.) to enroll willing landowners in a Utah prairie dog conservation bank that is beneficial to landowners, developers, and prairie dogs. A pilot program implemented in 2010 pays landowners to protect properties in perpetuity with conservation easements that conserve Utah prairie dogs. Conservation on private lands can then be used to mitigate development in Utah prairie dog habitat. The habitat credit exchange, or other conservation banking opportunities, can help us promote mitigation in a way that provides a net benefit to the species by incorporating private lands and protecting prairie dogs on these lands with perpetual conservation easements (Environmental Defense 2009, p. 1). Again, we believe that we are more likely to gain community support for these land protection mechanisms if we can provide regulatory flexibility for neighboring landowners.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

The protection of many conservation lands will occur as mitigation required to obtain incidental take permits under section 10(a)(1)(B) and their associated HCPs. The existing Iron County HCP allows the use of mitigation banks to offset the impacts of development to Utah prairie dogs (Iron County 2006). We are working with the counties and local communities to develop a rangewide HCP to replace the Iron County HCP. It is too early to describe specific mitigation scenarios under a new rangewide HCP, other than to summarize our intent that a new HCP contribute to recovery and simultaneously accommodate urban growth. Conservation banking agreements and conservation easements to conserve Utah prairie dog habitats on private or other non-Federal lands are likely tools that will be employed under this new HCP. We believe that local support for any conservation lands set aside for the species in association with HCPs, especially in urban or agricultural areas, will be greatly enhanced by our ability to control the expansion of colonies onto neighboring lands.

Many of the enrolled conservation lands will likely be in or adjacent to agricultural production. The goal in establishing conservation lands is to increase prairie dog populations. As such, we believe there will be site-specific needs to control some animals adjacent to the enrolled conservation lands, on nearby agricultural and other private properties. Our ability to provide sufficient control measures is essential if we are to gain increased interest on the part of private landowners and local communities in the long-term conservation of the Utah prairie dog.

Collectively, the available information indicates it is prudent to limit where take may be permitted to: (1) Agricultural lands being physically or economically impacted by Utah prairie dogs when the spring count on the agricultural lands is seven or more individuals (see Limiting the Amount and Distribution of Direct Take That Can Be Permitted, "Agricultural Lands," below), (2) private properties within 0.8 km (0.5 mi) of Utah prairie dog conservation lands, and (3) locations where Utah prairie dogs present serious human safety hazards or disturb the sanctity of significant human cultural or human burial sites—e.g., airport safety areas, recreational sports fields, cemeteries, sacred Tribal sites. Limiting the existing take authority to these locations is consistent with UDWR's permitting practices under the previous special rules. Prairie dogs in these areas achieve population densities and abundances higher than their counterparts in native semiarid grassland communities. In addition, allowing take on private property within 0.8 km (0.5 mi) of conservation lands and areas with safety or human cultural concerns will promote landowner and community support for Utah prairie dogs that is necessary to achieve recovery on non-Federal lands. The ability to allow some control of prairie dogs is prudent from a biological and social context, and has and will continue to enhance our ability to recover the species. Utah prairie dog populations have remained stable to increasing throughout implementation of the previous special rule and past practices, as implemented under the UDWR's permit system.

*Limiting the Amount and Distribution of Direct Take That Can Be Permitted*

Agricultural Lands

The 1991 special rule allowed UDWR to permit take for a maximum of 6,000 animals annually, without additional restrictions as long as such take was not having an effect that was inconsistent with Utah prairie dog conservation. A set maximum take limit such as this could be considered a fixed harvest rate.

According to recent literature, we now conclude that fixed harvest rates can lead to extirpation of prairie dog colonies, at least in the case of black-tailed prairie dogs (Reeve and Vosburgh 2006, pp. 123-125). This colony loss will occur more rapidly with larger fixed annual harvests (Reeve and Vosburgh 2006, pp. 123-125).

From 1985 through 2010, the total estimated rangewide population of Utah prairie dogs (including juveniles) ranged from 23,753 to 54,194 animals (see Table 3, above). Thus, since 1991, if UDWR had authorized the maximum amount of allowed take (6,000 animals), it would have represented 11 to 26 percent of the total estimated annual rangewide popula-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

tion (adults and juveniles). The UDWR has never authorized the 1991 rule's maximum allowed take (6,000 animals). Actual reported take has always been considerably below the maximum allowance. We do not know if a fixed amount of 6,000 animals would negatively affect Utah prairie dog populations over time. Therefore, when considered alongside the specific existing data for the Utah prairie dog, the information from available literature that pertains to harvest of prairie dogs in general seems to indicate that additional safeguards are prudent.

According to the literature, a fluctuating harvest rate based on a percentage of the known population can help ensure maintenance of a sustainable population, with no risk of extinction (Reeve and Vosburgh 2006, p. 123). Available models indicate that harvest rates of 20 to 25 percent of a prairie dog population are sustainable (Reeve and Vosburgh 2006, p. 123; CDOW 2007, p. 135); however, these models were not specific to Utah prairie dogs. In our view, the Utah prairie dog situation differs from the ones modeled. One major difference is that prairie dog productivity and survivorship, key assumptions for these models, are substantially higher in colonies occurring on irrigated agricultural land than they are on native semiarid **46175** grasslands (Collier 1975, pp. 42-43, 53; Crocker-Bedford and Spillet 1981, p. 1, 15-17). These differences suggest that existing models for black-tailed and Gunnison prairie dogs are poor predictors of likely impacts to Utah prairie dogs; the existing models are not specific to agricultural lands as in the case of this special rule. Thus, the suggested sustainable harvest rates recommended by these models are not directly applicable to agricultural lands occupied by Utah prairie dogs. Regardless, we use this available modeling in conjunction with data from 25 years of implementation of the previous special rules to allow take in a manner that promotes the conservation of the Utah prairie dog.

Although the previous special rules did not follow a fluctuating harvest-rate model (i.e., a fixed rate of 6,000 animals could be taken annually), we used the available UDWR implementation data to determine the yearly permitted and actual take numbers as percentages of total annual population estimates. Under the UDWR system, permitted take has averaged 5.7 percent of the total rangewide population estimate (range equals 1.8 to 13.0 percent), with actual take averaging 2.6 percent of the total rangewide population (range equals 0.9 to 5.3 percent). With these levels of permitted and reported take, rangewide Utah prairie dog populations have, to date, remained stable to increasing (see Figure 1, above).

This rule limits the allowable permitted take to no more than 10 percent of the estimated annual rangewide population (adults and juveniles). Take associated with agricultural lands can never exceed 7 percent of the estimated annual rangewide population. The remaining allowable take is reserved for properties within 0.8 km (0.5 mi) of conservation lands (see below).

While our new limit on allowable take is above the average actual take under the previous special rules, UDWR-permitted take associated with agricultural lands previously met or exceeded the standard for agricultural lands (7 percent) eight times since 1985. Thus, this rule is more restrictive than past practice in some years and less restrictive than past practice in other years. We also note that actual take has always been less than permitted take (see Table 3, above), and we expect this trend to continue under this revised special rule. In addition, our new limit on allowable take is well below the standards set by the previously described modeling where harvest rates of 20 to 25 percent are sustainable.

We include additional safeguards. Permitting entities will spatially distribute the 7 percent allowed take on agricultural lands across the three Recovery Units, based on the distribution of the total annual population estimate within each Recovery Unit. This spatial distribution will help ensure that the take is not clustered in one area, and is instead more uniform based on comparative annual population numbers.

Furthermore, we are limiting within-colony take on agricultural lands to one-half of a colony's estimated annual productivity. Annual productivity = [(2 x spring adult count) x 0.67 (proportion of adult females) x 0.97 (proportion of

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

breeding females) x 4 (average number of young per breeding female)], or approximately 36 percent of the total estimated population of the colony. This limit is consistent with UDWR's past practices. Under these practices, since 1985, we have never verified the loss of a prairie dog colony because of take permitted by UDWR (Day 2010, pers. comm.). Furthermore, according to UDWR personnel, prairie dog counts have remained stable to increasing on sites where permits are repeatedly requested, indicating a self-sustaining population and, sometimes, the expansion of these colonies despite long-term control efforts (Day 2010, pers. comm.). Our available data show that reported take in 1 year has not resulted in significant population declines of the colony the following year (Brown 2012). Thus, limiting within-colony take on agricultural lands to no more than one-half of a colony's estimated annual productivity (approximately 36 percent of the total estimated colony population) is consistent with conservation of the Utah prairie dog.

Colony size will be taken into consideration by the permitting biologist when evaluating the permittee's property and determining appropriate take levels, because the impacts of take may be greater on smaller colonies (CDOW 2007, p. 135). Personnel from the permitting entity will count prairie dogs on the applicant's property and determine a total population estimate (adults and juveniles) for each colony. The permitting entity will identify each permitted colony by name or number. A minimum spring count of seven animals (total population estimate = 50 animals) is required to ensure that permits are authorized only where resident prairie dogs have become established on agricultural lands (Day 2011, pers. comm.), and to ensure that lethal take does not result in the elimination of the colony (CDOW 2007, p. 128). If the maximum amount of take (one-half of the colony's productivity = 18 prairie dogs) occurs on this size colony, it would reduce the total colony size to 32 animals prior to the following breeding season. Colonies of at least 25 prairie dogs are likely to show population growth with very little risk of extinction. Populations with 50 or greater animals show no risk of extinction and strong population growth (CDOW 2007, p. 128). Therefore, we expect prairie dog colonies of at least 32 animals to continue to exist long term with minimal, regulated lethal take. This conclusion is supported by our observations that we have never verified the loss of a Utah prairie dog colony because of take permitted by UDWR under the previous special rules, and prairie dog counts have remained stable to increasing on sites where permits were repeatedly requested and given since 1985 (Day 2010, pers. comm.).

These limits are largely consistent with UDWR's past practice, which has successfully controlled prairie dogs in site-specific locations without negatively impacting recovery of the species (Day 2010, pers. comm.; Brown 2012). In fact, this rule is more restrictive in that it increases the minimum colony size for permitting from a spring count of five animals (1991 special rule) to a spring count of seven animals (total estimated population size = 50 animals) because that is the best available information we have to ensure continued population growth rates and low extinction risk (CDOW 2007, p. 128).

Properties Near Conservation Lands

As noted above, a maximum of 7 percent of estimated annual rangewide population is allocated to agricultural lands. The remaining take (3 percent or more, depending on the percent of take associated with agricultural lands) is reserved for permitted take on private property within 0.8 km (0.5 mi) of Utah prairie dog conservation lands. This level of take allows us to address impacts to private lands associated with increased prairie dog distribution and numbers that are likely to result from the rangewide protection of conservation properties. Without such ability, private landowners and local governments would likely not support, and could prevent, much if not all recovery progress on private lands. We have determined that the ability to respond to this need, in a carefully regulated environment, is necessary and advisable for the conservation of the Utah prairie dog.

*46176 The extent of take on properties within 0.8 km (0.5 mi) of conservation lands is further limited to not reduce populations below the baseline estimated total population size (adults and juveniles) that existed on these lands prior to the

establishment of the conservation property. This provision provides assurances to the landowners that they will not incur new Federal regulatory restrictions as a result of their habitat improvements and the reintroduction of prairie dogs on a conservation property. Conversely, this provision assists us with the creation of conservation properties by allowing landowners to take prairie dogs down to, but not below, the established baseline population. The property's baseline is the highest estimated population size (adults and juveniles) on the property during the 5 years prior to establishment of the conservation property, except that if no UDWR surveys to determine population size on a property were conducted during such 5-year period, the baseline population is the estimated total (summer) population size on that property as determined in the first survey conducted after the establishment of the conservation property. Thus, this provision provides a conservation benefit for Utah prairie dogs by promoting landowner support for such efforts while not reducing populations below the established baseline. Similar provisions were incorporated into all previously approved Utah prairie dog safe harbor agreements.

Safety Hazards, Human Cultural and Burial Sites

We are not limiting the amount of translocation or lethal take on lands where Utah prairie dogs create serious human safety hazards or disturb the sanctity of significant human cultural or human burial sites. These sites are relatively small areas, and for lethal take the areas must be fenced, and prairie dogs removed by translocation prior to the Service's written approval for lethal take. For example, fencing was recently constructed around the Parowan airport runway to preclude prairie dogs from using 53 ac (21 ha) of occupied habitat, and the 5 ac (2 ha) Paragonah cemetery will be fenced in 2012; prairie dogs will be translocated from these sites prior to lethal take. Thus, we expect that the numbers of Utah prairie dogs lethally removed will be small. In addition, as previously described, these areas do not contribute to conservation of the species because they are generally within otherwise developed areas with substantial human activity and habitat fragmentation. Translocation of prairie dogs from these sites also will assist with recovery efforts on Federal lands (USFWS 2012, p. 3.5-7).

Most studies on the impacts of shooting are related to recreational hunting on black-tailed prairie dog colonies. This information indicates that recreational shooting of other prairie dog species can cause localized effects on a population (Stockrahm 1979, pp. 80-84; Knowles 1988, p. 54; Vosburgh 1996, pp. 13, 15, 16, and 18; Vosburgh and Irby 1998, pp. 366-371; Pauli 2005, p. 1; Reeve and Vosburgh 2006, p. 144), but populations typically rebound thereafter (Knowles 1988, p. 54; Vosburgh 1996, pp. 16, 31; Dullum et al. 2005, p. 843; Pauli 2005, p. 17; Cully and Johnson 2006, pp. 6-7). Extirpations due to shooting, while documented, are rare (Knowles 1988, p. 54). Impacts to other species of prairie dogs from unregulated or minimally regulated recreational shooting, as cited above, are likely to be more pronounced than impacts to Utah prairie dog permitted control, given our restrictions on the amount and distribution of take.

On the whole, we believe our limits on the amount and distribution of take ensures that this rule does not negatively impact the stable-to-increasing Utah prairie dog population trends of the last 25 years. Continuing to allow sufficient permitted take limits will help ensure that private landowners and local communities are willing to work with us on prairie dog conservation efforts (see Limiting Where Take is Allowed, above). Consequently, we believe this final rule is sufficient to address prairie dog control issues and Utah prairie dog recovery simultaneously.

*Limiting Take by Season*

Agricultural Lands and Properties Near Conservation Lands

We are limiting take on agricultural lands and properties within 0.8 km (0.5 mi) of conservation lands by season. Take is allowed between June 15 and December 31. This is a moderate change from the dates authorized by the previous special rules, but is based on our most current knowledge of the species biology; pups emerge from their burrows by approxim-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

ately mid-June, at which time they are foraging independently (Hoogland 2003, p. 236; see "Life History," above). Therefore, the loss of female adult prairie dogs to shooting will not negatively affect the survivability of the remaining young. In addition, prairie dog populations with seasonal shooting closures of March 14 to June 15 show positive population growths and low to negligible risk of extirpation (CDOW 2007, p. 135). These seasonal shooting closure dates directly correspond to our timing of June 15 through December 31 for allowing direct lethal take on agricultural lands. Thus, we can conclude that restricting use of this 4(d) rule between the dates of January 1 through June 14 will result in positive population growths with low to negligible risk of extinction. This conclusion is supported by our observations that we have never verified the loss of a Utah prairie dog colony because of take permitted by UDWR, and prairie dog counts have remained stable to increasing on sites where permits were repeatedly requested over the last 25 years (Day 2010, pers. comm.). In this timeframe, UDWR provided permits to landowners beginning June 1. Thus, this revision to June 15 is more conservative than past practice, and is based on the best current available science.

According to the literature and on-the-ground experience with Utah prairie dogs, our timing of permitted Utah prairie dog control, when combined with other take limitations outlined elsewhere in this rule (e.g., a harvest rate based on a percentage of the known population and restrictions on lands where take is allowed), is sufficient to allow long-term, stable-to-improving population trends to continue. Thus, permitted Utah prairie dog control on agricultural lands and properties near conservation lands is allowed from June 15 to December 31.

Lethal take from March to May would likely kill pregnant or lactating females so that neither they nor their offspring would reproduce the following year (Knowles 1988, p. 55). If the timing of lethal take is restricted to times outside of the breeding and young-rearing (lactating) periods, then impacts can be minimized (Vosburgh and Irby 1998, p. 370; CDOW 2007, pp. 135-137). In fact, as described in this and previous rules (49 FR 22333, May 29, 1984; 56 FR 27439-27441, June 14, 1991), controlling prairie dogs when populations are at high densities (i.e., particularly during the summer months when the aboveground prairie dog population explodes as the juveniles emerge from their burrows) may enhance long-term population growth rates by reducing competition for limited resources and increasing overwinter survival (see Limiting Where Direct Take Can Be Permitted). This information is supported by observations that Utah prairie dog colonies are maintained at high levels on properties that have received multiple annual control permits despite over 25 years of permitted control under **46177** the previous special rules (Day 2010, pers. comm.).

Safety Hazards, Human Cultural and Burial Sites

We will not restrict lethal take to a specified timeframe in areas where prairie dogs present a serious human safety concern or disturb the sanctity of a significant human cultural or human burial site because the specific intent of lethal take in these areas is to remove all remaining prairie dogs from these areas following implementation of all practicable measures, including fencing and translocations.

*Limiting Methods Allowed To Implement Direct Take*

The previous special rules did not restrict the method or type of take UDWR could permit. In practice, UDWR previously permitted the control of Utah prairie dogs through translocation efforts, trapping intended to lethally remove prairie dogs, and shooting. This amendment limits methods of take that can be permitted on agricultural lands and properties within 0.8 km (0.5 mi) of conservation lands to be consistent with this past practice.

Agricultural Lands and Properties Near Conservation Lands

Translocations of Utah prairie dogs are used to increase the numbers of prairie dog colonies in new locations across the species' range. Translocation of Utah prairie dogs occurs within and between recovery units in part to address the species'

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

limited levels of genetic diversity (USFWS 2012, p. 1.9-1; Roberts et al. 2000). Translocation efforts include habitat enhancement at selected translocation sites and live trapping of Utah prairie dogs from existing colonies to move them to the selected translocation sites. In short, translocations play an important role in establishing new colonies and facilitating gene flow.

Thus, translocation will be one of the approved methods of taking Utah prairie dogs. Previously, only UDWR performed Utah prairie dog translocations. This rule allows all properly trained and permitted individuals to translocate prairie dogs to new colony sites in support of recovery actions, provided these parties comply with current Service-approved translocation guidance. Translocated prairie dogs count toward the take limits established by the previous special rules and will continue to count toward the more restricted take limits in this rule. Translocation activities must be in accordance with Service-approved translocation protocol in order for the provisions of this rule to apply.

While translocation is and will continue to be the preferred take option, largely due to its contribution to recovery, finite staff resources and a limited availability of suitable translocation sites require that other tools also be available. Thus, we are limiting the methods of intentional lethal take on agricultural lands and properties within 0.8 km (0.5 mi) of conservation lands to forms with a proven success record as demonstrated by past UDWR permitting, including lethal removal through trapping and shooting. Under this rule, permitted lethal take can be carried out by the landowner or the U.S. Department of Agriculture—Wildlife Services with the landowner's permission. Use of these methods has occurred over the past 25 years, while the total population rangewide and within individual colonies subject to take have remained stable to increasing (Day 2010, pers. comm.).

We are specifically prohibiting drowning, poisoning, and the use of gas cartridges, anticoagulants, and explosive devices as methods of permissible lethal control on agricultural lands and properties within 0.8 km (0.5 mi) of conservation lands. Drowning or poisoning are typically applied across large areas and usually kill large numbers of prairie dogs (Collier 1975, p. 55). These techniques were not employed by UDWR under the previous rule and are explicitly prohibited by this rule because they do not allow control agents to target a specific number of prairie dogs or track actual take.

One potential concern is lead poisoning as an indirect impact from shooting. Specifically, shooting may increase the potential for lead poisoning in predators and scavengers consuming shot prairie dogs (Reeve and Vosburgh 2006, p. 154). This risk may extend to prairie dogs, which have occasionally been observed scavenging carcasses (Hoogland 1995, p. 14). Expanding bullets leave an average of 228.4 milligrams (mg) (3.426 grains) of lead in a prairie dog carcass, while nonexpanding bullets averaged 19.8 mg (0.297 grains) of lead (Pauli and Buskirk 2007, p. 103). The amount of lead in a single prairie dog carcass shot with one expanding bullet is potentially sufficient to acutely poison scavengers or predators, and may provide an important portal for lead entering wildlife food chains (Pauli and Buskirk 2007, p. 103). A wide range of sublethal toxic effects also is possible from smaller quantities of lead (Pauli and Buskirk 2007, p. 103).

At the present time, we do not have information to indicate that the concern of potential lead poisoning is translating into impacts on Utah prairie dogs. Allowed take is limited to agricultural lands, properties within 0.8 km (0.5 mi) of conservation lands, and areas where prairie dogs create serious human hazards or disturb the sanctity of significant human cultural or human burial sites. Therefore, any potential site-specific impacts as a result of potential lead poisoning are limited in scope and likely of minor consequence to the Utah prairie dog. Limitations on the timing of allowed control further limit the scope of potential impacts. Our December 3, 2009, black-tailed prairie dog status review came to a similar conclusion when it found use of expandable lead shot did not pose a substantial risk of lead poisoning to surviving prairie dogs due to scavenging carcasses (74 FR 63343).

Given these findings, this rule does not prohibit certain types of shot (expandable vs. nonexpendable or lead vs. nonlead).

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

However, we may consider ammunition-type restrictions in the future if available data indicate such restrictions would be necessary and advisable to provide for the conservation of the species.

Safety Hazards, Human Cultural and Burial Sites

The use of any lethal take methodology will be allowed in areas where Utah prairie dogs create serious human safety hazards or disturb the sanctity of significant human cultural or human burial sites. At the time that lethal take is authorized at these sites, the areas will have been fenced and prairie dogs translocated off-site. Therefore, we anticipate that relatively small numbers of prairie dogs will remain in these areas. We do not consider these areas important to the conservation of the species because as previously stated they are generally within otherwise developed areas with substantial human activity and habitat fragmentation. It is our intent that these designated areas remain free of prairie dogs, and thus all otherwise lawful methodologies for lethal take are allowable.

*Exemption for Incidental Take From Normal Agricultural Practices*

Normal agricultural practices can result in the unlawful take (harm, harass, or kill) of Utah prairie dogs. For example, agricultural equipment can accidentally crush burrows or individual animals. Similarly, burrows also can be flooded by normal irrigation practices and thus made uninhabitable **\*46178** for Utah prairie dogs, or result in incidental mortality. Although the incidental take permit for the Iron County HCP (Iron County 2006, entire) authorizes normal agricultural practices as a form of non-permanent take in Iron County, this incidental take permit does not extend to address these issues for agricultural users across the entire range of the Utah prairie dog.

We are exempting incidental take resulting from agricultural practices on legitimately operating agricultural lands. Exempted practices include plowing to depths not exceeding 46 centimeters (cm) (18 in.), discing, harrowing, irrigating crops, mowing, harvesting, and bailing, as long as the activities are not intended to eradicate Utah prairie dogs. These are traditional practices on the landscape where Utah prairie dogs occur.

While it is possible that some incidental mortality or harassment results from these activities, no available information indicates sizable or noteworthy impacts. Similarly, the available information (namely, annual Utah prairie dog surveys conducted by UDWR rangewide; see "Distribution and Abundance," above) does not indicate adverse impacts at the colony or species level. The continued presence of large, persistent colonies on agricultural lands despite ongoing agricultural uses indicates any negative impacts are minor and temporary. Agricultural operations make the land more productive than it would be in its natural state. Provided that careful regulation of direct take continues, this increased productivity appears, based on individual colony persistence and abundance data, to more than offset any temporary negative impacts that are created by the incidental take of individual prairie dogs.

Providing a take exemption for otherwise legal activities associated with standard agricultural practices is necessary and advisable to provide for the conservation of the species. This is the case because agricultural users are a key partner in our efforts to recover the Utah prairie dog. As previously described, up to 85 percent of prairie dogs occur on private lands (see Table 2), many of which are in agricultural production (USFWS 2012, p. 1.7-3). Agricultural users are often interested in participating in conservation programs for the species such as safe harbors and conservation easements if they know they have some regulatory flexibility regarding their daily operational activities (see Limiting Where Take is Allowed, Conservation Benefits of Allowing Take on Specific Lands, above; Elmore and Messmer 2006, p. 9-13; US-FWS 2012, p. 2.3-2). If we can provide regulatory flexibility to these land users, they are more likely to support rangewide conservation programs for the Utah prairie dog.

Because such incidental take is not limited in quantity, it is imperative we build in safeguards to prevent abuse. There-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

fore, the above activities are exempted from incidental take prohibitions on agricultural lands, only in accordance with the previously described Utah Farmland Assessment Act of 1969 (Utah Code Annotated Sections 59-2-501 through 59-2-515). To be considered agricultural land under this rule, lands must meet the following requirements: They must meet the general classification of irrigated, dryland, grazing land, orchard, or meadow; must be capable of producing crops or forage; must be at least 2 contiguous ha (5 contiguous ac) (smaller parcels may qualify where devoted to agriculture use in conjunction with other eligible acreage under identical legal ownership); must be managed in such a way that there is a reasonable expectation of profit; must have been devoted to agricultural use for at least 2 successive years immediately preceding the year in which application of agricultural land status is made; and must meet State average annual (per acre) production requirements.

Limiting the take to such lands ensures only legitimately operating agricultural producers will be eligible for the incidental take provisions as described in this rule. As previously discussed, available information indicates that prairie dog populations on agricultural lands are not negatively affected by ongoing standard agricultural practices. In fact, 25 years of data under the previous special rules show stable-to-increasing, rangewide prairie dog population trends. Providing the safeguard of specifically defining agricultural lands ensures that we limit the allowable incidental take to specific types of agricultural uses, of which any possible resulting negative impact would be only a minor and temporary accompaniment to the continued long-term benefits to the species. As described earlier, we conclude that allowing direct lethal take in agricultural areas will increase the participation of landowners and local communities in the species' conservation and recovery (see Limiting Where Take is Allowed, "Conservation Benefits of Allowing Take on Specific Lands"). This same benefit is anticipated with standard agricultural practices because agricultural users are a key partner for Utah prairie dog recovery efforts (see Exemption for Incidental Take from Normal Agricultural Practices, above).

Effects of This Rule

The 1991 special rule (56 FR 27438, June 14, 1991; 50 CFR 17.40(g)) authorized UDWR to permit take of up to 6,000 animals on private land within the species' range annually. We amend that rule with new restrictions on direct take previously authorized and add a new incidental take authorization. Table 4 summarizes the amendments finalized by this rule.

Table 4—Summary of Our Final Amendments

| Final Amendments | |
| --- | --- |
| Who Can Allow Take | UDWR or, with the Service's written approval, other entities can perform the permitting and reporting tasks for control activities on agricultural lands or properties within 0.8 km (0.5 mi) of conservation lands. No permits are required for take in areas where prairie dogs create serious human safety hazards or disturb the sanctity of significant human cultural or human burial sites. |
| Where Direct Take Is Allowed | Direct take is limited to: Agricultural land being physically or economically impacted by Utah prairie dogs when the spring count on the agricultural lands is seven or more individuals; private properties within 0.8 km (0.5 mi) of Utah prairie dog conservation land; and areas where human safety hazards or the sanctity of significant human cultural or human burial sites are a serious concern, but only after |

all practicable measures to resolve the conflict are implemented.

Amount of Rangewide Direct Take Allowed

The upper permitted take limit may not exceed 10 percent of the estimated rangewide population annually for agricultural lands and properties within 0.8 km (0.5 mi) of conservation lands; and, on agricultural lands, may not exceed 7 percent of the estimated annual rangewide population annually. There is no limit for the amount of take in areas where prairie dogs create serious human safety hazards or disturb the sanctity of significant human cultural or human burial sites, and take in these circumstances does not contribute to the upper permitted take limits described above.

Site-Specific Limits on Amount of Direct Take

On agricultural lands, within-colony take is limited to one-half of a colony's estimated annual production (approximately 36 percent of estimated total population). On properties neighboring conservation lands, take is restricted to animals in excess of the baseline population. The baseline population is the highest estimated total (summer) population size on that property during the 5 years prior to establishment of the conservation property, except that if no UDWR surveys to determine population size on a property were conducted during such 5-year period, the baseline population is the estimated total (summer) population size on that property as determined in the first survey conducted after the establishment of the conservation property. There are no site-specific direct take limits in areas where prairie dogs create serious human safety hazards or disturb the sanctity of significant human cultural or human burial sites.

Timing of Allowed Direct Take

The timing of permitted direct take on agricultural lands and properties ne within 0.8 km (0.5 mi) of conservation lands is limited to June 15 through December 31. There is no timing restriction where prairie dogs create serious human safety hazards or disturb the sanctity of significant human cultural or human burial sites, except that translocations must be completed prior to conducting any lethal take.

Methods Allowed to Implement Direct Take

On agricultural lands and properties within 0.8 km (0.5 mi) of conservation lands, direct take is limited to activities associated with translocation efforts by trained and permitted individuals complying with current Service-approved guidance, trapping intended to lethally remove prairie dogs, and shooting. Actions intended to drown or poison prairie dogs, and the use of gas cartridges, anticoagulants, or explosive devices is prohibited in these areas. There are no restrictions on methods to implement take in areas where prairie

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

| | |
|---|---|
| | dogs create serious human safety hazards or disturb the sanctity of significant human cultural or burial sites, except that translocations will be conducted before lethal measures of control are allowed. |
| Service Ability to Further Restrict Direct Take | Unchanged. The Service may immediately prohibit or restrict take as appropriate for the conservation of the species. |
| Incidental Take for Agricultural Activities | Utah prairie dogs may be taken when take is incidental to otherwise legal activities associated with standard agricultural practices (see Regulation Promulgation section for specifics). |

**\*46179** First, this rule restricts where direct take can be permitted to: (1) Agricultural land being physically or economically impacted by Utah prairie dogs when the spring count on the agricultural lands is 7 or more individuals; (2) private property within 0.8 km (0.5 mi) of Utah prairie dog conservation land; and (3) areas where Utah prairie dogs are determined, with the approval of the Service, to be presenting a serious human safety hazard (e.g., airport safety areas, recreational sports fields, nursing homes, schools), or disturbing the sanctity of significant human cultural or human burial sites if these lands are determined not necessary for the conservation of the species.

Second, this rule limits the amount and distribution of direct take that can be permitted. Total take cannot exceed 10 percent of the estimated annual rangewide population. On agricultural lands, permitted take is limited to 7 percent of the estimated annual rangewide population and within-colony take is limited to one-half of a colony's estimated annual productivity. On properties within 0.8 km (0.5 mi) of conservation lands, the remaining take (3 percent of the estimated annual rangewide population or more, depending on the amount permitted on agricultural lands) is restricted to animals in excess of the baseline population.

Third, this rule limits the methods of take that can be permitted on agricultural lands and properties within 0.8 km (0.5 mi) of conservation lands to include: (1) Activities associated with translocation efforts by trained and permitted individuals complying with current Service-approved guidance; (2) trapping intended to lethally remove prairie dogs; and (3) shooting.

These limitations on direct take are largely consistent with past UDWR practice. Slight modifications are included where implementation data indicate modifications are warranted.

Additionally, this rule exempts standard agricultural practices from incidental take prohibitions on private property meeting the Utah Farmland Assessment Act of 1969 (Utah Code Annotated Sections 59-2-501 through 59-2-515) definition of agricultural lands. Any Utah prairie dog mortalities resulting from these standard agricultural practices are in addition to the direct or intentional take described above. Allowable practices include plowing to depths that do not exceed 46 cm (18 in.), discing, harrowing, irrigating crops, mowing, harvesting, and bailing, as long as the activities are not intended to eradicate Utah prairie dogs.

Finally, the Service maintains the right to immediately prohibit or restrict permitted taking. Restrictions on permitted taking could be implemented without additional rulemaking, as appropriate for the conservation of the species, if we receive evidence that taking pursuant to the special rule is having an effect that is inconsistent with the conservation of the Utah prairie dog. If restrictions on permitted taking are required, the Service will immediately notify the permitting entities in writing.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

These new restrictions on direct take and the new incidental take provision will support the conservation of the species while still providing relief and conservation incentives to private landowners. On the whole, we believe this rule will help maintain the stable-to-increasing (more likely increasing) long-term population trends we have seen over the last 25 years, and facilitate the recovery of the Utah prairie dog.

**\*46180** Required Determinations

*Regulatory Planning and Review (Executive Orders 12866 and 13563)*

Executive Order (E.O.) 12866 provides that the Office of Information and Regulatory Affairs will review all significant rules. The Office of Information and Regulatory Affairs has determined that this rule is not significant.

E.O. 13563 reaffirms the principles of E.O. 12866 while calling for improvements in the nation's regulatory system to promote predictability, to reduce uncertainty, and to use the best, most innovative, and least burdensome tools for achieving regulatory ends. The E.O. directs agencies to consider regulatory approaches that reduce burdens and maintain flexibility and freedom of choice for the public where these approaches are relevant, feasible, and consistent with regulatory objectives. The E.O. 13563 emphasizes further that regulations must be based on the best available science and that the rulemaking process must allow for public participation and an open exchange of ideas. We have developed this rule in a manner consistent with these requirements.

*Regulatory Flexibility Act*

Under the Regulatory Flexibility Act (RFA) 5 U.S.C. 601 et seq., as amended by the Small Business Regulatory Enforcement Fairness Act (SBREFA) of 1996, whenever an agency must publish a notice of rulemaking for any proposed or final rule, it must prepare and make available for public comment a regulatory flexibility analysis that describes the effects of the rule on small entities (small businesses, small organizations, and small government jurisdictions). However, no regulatory flexibility analysis is required if the head of the agency certifies the rule will not have a significant economic impact on a substantial number of small entities. The SBREFA amended RFA to require Federal agencies to provide a statement of the factual basis for certifying that the rule will not have a significant economic impact on a substantial number of small entities. Thus, for a regulatory flexibility analysis to be required, impacts must exceed a threshold for "significant impact" and a threshold for a "substantial number of small entities" (see 5 U.S.C. 605(b)). Based on the information that is available to us at this time, we certify that this regulation will not have a significant economic impact on a substantial number of small entities. The following discussion explains our rationale.

Utah prairie dogs have been Federally listed under the ESA since the early 1970s (38 FR 14678, June 4, 1973; 39 FR 1158, January 4, 1974). A section 4(d) special rule has been in place since 1984 that provides protections deemed necessary and advisable to provide for the conservation of the species (49 FR 22330, May 29, 1984; 56 FR 27438, June 14, 1991). These special regulations allowed limited take of Utah prairie dogs on private land from June 1 through December 31, as permitted by UDWR (50 CFR 17.40(g)). While this final rule places limits on the previous special rules, the changes are largely consistent with past UDWR permitting practices. Because this rule largely institutionalizes past practices, there should be little or no increased costs associated with this regulation compared to the past similar special rules that were in effect for the last several decades.

In summary, we have considered whether the rule results in a significant economic impact on a substantial number of small entities. For the above reasons and based on currently available information, we certify that these amendments do not have a significant economic impact on a substantial number of small entities. Therefore, a regulatory flexibility analysis is not required.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

*Unfunded Mandates Reform Act*

In accordance with the Unfunded Mandates Reform Act (2 U.S.C. 1501 et seq.), we make the following findings:

(a) This rule will not produce a Federal mandate. In general, a Federal mandate is a provision in legislation, statute, or regulation that would impose an enforceable duty upon State, local, or Tribal governments, or the private sector, and includes both "Federal intergovernmental mandates" and "Federal private sector mandates." These terms are defined in 2 U.S.C. 658(5)-(7). "Federal intergovernmental mandate" includes a regulation that "would impose an enforceable duty upon State, local, or [T]ribal governments," with two exceptions. It excludes "a condition of Federal assistance." It also excludes "a duty arising from participation in a voluntary Federal program," unless the regulation "relates to a then-existing Federal program under which $500,000,000 or more is provided annually to State, local, and tribal governments under entitlement authority," if the provision would "increase the stringency of conditions of assistance" or "place caps upon, or otherwise decrease, the Federal Government's responsibility to provide funding," and the State, local, or Tribal governments "lack authority" to adjust accordingly. Federal private sector mandate" includes a regulation that "would impose an enforceable duty upon the private sector, except (i) a condition of Federal assistance or (ii) a duty arising from participation in a voluntary Federal program."

This rule does not impose a legally binding duty on non-Federal Government entities or private parties. Instead, this amendment to the previous special rules establishes take authorizations and limitations deemed necessary and advisable to provide for the conservation of the Utah prairie dog. Application of the provisions within this rule, as limited by existing regulations and this amendment, is optional.

(b) We do not believe that this rule significantly or uniquely affects small governments. The State of Utah originally requested measures such as this regulation to assist with reducing conflicts between Utah prairie dogs and local landowners on agricultural lands (49 FR 22330, May 29, 1984). In addition, the UDWR actively assists with implementation of the 1984 special rule, as amended in 1991, and will do the same under this regulation, through a permitting system. Under this rule, we have included the ability for other permitting entities to perform many of the UDWR's permitting and reporting tasks for control activities. However, this change was in response to a recommendation from UDWR provided in that agency's comments to our proposed rule. Thus, no intrusion on State policy or administration is expected; roles or responsibilities of Federal or State governments will not change; and fiscal capacity will not be substantially directly affected. The special rule operates to maintain the existing relationship between the States and the Federal Government. Furthermore, the limitations on where permitted take can occur, the amount of take that can be permitted, and methods of take that can be permitted are largely consistent with past UDWR practices. Therefore, the rule will not have a significant or unique effect on State, local, or Tribal governments or the private sector. A statement containing the information required by the Unfunded Mandates Reform Act is not required.

*Takings*

This action is exempt from the requirements of E.O. 12630 (Government Actions and Interference with Constitutionally Protected Private Property Rights). According to section VI(D)(3) of the Attorney General's **\*46181** Guidelines for the Evaluation of Risk and Avoidance of Unanticipated Takings, regulations allowing the take of wildlife issued under the ESA fall under a categorical exemption. This rule pertains to regulation of take (defined by the ESA as "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct") deemed necessary and advisable to provide for the conservation of the Utah prairie dog. Thus, this exemption applies to this action.

Regardless, we do not believe this action poses significant takings implications. This rule will substantially advance a legitimate government interest (conservation and recovery of listed species). However, it will not deny property owners

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

economically viable use of their land, and will not present a bar to all reasonable and expected beneficial use of private property. We believe this rule provides substantial flexibility to our partners while still providing for the conservation of the Utah prairie dog. Should additional take provisions be required, an applicant has the option to develop a habitat conservation plan and request an incidental take permit (see section 10(a)(1)(B) of the ESA). This approach allows permit holders to proceed with an activity that is legal in all other respects, but that results in the "incidental" take of a listed species.

We have concluded that this action does not result in any takings of private property. Should any takings implications associated with this amendment be realized, they will likely be insignificant.

*Federalism*

In accordance with E.O. 13132 (Federalism), this rule does not have significant Federalism effects. A federalism summary impact statement is not required. In keeping with Department of the Interior and Department of Commerce policy, we requested information from, and coordinated development of this amendment with, appropriate State resource agencies in Utah. The State of Utah originally requested measures such as this regulation to assist with reducing conflicts between Utah prairie dogs and local landowners on agricultural lands (49 FR 22330, May 29, 1984). In addition, the UDWR actively assists with implementation of the previous special rules, and will do the same under this regulation, through a permitting system. Under this rule, we have included the ability for other permitting entities to perform many of the UDWR's permitting and reporting tasks for control activities. However, this change was in response to a recommendation from UDWR provided in that agency's comments to our proposed rule. Thus, no intrusion on State policy or administration is expected; roles or responsibilities of Federal or State governments will not change, and fiscal capacity will not be substantially directly affected. The special rule operates and, as amended, will continue to operate to maintain the existing relationship between the State and the Federal Government. Therefore, this rule does not have significant Federalism effects or implications to warrant the preparation of a federalism summary impact statement pursuant to the provisions of E.O. 13132.

*Civil Justice Reform*

In accordance with E.O. 12988 (Civil Justice Reform), the Office of the Solicitor has determined that the rule does not unduly burden the judicial system and that it meets the requirements of sections 3(a) and 3(b)(2) of the Order. We have amended the previous special rules for the Utah prairie dog in accordance with the provisions of the ESA. Under section 4(d) of the ESA, the Secretary may extend to a threatened species those protections provided to an endangered species as deemed necessary and advisable to provide for the conservation of the species. These amendments satisfy this standard.

*Paperwork Reduction Act*

This rule does not contain any new collections of information that require approval by OMB under the Paperwork Reduction Act of 1995 (44 U.S.C. 3501 et seq.). This rule will not impose recordkeeping or reporting requirements on State or local governments, individuals, businesses, or organizations. An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a currently valid OMB control number.

*National Environmental Policy Act*

In 1983, upon recommendation of the Council on Environmental Quality, the Service determined that National Environmental Policy Act (NEPA) documents need not be prepared in connection with regulations adopted pursuant to section 4(a) of the ESA (http://ceq.hss.doe.gov/nepa/regs/1983/1983guid.htm). The Service subsequently expanded this determ-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

ination to section 4(d) rules. A section 4(d) rule provides the appropriate and necessary take prohibitions and authorizations for a species that has been determined to be threatened under section 4(a) of the ESA. It is our view that NEPA procedures unnecessarily overlay NEPA's own matrix upon the ESA section 4 decisionmaking process. For example, the opportunity for public comment—one of the goals of NEPA—is already provided through section 4 rulemaking procedures.

However, out of an abundance of caution, we complied with the provisions of NEPA for this rulemaking. We analyzed the impact of this modification to the existing special rule and determined that there were no significant impacts or effects caused by this rule. A final environmental assessment was completed for this action, and is available for public inspection (see ADDRESSES section).

*Government-to-Government Relationship With Tribes*

In accordance with the President's memorandum of April 29, 1994, Government-to-Government Relations With Native American Tribal Governments (59 FR 22951), E.O. 13175, and the Department of the Interior's manual at 512 DM 2, we readily acknowledge our responsibility to communicate meaningfully with recognized Federal Tribes on a government-to-government basis. In accordance with Secretarial Order 3206 of June 5, 1997 (American Indian Tribal Rights, Federal-Tribal Trust Responsibilities, and the ESA), we readily acknowledge our responsibilities to work directly with Tribes in developing programs for healthy ecosystems, to acknowledge that Tribal lands are not subject to the same controls as Federal public lands, to remain sensitive to Indian culture, and to make information available to Tribes. Therefore, we coordinated with affected Tribes within the range of the Utah prairie dog. We did not receive any comments on the proposed special regulations from Tribes or Tribal members during the public comment period.

*Energy Supply, Distribution, or Use*

On May 18, 2001, the President issued E.O. 13211 (Actions Concerning Regulations That Significantly Affect Energy Supply, Distribution, or Use) on regulations that significantly affect energy supply, distribution, and use. E.O. 13211 requires agencies to prepare Statements of Energy Effects when undertaking certain actions. We do not expect this action to significantly affect energy supplies, distribution, or use. Therefore, this action is not a significant **\*46182** energy action, and no Statement of Energy Effects is required.

References Cited

A complete list of all references cited in this rulemaking is available upon request from our Utah Ecological Services Field Office (see FOR FURTHER INFORMATION CONTACT section).

List of Subjects in 50 CFR Part 17

Endangered and threatened species, Exports, Imports, Reporting and recordkeeping requirements, Transportation.

Regulation Promulgation

For the reasons stated in the preamble, the Service amends part 17, chapter I, title 50 of the Code of Federal Regulations, as set forth below:

PART 17—[AMENDED]1. The authority citation for part 17 continues to read as follows:

Authority: 16 U.S.C. 1361-1407; 16 U.S.C. 1531-1544; 16 U.S.C. 4201-4245; Pub. L. 99-625, 100 Stat. 3500; unless otherwise noted.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

50 CFR § 17.40

2. Amend § 17.40 by revising paragraph (g) to read as follows:

50 CFR § 17.40

§ 17.40 Special rules—mammals.

* * * * *

(g) Utah prairie dog (Cynomys parvidens).

(1) Except as noted in paragraphs (g)(2) through (g)(6) of this section, all prohibitions of § 17.31(a) and (b) and exemptions of § 17.32 apply to the Utah prairie dog.

(2) A Utah prairie dog may be directly or intentionally taken as described in paragraphs (g)(3) and (4) of this section on agricultural lands, properties within 0.8 kilometers (km) (0.5 miles (mi)) of conservation lands, and areas where prairie dogs create serious human safety hazards or disturb the sanctity of significant human cultural or human burial sites.

(3) Agricultural lands and properties near conservation lands. When permitted by the Utah Division of Wildlife Resources (UDWR), or other parties as authorized in writing by the Service, direct or intentional take is allowed on private properties that are located within 0.8 km (0.5 mi) of conservation land, and on agricultural land. Records on permitted take will be maintained by the State (or other parties as authorized in writing by the Service), and made available to the Service upon request.

(i) Agricultural land. (A) Take may be permitted only on agricultural land being physically or economically affected by Utah prairie dogs, and only when the spring count on the agricultural lands is seven or more individuals, and only during the period of June 15 to December 31; and

(B) The land must:

(1) Meet the general classification of irrigated, dryland, grazing land, orchard, or meadow;

(2) Be capable of producing crops or forage;

(3) Be at least 2 contiguous hectares (5 contiguous acres) in area (smaller parcels may qualify where devoted to agricultural use in conjunction with other eligible acreage under identical legal ownership);

(4) Be managed in such a way that there is a reasonable expectation of profit;

(5) Have been devoted to agricultural use for at least 2 successive years immediately preceding the year in which application is made; and

(6) Meet State average annual (per-acre) production requirements.

(ii) Private property near conservation land. (A) Take may be permitted on private properties within 0.8 km (0.5 mi) of Utah prairie dog conservation land during the period of June 15 to December 31.

(B) Conservation lands are defined as non-Federal areas set aside for the preservation of Utah prairie dogs and are man-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

aged specifically or primarily toward that purpose. Conservation lands may include, but are not limited to, properties set aside as conservation banks, fee-title purchased properties, properties under conservation easements, and properties subject to a safe harbor agreement (see § 17.22). Conservation lands do not include Federal lands.

(iii) Amount of permitted take on agricultural lands and private property near conservation land. (A) The UDWR, or other parties as authorized in writing by the Service, will ensure that permitted take on agricultural lands and properties within 0.8 km (0.5 mi) of conservation lands does not exceed 10 percent of the estimated rangewide population annually.

(B) On agricultural lands, the UDWR, or other parties as authorized in writing by the Service, will limit permitted take to 7 percent of the estimated annual rangewide population and will limit within-colony take to one-half of a colony's estimated annual production. The UDWR, or other parties as authorized in writing by the Service, will spatially distribute the 7 percent allowed take on agricultural lands across the three Recovery Units, based on the distribution of the total annual population estimate within each Recovery Unit.

(C) In setting take limits on properties within 0.8 km (0.5 mi) of conservation lands, the UDWR, or other parties as authorized in writing by the Service, will consider the amount of take that occurs on agricultural lands. The State, or other parties as authorized in writing by the Service, will restrict the remaining permitted take (the amount that would bring the total take up to 10 percent of the estimated annual rangewide population) on properties within 0.8 km (0.5 mi) of conservation lands to animals in excess of the baseline population. The baseline population of these lands is determined in accordance with paragraph (g)(3)(iii)(D) of this section.

(D) Take on properties within 0.8 km (0.5 mi) of conservation lands is restricted to prairie dogs in excess of the baseline population. The baseline population is the highest estimated total (summer) population size on that property during the 5 years prior to the establishment of the conservation property, except that if no UDWR surveys to determine population size on a property were conducted during such 5-year period, the baseline population is the estimated total (summer) population size on that property as determined in the first survey conducted after the establishment of the conservation property. The baseline population will be established by the UDWR, or other parties as authorized in writing by the Service.

(E) Translocated Utah prairie dogs will count toward the take limits in paragraphs (g)(3)(iii)(A) through (D) of this section.

(iv) Methods of allowed direct take on agricultural lands and private properties near conservation land. Methods for controlling Utah prairie dogs on agricultural lands and properties within 0.8 km (0.5 mi) of conservation lands are limited to activities associated with translocation efforts by trained and permitted individuals complying with current Service-approved guidance, trapping intended for lethal removal, and shooting. Actions intended to drown or poison Utah prairie dogs and the use of gas cartridges, anticoagulants, and explosive devices are prohibited.

(4) Human safety hazards and significant human cultural or human burial sites.

(i) Nonlethal take is allowed where Utah prairie dogs create serious human safety hazards or disturb the sanctity of significant human cultural or human burial sites, if approved in writing by the Service. To reduce hazards, prairie dog burrows may be filled with dirt if they are directly creating human hazards or disturbing the sanctity of **46183** significant human cultural or human burial sites. Utah prairie dogs also may be translocated from these sites to approved translocation sites by properly trained personnel using Service-approved translocation protocols.

(ii) Direct or intentional lethal take is allowed where Utah prairie dogs create serious human safety hazards or disturb the

sanctity of significant human cultural or human burial sites, but only after all practicable measures to resolve the conflict are implemented, and only as approved in writing by the Service. A permit is not required to allow take under these conditions.

(A) All practicable measures means, with respect to these situations:

(1) Construction of prairie-dog-proof fence, above and below grade to specifications approved by the Service, around the area in which there is concern.

(2) Translocation of Utah prairie dogs out of the fenced area in which there is a concern must be conducted prior to allowing lethal take. Lethal take is allowed only to remove prairie dogs that remain in these areas after the measures to fence and translocate are successfully carried out.

(3) Continued maintenance or modification of the fence as needed to preclude Utah prairie dogs from entering the fenced sites.

(B) There are no restrictions on the amount, timing, or methods of lethal take allowed on lands where Utah prairie dogs create serious human safety hazards or disturb the sanctity of significant human cultural or human burial sites, as long as all qualifications in paragraphs (g)(4)(ii)(A)(1)through (3) of this section are met.

(C) The amount of take in areas where Utah prairie dogs create serious human safety hazards or disturb the sanctity of significant human cultural or human burial sites does not contribute to the upper permitted take limits described above for agricultural lands and private properties within 0.8 km (0.5 mi) of conservation lands.

(5) Incidental take associated with agriculture. Utah prairie dogs may be taken when take is incidental to otherwise-legal activities associated with legal and standard agricultural practices on legitimately operating agricultural lands. Acceptable practices include plowing to depths that do not exceed 46 cm (18 in.), discing, harrowing, irrigating crops, mowing, harvesting, and bailing, as long as the activities are not intended to eradicate Utah prairie dogs. There is no numeric limit established for incidental take associated with standard agricultural practices. Incidental take is in addition to, and does not contribute to, the take limits described in paragraphs (g)(2) through (4) of this section. A permit is not required for incidental take associated with agricultural practices.

(6) If the Service receives evidence that take pursuant to paragraphs (g)(2) through (5) of this section is having an effect that is inconsistent with the conservation of the Utah prairie dog, the Service may immediately prohibit or restrict such take as appropriate for the conservation of the species. The Service will notify the permitting entities in writing if take restrictions are necessary.

* * * * *

Dated: July 17, 2012.

Eileen Sobeck,

Acting Assistant Secretary for Fish and Wildlife and Parks.

[FR Doc. 2012-18284 Filed 8-1-12; 8:45 am]

BILLING CODE 4310-55-P

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

77 FR 46158-01, 2012 WL 3111857 (F.R.)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

# DISTRICT COURT
# FINDINGS AND
# CONCLUSIONS

IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| PEOPLE FOR THE ETHICAL TREATMENT OF PROPERTY OWNERS,<br><br>        Petitioner and Plaintiff,<br><br><br>vs.<br><br><br>UNITED STATES FISH AND WILDLIFE SERVICE; et al.,<br><br>        Respondents and Defendants,<br><br>    and<br><br>FRIENDS OF ANIMALS,<br>        Respondent-Intervenor. | MEMORANDUM DECISION AND ORDER<br><br><br><br><br>Case No. 2:13-cv-00278-DB<br>Judge Dee Benson |

Plaintiff People for the Ethical Treatment of Property Owners ("PETPO") filed the instant lawsuit against United States Fish and Wildlife Service, Daniel M. Ashe, in his official capacity as Director of the United States Fish and Wildlife Service, Noreen Walsh, in her official capacity as Regional Director of the United States Fish and Wildlife Service's Mountain Prairie Region, the United States Department of the Interior, and Sally Jewell, in her official capacity as Secretary of the Interior (collectively "Defendants"), challenging the constitutional authority of the federal government to regulate take of the Utah prairie dog on non-federal land under the

1

Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531-1544.  Friends of Animals ("FoA") has

intervened as a Defendant.  The case is now before the court on the parties' opposing motions for

summary judgment.  The parties agree that there are no genuine issues of material fact that

would preclude the court from ruling, as a matter of law, on the merits of this case.


The court heard oral argument on the motion and cross-motion on September 11, 2014.

At the hearing, PETPO was represented by Jonathon C. Wood.  Defendants were represented by

Mary Hollingsworth.  FoA was represented by Michael Harris.  Prior to the hearing, the court

considered the memoranda and other materials submitted by the parties.  Since taking the matter

under advisement, the court has further considered the law and facts relating to the motions.

Now being fully advised, the court renders the following Memorandum Decision and Order.

## BACKGROUND

The Utah prairie dog is an animal whose population is located exclusively in

southwestern Utah.  (FWS' Mot. for Summ. J. at 6.)  Nevertheless, the federal government began

protecting the prairie dog as an endangered species in 1973, pursuant to the Endangered Species

Conservation Act of 1969.  38 Fed. Reg. 13678.

Later that same year, Congress replaced the Endangered Species Conservation Act with

the ESA.  The ESA was enacted by Congress "to provide a means whereby the ecosystems upon

which endangered species and threatened species depend may be conserved" and "to provide a

program for the conservation of such endangered species and threatened species."  16 U.S.C. §

1531(b).  A species is considered "endangered" if it is "in danger of extinction throughout all or

a significant portion of its range," and is considered "threatened" if it is "likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." Id. § 1532 (6), (20).  Section 9 of the ESA protects endangered species from unauthorized "take," possession, delivery, transportation, receipt, or sale.  Id. § 1538(a)(1)(A)-(F).  Section 4(d) of the ESA authorizes the Secretary of the Interior to "issue such regulations as he deems necessary and advisable to provide for the conservation of" threatened species.  Id. § 1533(d).  This is often done by creating a special section 4(d) rule to protect the particular threatened species.  (FWS' Mot. for Summ. J. at 5-6.)

On January 4, 1974, the Utah prairie dog's listing as an endangered species was incorporated into the ESA.  In 1984, the U.S. Fish and Wildlife Service ("FWS")  reclassified the Utah prairie dog as a threatened species and issued a special section 4(d) rule to govern the protection of that animal.  49 Fed. Reg. 22330.  The rule authorized the "take" of 5,000 prairie dogs annually on certain lands in Iron County, as long as the takes were consistent with Utah State law.  Id. at 22331.  The rule was amended in 1991 to increase the limit of authorized take to 6,000 prairie dogs annually and to expand the geographic scope of authorized take to include all private lands within the region.  (FWS' Mot. for Summ. J. at 8.)

On August 2, 2012, the FWS revised the special rule to its current form.  50 C.F.R. § 17.40(g) (the "rule".)  Under this revision, take of the Utah prairie dog is authorized only by permit and only on "agricultural lands, [private property] within [.5 miles] of conservation lands, and areas where prairie dogs create serious human safety hazards or disturb the sanctity of significant human cultural or human burial sites."  Id.  The rule does not permit take of the Utah

3

prairie dog on any federal land.[1] Id.

In context of the ESA, the term "take" means to "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect" any endangered or threatened animal, as listed in the ESA. 15 U.S.C. § 1532(19). Furthermore, the term "harm" within the definition of "take" includes any "significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering." 50 C.F.R. § 17.3. Consequently, where no permit has been issued, the rule prevents anyone from undertaking any activity that would injure or kill a Utah prairie dog or significantly impair its habitat.

PETPO filed this action on April 18, 2013, alleging under the Administrative Procedures Act ("APA") that FWA's special rule governing the Utah prairie dog is "contrary to a constitutional right, power, privilege, or immunity and not in accordance with law." (Compl. ¶¶ 99-100.) PETPO asserts that Congress does not have the authority to regulate take of the Utah prairie dog on non-federal land. Specifically, PETPO argues that the Commerce Clause and the Necessary and Proper Clause fail to authorize such regulation because the Utah prairie dog is located exclusively within the state of Utah and because take of the prairie dog does not substantially affect interstate commerce. (Id. ¶¶ 101-110.) PETPO subsequently moved for summary judgement.

Defendants responded by filing a cross-motion for summary judgment, contending that

---

[1]However, the authorization of takes in "areas where prairie dogs create serious human safety hazards or disturb the sanctity of significant human cultural or human burial sites," does not exempt federal land. Id. at (g)(2).

PETPO lacks standing to bring this case because its injuries will not necessarily be redressed by a final decision in its favor.  Defendants further contend that even if PETPO has standing, Congress is authorized to regulate the Utah prairie dog through the Commerce Clause and the Necessary and Proper Clause.  (FWA's Mot. for Summ. J. at 20.)

Defendants assert that every United States circuit court of appeals that has heard a similar case has upheld Congress' authority to regulate the take of purely intrastate species.  See San Luis & Delta-Mendota Water Authority v. Salazar, 638 F.3d 1163 (9th Cir. 2011); Alabama-Tombigbee Rivers Coalition v. Kempthorne, 477 F.3d 1250 (11th Cir. 2007); GDF Realty Investments, LTD. v. Norton, 326 F.3d 622 (5th Cir. 2003); Gibbs v. Babbitt, 214 F.3d 483 (4th Cir. 2000); Nat'l Ass'n of Home Builders v. Babbit, 130 F.3d 1041 (D.C. Cir. 1997).  Relying on these cases, Defendants present three arguments in support of congressional authority for the special rule governing take of the Utah prairie dog.

First, the rule has a substantial effect on interstate commerce because many of the proposed activities that have been prohibited by the rule are commercial or economic in nature. For example, Defendants' demonstrate that the rule has prevented several proposed agricultural activities and land development plans. (Id. at 31-32.)

Second, Defendants argue that because the Utah prairie dog has biological and commercial value, any takes of the animal have a substantial effect on interstate commerce.  As far as biological value, Defendants argue that prairie dogs perform many functions that contribute to the ecosystem.  For example, prairie dogs improve the soil where they burrow and "golden eagles, large hawks and bobcats, are . . . known to prey on prairie dogs." (Id. at 29.)  As

far as commercial value, Defendants assert that the prairie dog attracts some interstate tourism.

(Id. at 29-30.)  FoA additionally emphasizes that the prairie dog has been the subject of scientific

studies and commercially published books.  (FoA Mot. for Summ. J. at 12-15.)

Finally, Defendants argue that the Necessary and Proper Clause authorizes special rule

4(d) because the regulation of takes of Utah prairie dogs is essential to the economic scheme of

the ESA.  Defendants assert that even if regulation of the take of the Utah prairie dog is not

essential to the economic scheme of the ESA on its own, it becomes essential when aggregated

with the regulation of take of other intrastate non-commercial species: "Excluding from

protection all intrastate species–68% of all listed species–or even all species with no current

commercial or economic value, would substantially frustrate the ESA's comprehensive scheme

to protect listed species."  (FWA's Mot. for Summ. J. at 40.)

Asserting that Congress is thus authorized to regulate the take of the Utah prairie dog on

non-federal lands, Defendants ask the court to grant their cross-motion for summary judgment

and to deny PETPO's motion for summary judgment.

## DISCUSSION

### Standing

Defendants argue that the court should grant its cross-motion for summary judgment

because PETPO lacks judicial standing to bring this case.  An organization has standing to bring

a suit on behalf of its members if "its members would otherwise have standing to sue in their

own right, the interests at stake are germane to the organization's purpose, and neither the claim

asserted nor the relief requested requires the participation of individual members in the lawsuit."

Friends of the Earth, Inc. V. Laidlaw Envtl. Servs., Inc., 528 U.S. 167, 181 (2000) (citation

omitted.)  The organization's members would have standing in their own right only if they can

demonstrate three elements: injury in fact, traceability, and redressability.  In this case,

Defendants refute PETPO's standing on the grounds that "PETPO cannot establish the third

element of standing," (e.g. redressability).[2]

 To satisfy the redressability requirement, PETPO must show that "there is a least a

'substantial likelihood' that the relief requested will redress the injury claimed . . . ."  Baca v.

King, 92 F.3d 1031, 1036 (10th Cir. 2012) (citation omitted).  Defendants claim that PETPO

fails to make this showing because there are other laws in place that will prevent the

organization's members from engaging in activities that would "take" prairie dogs even if the

court rules that special rule 4(d) is not a valid exercise of Congressional authority.  (FWS' Mot.

for Summ. J. at 13-14.)  Defendants specifically argue that even if special rule 4(d) is struck

down as unconstitutional, the limitations imposed by two laws would still apply: Utah Admin.

Code R657-19-6, which is the state law governing the take of prairie dogs; and, 50 C.F.R. ¶

17.31 ("general rule 4(d)"), which is the general federal law governing the take of threatened

animals.  Both of these laws would act as barriers to prevent PETPO's members from carrying

out potential construction plans and other activities.

---

[2]To satisfy the first two elements, PETPO asserts that its members have been injured by
this rule in a variety of ways.  For example, some of its members "are no longer eligible to obtain
take permits under the special 4(d) rule because the 2012 revision does not allow permits to be
issued for private property other than" the land listed in the rule. (Plaintiff's Mot. for Summ. J. at
12.) PETPO emphasizes that the rule consequently "prevents these property owners from
constructing single-family homes, developing car dealerships, and pursuing other commercial
development on their private property," because such activities would constitute an unauthorized
take of the Utah prairie dog under the rule. (Id. (internal citations omitted).)

PETPO responds by asserting that "a plaintiff can seek redress even if the challenged regulation is one of multiple obstacles to her desired action," Village of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 260-64 (1997), and that "[t]he requested relief would bring PETPO's members one important step closer to being able to use their property as they wish or to more efficiently provide government services to the residents of Cedar City." (PETPO's Mot. for Summ. J. at 5.)  The court agrees.

If PETPO is successful in this suit, the federal government will have no authority to regulate the take of the Utah prairie dog on non-federal land, whether through special rule 4(d) or the general rule 4(d).  Moreover, even though state law may still regulate the take of the Utah prairie dog in the absence of a federal regulation, the presence of an additional barrier to PETPO's ultimate desired result does not prevent the court from removing an initial barrier.  See Village of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. at 260-64.  Consequently, PETPO has satisfied the redressability requirement and has standing in this case.

**Constitutional Authority to Adopt Special Rule 4(d)**

At the heart of the dispute between the parties in this case is whether one of the enumerated powers in the Constitution authorizes Congress–and, through congressional delegation, the FWA–to regulate take of the Utah prairie dog on non-federal land.  PETPO argues that no enumerated powers authorize Congress to regulate take of an animal that is purely intrastate and that has no commercial market.  Defendants concede that the Utah prairie dog is a purely intrastate animal, but contend that Congress is nevertheless authorized to regulate take of the prairie dog under the Commerce Clause and the Necessary and Proper Clause.

8

The Commerce Clause gives Congress the power "[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes."  Art. 1, § 8.  At one point in time, Congress' Commerce Clause power seemed to be virtually unlimited, leading one scholar to "wonder why anyone would make the mistake of calling it the Commerce Clause instead of the 'hey-you-can-do-whatever-you-feel-like clause.'"  Judge Alex Kozinski, *Introduction to Volume 19*, 19 HARV. J. L. PUB. POL., 1, 5 (1995).  This changed with the United States Supreme Court's rulings in United States v. Lopez, 514 U.S. 549 (1995) and United States v. Morrison, 529 U.S. 598 (2000).

In Lopez, the Court clarified that, although the categories are broad, there are only three "categories of activity that Congress may regulate under its commerce power."  514 U.S. at 558-59.

> First, Congress may regulate the use of the channels of interstate commerce. Second, Congress is empowered to regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities. Finally, Congress' commerce authority includes the power to regulate those activities having a substantial relation to interstate commerce.

Id.

After articulating these categories, the Court examined whether the Commerce Clause authorized Congress to enact the Gun-Free School Zones Act of 1990–which forbade an individual from knowingly possessing a gun in a place that the individual knew, or had reason to believe, was a school zone.  Id.  Finding that the regulated activity (possessing a gun in a school zone) did not fit into any of the three categories, the Court ruled that the Act was unconstitutional.  Id.

9

In <u>Morrison</u>, the Court clarified what it did in <u>Lopez</u>.  <u>Morrison</u>, 529 U.S. 598, 609-612. Focusing its analysis purely on the third <u>Lopez</u> category, the Court stated that it had relied on four considerations when determining that the Commerce Clause could not authorize the gun possession law.  <u>Id.</u>  First, the gun possession law was non-economic and criminal in nature.  <u>Id.</u> at 610.  Second, "the statute contained 'no express jurisdictional element which might limit its reach to a discrete set of firearm possessions that additionally have an explicit connection with or effect on interstate commerce.'"  <u>Id.</u> at 611 (quoting <u>Lopez</u>, 514 U.S. at 562).  Third, the act's legislative history did not contain any "express congressional findings regarding the effects upon interstate commerce of gun possession in a school zone."  <u>Id.</u> at 611-12.  The Court clarified that "the existence of congressional findings is not sufficient, by itself, to sustain the constitutionality of Commerce Clause legislation."  <u>Id.</u> at 614.  Fourth, "our decision in <u>Lopez</u> rested in part on the fact that the link between gun possession and a substantial effect on interstate commerce was attenuated."  <u>Id.</u> at 612.  Relying on these same considerations, the Court ruled that the Commerce Clause did not authorize Congress to create a civil remedy for victims of gender-motivated crimes.  Consequently, the relevant parts of the Violence Against Women Act of 1994 were declared unconstitutional.

Because the parties in the present dispute agree that the first two <u>Lopez</u> categories do not apply, the court's analysis will focus solely on the third <u>Lopez</u> category.  Applying the relevant considerations as presented in <u>Morrison</u>, it is clear that the Commerce Clause does not authorize Congress to regulate takes of Utah prairie dogs on non-federal land.

The court agrees with PETPO's claim that the rule is non-economic because "the Service

is regulating every activity, regardless of its nature, if it causes harm to a Utah prairie dog."
(PETPO's Mot. for Summ. J. at 24.)  Additionally, it is undisputed that the rule in question does
not contain any jurisdictional element that would limit its reach to takes that have an explicit
connection to interstate commerce.  (FWS' Mot. for Summ. J. at 12.)  It is also undisputed that
there are no express congressional findings regarding the effects upon interstate commerce of
taking a Utah prairie dog.  Id.  Finally, as will be demonstrated below, all of Defendants'
arguments purporting to establish a link between Utah prairie dog takes and a substantial effect
on interstate commerce are attenuated.

      Defendants' argument that the rule has a substantial effect on interstate commerce
because it has frustrated several proposed agricultural and commercial activities misses the
mark.  The proper focus of the "substantial effect" test is the "regulated activity."  See Gonzales
v. Raich, 545 U.S. 1, 23 (2005).  Illustratively, the Supreme Court ruled that Congress could
regulate the purely local growth and consumption of wheat or marijuana because those activities
altered the national market for those commodities.  Raich, 545 U.S. 1; Wickard v. Filburn, 317
U.S. 111 (1942).  However, the Court ruled that Congress could not regulate the possession of a
gun in a known school zone, even though the regulation of that activity affected commerce in a
variety of ways (e.g. people could not sell guns in a school zone).  Lopez  514 U.S. 549 (1995);
see also Morrison 529 U.S. 598 (2000).  In other words, the question in the present case is
whether take of the Utah prairie dog has a substantial effect on interstate commerce, not whether
the regulation preventing the take has such an effect.  Consequently, the fact that PETPO
members or other persons are prohibited from engaging in commercial activities as a result of

special rule 4(d) is irrelevant to the Commerce Clause analysis.

Furthermore, Defendants' argument concerning the biological value of the Utah prairie dog is insufficient to demonstrate that take of the prairie dog has a substantial effect on interstate commerce.  The Court acknowledges that the Utah prairie dog may have an effect on the ecosystem.  Nevertheless, as aptly observed by Chief Judge Sentelle, "[T]he Commerce Clause empowers Congress 'to regulate commerce' not 'ecosystems.'"  National Ass'n of Home Builders v. Babbitt, 327 U.S. App. D.C. 248, 272 (D.C. Cir. 1997) (Sentelle, J., dissenting).  If Congress could use the Commerce Clause to regulate anything that *might* affect the ecosystem (to say nothing about its effect on commerce), there would be no logical stopping point to congressional power under the Commerce Clause.  Accordingly, the asserted biological value of the Utah prairie dog is inconsequential in this case.

Defendants' arguments concerning the commercial value of the Utah prairie dog is also insufficient because the purported value is too attenuated to support the premise that take of the prairie dog would have a substantial effect on interstate commerce.  Even if Defendants' presumption that "tourism websites would not feature a species that was of no interest to visitors" is true, there is no evidence that tourism in southern Utah would be negatively affected by takes of the Utah prairie dog on non-federal land.  In fact, all of the websites cited by Defendants specifically refer to the animals' presence in national parks of forests.

The fact that scientific research has been conducted and books have been published about the Utah prairie dog is similarly too attenuated to establish a substantial relation between the take of the Utah prairie dog and interstate commerce.  After all, scientific research has also been

12

conducted and books have also been published about both guns and women.  Nevertheless, the Supreme Court ruled that federal regulation of gun possession and violence against women is beyond Congress' Commerce Clause power.  See Morrison, 529 U.S. at 601-02, 613-17; Lopez, 514 U.S. at 560-66.

Finally, as stated by the U.S. Court of Appeals for the Fifth Circuit (which ultimately upheld Congress' authority to regulate takes of intrastate noncommercial species for different reasons), "[t]he *possibility* of future substantial effects of the [intrastate noncommercial species] on interstate commerce, through industries such as medicine, is simply too hypothetical and attenuated from the regulation in question to pass constitutional muster."  GDF Realty Investments, Ltd. v. Norton, 326 F.3d 622, 638 (2003) (citing Morrison, 529 U.S. at 612).

Defendants' final argument, that the Necessary and Proper Clause authorizes special rule 4(d) because the rule is essential to the economic scheme created by the ESA, also fails upon close examination.  This argument is based on the Supreme Court's ruling in Raich that a regulation may be upheld when it is an "essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated." 545 U.S. at 24-25.

Although the ESA itself regulates some economic activity, the rule in question is not necessary to the statute's economic scheme.  Defendants emphasize that the Supreme Court cited the federal regulation of the take of bald and golden eagles as an example of congressional power that is clearly authorized by the Commerce Clause.  (FWS' Mot. for Summ. J. at 21 (citing Raich, 545 U.S. at 26 n.36).)  The Court's bald eagle example is not surprising because it

13

is consistent with the Court's ruling in <u>Raich</u>. 545 U.S. 1.

At issue in <u>Raich</u> was whether Congress was authorized to regulate the purely local growth and consumption of marijuana.  Because it was clear that a national market for marijuana already exists, the Court found that Congress has the power to regulate activities that have a substantial effect on that market.  <u>Id.</u> at 17-22.  Such activities obviously include growing marijuana, which leads to a greater national supply of the product, as well as consuming it, which affects the national demand for the product.  Congress was consequently authorized to regulate any growth or consumption of marijuana in the United States, including any such activity that occurs exclusively within one state.  <u>Id.</u>  If Congress was not able to regulate those local activities, its ability to regulate the national market would be frustrated.  <u>Id.</u>  The same is true with regulating takes of bald eagles because there is a national market for bald eagles and bald eagle products.  If Congress is not authorized to regulate purely intrastate takes of bald eagles, its attempt to regulate the market for bald eagles will be frustrated.

The present case, on the other hand, differs significantly from <u>Raich</u> in one important way that makes any appeal to the Necessary and Proper Clause futile: takes of Utah prairie dogs on non-federal land–even to the point of extinction–would not substantially affect the national market for any commodity regulated by the ESA.  The only evidence that suggests that the prairie dog's extinction would substantially affect such a national market is Defendants' assertion that golden eagles, hawks, and bobcats are "known to prey on prairie dogs."  (FWS' Mot. for Summ. J. at 29.)  However, Defendants do not claim that the Utah prairie dog is a major food source for those animals, and those animals are known to prey on many other rodents, birds,

and fish.  In other words, there is no evidence that the diminution of the Utah prairie dog on private lands in Utah would significantly alter the supply or quality of animals for which a national market exists.  Therefore, congressional protection of the Utah prairie dog is not necessary to the ESA's economic scheme.

The court also rejects Defendant's argument that the regulation of takes of Utah prairie dogs can be aggregated with the regulation of takes of every other intrastate non-commercial species to satisfy the Necessary and Proper Clause.  The court sees no reason to consider such aggregation.  PETPO is not asking the court to invalidate the regulation of takes of all intrastate non-commercial species on all lands, but just the regulation of takes of Utah prairie dogs on non-federal ground.  Moreover, there is no evidence that the extinction of the Utah prairie dog would cause any other species to lose value or likewise become extinct.  Although Congress might be authorized to unlimitedly regulate takes of intrastate non-commercial species whose extinction would subsequently cause the extinction of other species (especially the extinction of commercial species), that is simply not the case before the court.  Instead, Defendants essentially ask the court to find that takes of Utah prairie dogs substantially affect interstate commerce solely because the prairie dog has been grouped with a number of other species, whose extinction also may or may not substantially affect interstate commerce.  Such effect is far too attenuated to suggest that regulating takes of Utah prairie dogs is a necessary part of the ESA's economic scheme.  Consequently, the court in this case declines to aggregate the regulation of takes of all intrastate non-commercial species.

For these reasons, the court finds that Congress has no authority to regulate takes of Utah

prairie dogs on non-federal land.

## **SUMMARY AND CONCLUSION**

Although the Commerce Clause authorizes Congress to do many things, it does not authorize Congress to regulate takes of a purely intrastate species that has no substantial effect on interstate commerce. Congress similarly lacks authority through the Necessary and Proper Clause because the regulation of takes of Utah prairie dogs is not essential or necessary to the ESA's economic scheme.

PETPO's Motion for Summary Judgment is GRANTED, with prejudice.

Defendants' Cross-Motion for Summary Judgment is DENIED, with prejudice.

IT IS SO ORDERED

DATED this 4th day of November, 2014.

_____
Dee Benson
United States District Judge

AO 450 (Rev.5/85) Judgment in a Civil Case

# United States District Court

Central Division for the District of Utah

FILED
U.S. DISTRICT COURT

2014 NOV -6  A II: 12

DISTRICT OF UTAH

DEPUTY CLERK

PEOPLE FOR THE ETHICAL
TREATMENT OF PROPERTY OWNERS,

Plaintiff

v.

UNITED STATES FISH AND WILDLIFE
SERVICES, DANIEL M. ASHE, in his
official capacity as Director of the United
States Fish and Wildlife Service, NOREEN
WALSH, in her official capacity as Regional
Director of the United States Fish and
Wildlife Service's Mountain-Prairie Region,
UNITED STATES DEPARTMENT OF THE
INTERIOR, and SALLY JEWELL, in her
official capacity as Secretary of the Interior,

Defendants

**JUDGMENT IN A CIVIL CASE**

Case Number: 2:13-CV-278-DB

This action came to trial or hearing before the Court.  The issues have been tried or heard and a decision has been rendered.

IT IS ORDERED AND ADJUDGED

that judgment be entered in favor of the plaintiff.  The court finds that Congress has no authority to regulate takes of Utah prairie dogs on non federal land.

November 6, 2014
_____
*Date*

D. Mark Jones
_____
*Clerk of Court*

_____
*(By) Deputy Clerk*

District Court Materials 17

90-8-6-07542

## CERTIFICATE OF SERVICE

I hereby certify that on April 14, 2014, I served the foregoing brief with the

Clerk of Court of the United States Court of Appeals for the Tenth Circuit using the

appellate ECF system, and thus served the following counsel of record. The resulting

service is consistent with the Service Method Report:

- M. Reed Hopper, mrh@pacificlegal.org
- Jonathan Wood, jw@pacificlegal.org
- Matt Munson, matt@mamunsonlaw.com
- Jared Carl Bennett, jared.bennett@usdoj.gov
- Mary Hollingsworth, mary.hollingsworth@usdoj.gov
- Jennifer Barnes, jenniferbarnes@friendsofanimals.org
- Michael Ray Harris, michaelharris@friendsofanimals.org
- David Driesen, ddriesen@law.syr.edu

*s/ Anna T. Katselas*
ANNA T. KATSELAS
U.S. Department of Justice
Environment & Natural Resources Division
P.O. Box 7415
Washington, D.C. 20044
(202) 514-2772
anna.katselas@usdoj.gov